LHT

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:00-CR-00074-1

FILED
ASHEVILLE, N. C.

APR 2 8 2005

U.S. DISTRICT COURT
W. DIST. OF N. C.

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| RICHARD ALLEN JACKSON | ) |

## AMENDMENT TO MOTION OF RICHARD ALLEN JACKSON TO VACATE CONVICTION AND SENTENCE PURSUANT TO 28 U.S.C. §2255

Richard Allen Jackson moves to amend his motion to vacate based upon evidence not previously available to him of which he became aware after the motion to vacate was filed. 28 U.S.C. §2255(4) (one-year runs from date facts supporting claim discovered). The government does not oppose this motion since it did not provide this information to Mr. Jackson until after his motion was filed. Letter to M. Gordon Widenhouse, Jr., and Shelagh Rebecca Kenney, from Richard L. Edwards dated 10 December 2004, Exhibit 1.

**XXXIV. RICHARD JACKSON'S CONVICTION AND SENTENCE OF DEATH SHOULD BE VACATED BECAUSE NEW MATERIAL EVIDENCE IS NOW AVAILABLE THAT HE COULD NOT OBTAIN AT THE TIME OF TRIAL AND WHICH WOULD PROBABLY CHANGE THE RESULT OF ANOTHER TRIAL.**

A convicted defendant is entitled to a new trial on the basis of newly discovered evidence whenever new, material evidence is discovered after the trial that could not have been discovered by due diligence prior to trial and that probably would produce a different result at a new trial. *E.g., United States v. Fulcher*, 250 F.3d 244, 249 (4th Cir.), *cert. denied*, 534 U.S. 939 (2001). Richard Jackson now possesses newly discovered evidence that was

not available at the time of trial. The new evidence is material to issues relating to the degree of his involvement in and culpability for the crimes against Karen Styles and the propriety of the imposition of a death sentence. In particular, the new evidence calls into question the truth of many of the details of his confession, supports new theories of defense, and casts substantial doubt on whether the federal court had subject matter jurisdiction to try this case. While the evidence at trial tended to show that Mr. Jackson, acting alone, abducted and killed Karen Styles within the boundaries of the Pisgah National Forest during a short period of time on 31 October 1994, the new evidence tends to show that a second perpetrator was involved in the crimes, and thus raises the likelihood that some of the acts ascribed to defendant actually were committed by another person. The new evidence also shows that Styles was removed from the national forest and kept in an abandoned house in Asheville for several days before she was killed. This evidence, if true, creates a likelihood that her murder did not occur within the special territorial jurisdiction of the United States, as alleged in the indictment. Because the newly discovered evidence is material to a proper determination of Mr. Jackson's guilt, the propriety of a death sentence, and the existence of federal jurisdiction, its discovery requires this Court to vacate his conviction and death sentence.

Mr. Jackson was tried and sentenced to death in the United States District Court for the Western District of North Carolina at Asheville in May 2001. The conviction and sentence were affirmed. *See United States v. Jackson*, 327 F.3d 273 (4th Cir.), *cert. denied*, 540 U.S. 1019 (2003). Subsequently, in December 2004, the government informed post-conviction counsel that it had some information to disclose. Letter to M. Gordon Widenhouse, Jr. and Shelagh Rebecca Kenney from Richard L. Edwards dated 10 December 2004, Exhibit 1. According to this information, a person named Bob Lunsford (and known

locally as "Crazy Bob") made statements at a party in December 2003 in which Lunsford implicated himself in the crimes against Karen Styles. Edwards Letter, Exhibit 1. Someone at the party called 911 and, in January 2004, federal investigators interviewed several people who were present or had knowledge of the statements. In December 2004, nearly a year after the government first investigated the incident, the government provided defense counsel with the results of those interviews, along with an inaudible tape made at the party. Edwards Letter, Exhibits 1; Federal Bureau of Investigation Reports, Exhibit 2. Thereafter, in March 2005, the government provided defense counsel with the results of two polygraph tests the FBI administered to Bob Lunsford. Letter to M. Gordon Widenhouse, Jr. from Richard L. Edwards, dated 18 March 2005, Exhibit 4; FBI Polygraph Reports, Exhibit 5. According to the FBI Form 302s the government provided to defense counsel in December 2004, the FBI investigators interviewed Bob Lunsford and four other people.

Kristy Delana Clement told the investigators that, while working at the Mountain View restaurant, she came to know a dishwasher nicknamed Crazy Bob and Mr. Jackson, who also worked there as a dishwasher. Immediately after the disappearance of Karen Styles, Crazy Bob began working at a Taco Bell restaurant. On 15 December 2003, Kristy Clement ran into Crazy Bob at a gas station and invited him back to her brother's residence to drink liquor with her and her brother, Darren Clement. At Daren Clement's residence, all three individuals became very intoxicated. Kristy Clement asked Crazy Bob if he was involved in the murder of Karen Styles. Crazy Bob said to her, "Wait, wait, let me tell you something." Kristy Clement told her brother to get a tape recorder from the bedroom. During the ensuing conversation, Crazy Bob stated they had considered getting Kristy Clement and her sister. Kristy Clement understood Crazy Bob meant they intended to abduct and kill her and her sister instead of Styles. Statement of Kristy Clement, Exhibit 2.

3

William Darren Clement told the investigators he recalled his sister, Kristy, brought Crazy Bob to his residence on December 15 or 16, 2003. They were drinking together. While the three were drinking, Kristy told her brother she had a hunch Crazy Bob had something to do with the murder of Karen Styles. At Kristy's direction, Darren Clement set up a tape recorder behind some books and began taping. Darren Clement told the investigators he was drinking heavily that night and he did not recall much more about the evening or any subsequent conversation. Statement of William Darren Clement, Exhibit 2.

Paul Thomas Candler, also known as Tommy, told investigators that Kristy and Darren came to his house one evening. Bob Lunsford and his son, John Lunsford, also came to Candler's residence the same evening. At some point, Candler told Kristy to leave because she had been drinking heavily and was "mean drunk." Kristy and Darren left between 8:00 and 9:00 p.m.; Bob and John Lunsford left shortly thereafter. Sometime after 2:00 a.m., Candler received a call from Darren. Darren told Candler that Bob Lunsford was at his house. Lunsford had told Darren that Lunsford said he and Jackson took Karen Styles to an old house under renovation in West Asheville, where Lunsford had done some work in the past. They kept Styles at the house for a few days and when, according to Lunsford, Mr. Jackson began torturing Styles, Lunsford left. Darren also told Candler he had made a tape of Lunsford talking about the incident and he believed Lunsford was going to kill him. Statement of Paul Thomas Candler, Exhibit 2.

Jeffrey Ervine Spivey told investigators he was at his residence with Paul Thomas "Tommy" Candler on the evening of 14 December 2003 when another friend named Bob arrived. Bob had been drinking alcohol. During the evening, Kristy and Darren arrived. Kristy and Darren got into an argument, and Spivey told them to leave. Bob left with them. Spivey later heard a rumor that Bob had implicated himself in a homicide and that Darren

4

had made a tape about it. Statement of Jeffrey Ervine Spivey, Exhibit 2.

Investigators also interviewed Robert Louis Lunsford. Lunsford said he recalled being at the home of a friend named Tommy one evening before Christmas 2003 and ending up at the residence of Darren Clement later that evening. Clement's sister, Kristy, was there too. Everyone was drinking and intoxicated. "Out of nowhere," Darren Clement started talking about the death of Karen Style and accused Lunsford of being involved. Lunsford told Clement he would tell him everything he knew. Then he described to Clement an incident prior to Mr. Jackson's arrest when Lunsford was walking home from work at the Taco Bell. He heard footsteps behind him and ran away because he feared the same person who abducted Karen Styles was going to kill him. After Lunsford related this story to Darren and Kristy Clement, Darren told Lunsford he had tape-recorded the conversation and he was going to notify the sheriff's office and have Lunsford arrested. Lunsford told the investigators he had nothing to do with the abduction and murder of Karen Styles, and he asked to take a polygraph to verify his truthfulness. Statement of Robert Louis Lunsford, Exhibit 2.

The FBI administered polygraph examinations to Bob Lunsford on two occasions. The first polygraph test, administered on 13 January 2004, was inconclusive. FBI Polygraph Reports, Exhibit 4. The second polygraph test, administered on 1 August 2004, indicted that Lunsford was deceptive when he answered "no" to the following questions: (1) Did you participate in any way in the abduction of Karen Styles? and (2) Did you participate in any way in the shooting of Karen Styles? FBI Polygraph Reports, Exhibit 4.

A five-part test determines whether a defendant is entitled to a new trial on the basis of newly discovered evidence.

> (a) [T]he evidence must be, in fact, newly discovered, i.e. discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the

> part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*Fulcher*, 250 F.3d at 249 (quoting *United States v. Custis*, 988 F.2d 1355, 1359 (4th Cir. 1989)); *United States v. Singh*, 54 F.3d 1182, 1190 (4th Cir. 1995). The affidavits and other attachments to this pleading, along with the trial record, establish that Mr. Jackson fully meets all the requirements for obtaining a new trial.

First, evidence that Bob Lunsford was involved in Styles' abduction was unknown and unavailable to defendant at the time of trial and could not have been discovered with due diligence. According to the FBI interviews of witnesses, Bob Lunsford implicated himself in the crime in December of 2003, more than two years after the trial. The information was first made known to defense counsel by the government in December 2004, and defense counsel did not obtain the results of Lunsford's polygraph tests until March 2005. Furthermore, as demonstrated by the attached affidavit, Mr. Jackson's trial counsel had developed other information prior to trial suggesting a third party might have been involved in the offenses. However, counsel was unable to use the information at trial because he was unable to connect it to any particular individual. Supplemental Affidavit of Stephen P. Lindsay, Exhibit 5. Absent any clue from any source that Lunsford might have been involved, Mr. Jackson could not with due diligence have discovered the evidence implicating Lunsford.

Second, the new evidence is not merely cumulative or impeaching. No evidence was presented at trial suggesting Bob Lunsford or of any other third party was involved in the crime. Moreover, no evidence at trial showed that anyone took Karen Styles away from the Pisgah National Forest prior to her death, or that she was held captive somewhere in Asheville for several days. Thus, the newly discovered evidence does not corroborate any

6

trial testimony but presents completely new and different facts from any of the trial evidence. The relevance of the new evidence also is not limited to impeachment. The new evidence raises several new issues regarding what happened to Styles, and when and where she died, thereby making plausible one or more theories of defense that were not reasonably available during the trial.

Finally, the new evidence is material to issues at both the guilt and penalty phases and is sufficiently compelling that, properly investigated and developed, it would likely lead to different results at a new trial. Specifically, the newly discovered evidence is material and probative of (1) whether the federal court had jurisdiction to try the case; (2) whether Mr. Jackson's degree of involvement in the crimes amounted to first-degree murder; and (3) whether the killing was especially heinous, cruel, or depraved or involved substantial planning or premeditation, within the meaning of the federal death penalty statute, *see* 18 U.S.C. §3592(c)(6) & (9) or otherwise warranted a death sentence.

The North Carolina General Statutes and the United States Code grant the United States concurrent jurisdiction over national forest lands within North Carolina, including the Pisgah National Forest. *United States v. Raffield*, 82 F.3d 611 (4th Cir.), *cert. denied*, 519 U.S. 933 (1996). Mr. Jackson was charged in the superceding indictment with violating 18 U.S.C. § 924(c), § 924(j)(1), and § 7(3) by using a firearm "during and in relation to a crime of violence for which he may be prosecuted in a court of the United States," and for committing this offense "within the Special Territorial Jurisdiction of the United States, to wit: the Pisgah National Forest." The superceding indictment further alleged three predicate "crimes of violence" – kidnapping, aggravated sexual abuse, and murder. The indictment further charged Mr. Jackson "in the course of such violation and through the use of such firearm, did cause the death of a person, Karen Styles, in violation of title 18 United States

7

Code, Section 924(j)(l), which killing is a murder as defined in Title 18 United States Code, Section 1111." In order to obtain a conviction for use of a firearm in relation to a crime of violence under this charging document, pursuant to 18 U.S.C. § 924(c), the government had to prove Mr. Jackson committed at least one of these three crimes of violence and that the crimes occurred within the Pisgah National Forest.

The statutes defining kidnapping, aggravated sexual abuse, and murder each include as an element of the offense that the crime must have occurred within the special maritime and territorial jurisdiction of the United States. *See* 18 U.S.C. §1201 (a) (facts establishing federal jurisdiction are part of definition of kidnapping); 18 U.S.C. §2241(a) (aggravated sexual abuse must occur "in the special maritime or territorial jurisdiction of the United States or in a Federal prison"). Section 924(j)(1) specifically provides that a person may be punished by death or by imprisonment for life or for a term of years if he, in the course of a violation of §924(c), "causes the death of a person through the use of a firearm" and "if the killing is a murder (as defined in section 1111)." Furthermore, federal jurisdiction over murder prosecutions is established by 18 U.S.C. §1111(b), which makes commission of the homicide "[w]ithin the special maritime and territorial jurisdiction of the United States" an element of homicide which is an essential prerequisite for imposing a sentence of death or life imprisonment. Thus, "[t]o be guilty of §1111(a) murder, a defendant must have killed within a federal jurisdiction." *United States v. LaFleur*, 971 F.2d 200, 212 (9th Cir. 1991), *cert. denied, Holm v. United States*, 507 U.S. 924 (1993). The offense with which Mr. Jackson was charged -- carrying or using a gun during and in relation to a crime of violence, as defined by 18 U.S.C. § 924 (c) -- expressly required proof that the underlying requisite crime of violence was one "for which the person may be prosecuted in a court of the United States," that is, that it was committed within a federal jurisdiction. Consistently with these

8

provisions and with the allegations in the indictment, the trial court instructed the jury:

> Now, in order for you to convict the defendant of the charge contained in the superceding bill of indictment, the government must prove each of the following essential elements beyond a reasonable doubt: At the time and place described in the indictment, the defendant committed a crime of violence for which he may be prosecuted in a court of the United States, that is, kidnapping, aggravated sexual abuse, or murder; during and in relation to the crime of violence, the defendant knowingly used and carried the firearm described in the indictment; three, in the course of committing the crime of violence, the defendant killed Karen Styles, a human being, by use of the firearm described in the indictment; four, the defendant killed Karen Styles with malice aforethought; fifth, the killing of Karen Styles was premeditated; or the killing of Karen Styles occurred during the perpetration of the crime of kidnapping or aggravated sexual assault; *and seven, these actions took place within the special territorial jurisdiction of the United States, that is, the Pisgah National Forest.*

(Trial Transcript at 1245-46) (emphasis added).

At trial, the defense introduced Mr. Jackson's confession in which he claimed to have abducted, assaulted, and killed Styles in the Pisgah National Forest. However, the newly discovered evidence tends to show Bob Lunsford and Mr. Jackson (or perhaps someone else) took Styles to a location in Asheville far outside the federal jurisdiction and kept her there for several days before Lunsford, according to his self-serving observation, left. If true, these facts suggest the single fatal gunshot may have been inflicted in Asheville, outside the Pisgah National Forest.

A murder "shall be deemed to have been committed at the place where the injury was inflicted, or the poison administered or other means employed which caused death, without regard to the place where the death occurs. 18 U.S.C. §3236 (2005). In *United States v. Todd*, 657 F.2d 212 (8th Cir. 1981), *cert. denied*, 455 U.S. 926 (1982), the evidence showed that an accomplice of the defendant struck the murder victim on the head at a bar located outside the boundaries of Fort Leonard Wood, Missouri, but afterwards the men left the victim in a wooded area within Fort Leonard Wood. Applying 18 U.S.C. §3236, the Eighth

9

Circuit recognized that "[i]f [the victim] died as a result of the head wound, regardless of where the death occurred, there was not federal jurisdiction to hear the murder charge. If, on the other hand, [the victim] died of exposure after being left in the wooded area within the boundaries of Fort Leonard Wood, federal jurisdiction did exist." *Id.* at 215. All the evidence in this case showed that the cause of death was a single gunshot wound. As *Todd* makes clear, if the fatal wound was inflicted outside the Pisgah National Forest, federal jurisdiction was lacking, even if Styles actually died later in the national forest.

While the district court may determine as a matter of law the existence of federal jurisdiction over a particular geographic area, "the locus of the offense within that area is an issue for the trier of fact." *United States v. Smith*, 282 F.3d 758, 767 (9th Cir. 2002); *United States v. Sohappy*, 770 F.2d 816, 822 (9th Cir. 1985), *cert. denied*, 477 U.S. 906, 91 L.Ed.2d 568 (1986); *accord United States v. Jones*, 480 F. 2d 1135, 1139 (2nd Cir. 1973). Accordingly, the trial court in this case instructed the jury more than once that it had to find beyond a reasonable doubt that the killing of Karen Styles took place within the Pisgah National Forest. (Trial Transcript at 1245-1247) The court told the jury:

> The term special maritime or territorial jurisdiction of the United States as used in these instructions means any lands reserved or acquired for the use of the United State and under the exclusive or concurrent jurisdiction of the United States.

> The Pisgah National Forest is within the special territorial jurisdiction of the United States. However, it is for you to determine whether the government has proved beyond a reasonable doubt that the crime alleged took place within the Pisgah National Forest.

(Trial Transcript at 1249) The newly discovered evidence that Styles may have been held captive for several days at a location removed from the Pisgah National Forest is sufficient to create a reasonable doubt as to whether the fatal gunshot wound was inflicted in the Pisgah National Forest and, thus, whether the federal court had jurisdiction over Mr. Jackson on

10

these charges. Had the information been available at trial, defense counsel would have "strongly contested whether Ms. Styles' death occurred on federal land." Supplemental Affidavit of Stephen P. Lindsay, ¶ 5, Exhibit 5. For these reasons, the newly discovered evidence is material to the issue of federal jurisdiction. It would change the theory of defense at a new trial and create reasonable doubt about the existence of federal jurisdiction and Mr. Jackson's eligibility for the death penalty under 18 U.S.C. §1111.

In addition to its impact on jurisdiction, the newly discovered evidence is material and probative of other issues related to the charge of first-degree murder. The defense theory at the guilt phase of the trial was that Mr. Jackson was guilty of second-degree murder, based on his confession in which he admitted abducting, sexually assaulting, and killing Styles but denied any intent to kill her. Lacking any evidence of participation by an identifiable third party, counsel for both the government and the defense presented a case tending to show Mr. Jackson, acting alone, committed all the acts leading to Styles' death. Defense counsel introduce Mr. Jackson's confession because his claim that he did not intend to kill Styles but just "went off" when she started to scream cast doubt on whether the killing was premeditated. If every criminal act against Styles was, in fact, committed by Mr. Jackson, a verdict of guilty of first-degree murder was more likely than if some other person committed some or all of the acts leading to her death and Mr. Jackson was a less act active participant. Mr. Lindsay's affidavit demonstrates that, if he had knowledge of another participant in the crimes, the defense strategy would have been "markedly different." Lindsay Supplemental Affidavit, ¶ 7. Specifically, at the guilt phase, counsel could have argued that Mr. Jackson did not personally cause the victim's death, or that his participation was minor compared to the other person. *Id.* ¶ 6.

11

Moreover, evidence of the participation of Bob Lunsford would have provided an opportunity for defense counsel to make meaningful use of other evidence at their disposal. Prior to trial, Mr. Lindsay was developing evidence that caused him to believe more than one person was involved in the crimes against Styles. Lindsay Affidavit, ¶¶ 1 and 2. DNA tests showed that a hair found near the body did not match defendant or Styles. A cigarette also was recovered near the body, but other evidence showed that neither defendant nor Styles smoked cigarettes. In addition, the government's trial evidence tended to show that Styles' body was in the woods from 31 October 1994, the day Styles disappeared, until her body was discovered the following November 25. However, trial counsel had conferred with experts in body decomposition and forensic entomology (insect infestation) from the University of Tennessee and from Virginia Commonwealth University, and both experts had expressed an opinion that the body had been in the woods decomposing for a shorter period of time. Lindsay Supplemental Affidavit, ¶ 3, Exhibit 5; Supplemental Affidavit of Eric J. Foster, ¶¶ 4-8, Exhibit 6. These expert opinions that the body was decomposing for a shorter period of time than Styles had been missing are consistent with the newly discovered evidence that Styles was held captive for several days prior to her death, but are inconsistent with the trial evidence. Evidence that Styles was not killed until after several days after she disappeared on 31 October 1994 is particularly significant. It disproves the government's ballistics evidence that the fatal gunshot was fired from a gun Mr. Jackson purchased from K-Mart on 28 October 1994 and returned to the store on the afternoon of October 31, and supports the opinion of the defense ballistics expert that the shell casing found near the body could not be positively matched to the K-Mart rifle. If so, the government has not identified the murder weapon.

12

Case 1:00-cr-00074-MR    Document 242    Filed 04/28/05    Page 12 of 42

The only evidence linking Mr. Jackson to the abduction and death of Karen Styles was his confession, the questionable ballistics evidence, and testimony that he was seen near the place where Styles went to run. In light of the information about ballistics, DNA, body decomposition, and insect infestation, defense counsel's strategy at the guilt phase of trial would have been very different if counsel had possessed the new evidence that Bob Lunsford was involved in the crime. Lindsay Supplemental Affidavit, ¶ 5. Counsel could have refrained from introducing the confession. Counsel could, and would, have argued Mr. Jackson did not personally cause the death of Karen Styles and that the gun the government contended was used to kill Styles could not have been the murder weapon because it was returned to K-Mart prior to her death. Lindsay Supplemental Affidavit, ¶ 5. Armed with the newly discovered evidence, counsel can make better use of the other evidence at a new trial and probably establish a reasonable doubt about his guilt of first-degree murder.

The newly discovered evidence also is material to issues regarding the appropriateness of the death penalty. First, the federal death penalty is authorized only for killings that occur within the territorial jurisdiction of the United States. The new evidence suggests Karen Styles was held captive for several days away from the Pisgah National Forest before she died and casts a reasonable doubt on whether the fatal gunshot wound was inflicted within the federal jurisdiction, as alleged in the indictment. Furthermore, evidence that another person was involved makes it possible for defense counsel to argue "questionable culpability for Mr. Jackson, that he did not in fact kill Ms. Styles, that the person truly responsible for the crimes was the third person and that life is prison [is] sufficient" punishment if defendant was only partially responsible for Styles' death. Lindsay Supplemental Affidavit, ¶ 6. With the new evidence, the outcome of a new trial probably would be different.

13

## CONCLUSION

For the reasons stated herein, Richard Allen Jackson respectfully requests:

1. That his conviction and sentence be vacated;

2. That he be given sixty (60) days in which to investigate this matter;

3. That he be granted funds with which to employ the services of a private investigator; and

4. That he be granted an evidentiary hearing.

RESPECTFULLY submitted this the 28th day of April, 2005.

**RUDOLF WIDENHOUSE & FIALKO**

_M. Gordon Widenhouse, Jr._
M. Gordon Widenhouse Jr.
NCSB #10107
312 West Franklin Street
Chapel Hill, NC 27516
Telephone:   919-967-4900
Telefax:      919-967-4953

**CENTER FOR DEATH PENALTY LITIGATION**

_Shelagh Kenney_
Shelagh Kenney
NCSB #28202
201 West Main Street
Suite 301
Durham, NC 27701
Telephone:   919-956-9545
Telefax:      919-956-9547

**ATTORNEYS FOR RICHARD ALLEN JACKSON**

14

# CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that a copy of the foregoing AMENDMENT TO MOTION OF RICHARD ALLEN JACKSON TO VACATE CONVICTION AND SENTENCE PURSUANT TO 28 U.S.C. §2255 was duly served upon the following by depositing same enclosed in a post paid, properly addressed envelope in a Post Office or official depository under the exclusive care and custody of the United States Postal Service.

This the 28th day of April, 2005.

**RUDOLF WIDENHOUSE & FIALKO**

M. Gordon Widenhouse, Jr.
312 West Franklin Street
Chapel Hill, NC 27516
Telephone: 919-967-4900
Telefax: 919-967-4953

Served on:

Richard L. Edwards
Assistant United States Attorney
223 U.S. Courthouse
100 Otis Street
Asheville, NC 28801

Matt Hellman
Assistant Attorney General
1331 F Street, NW
Washington, DC 20530

01-108.P29

15

Case 1:00-cr-00074-MR    Document 242    Filed 04/28/05    Page 15 of 42

# EXHIBITS TO AMENDMENT TO MOTION TO VACATE

1. Letter to M. Gordon Widenhouse, Jr. and Shelagh Rebecca Kenney from Richard L. Edwards dated 10 December 2004

2. Federal Bureau of Investigation Reports (numbered 0001 through 0009)

3. Letter to M. Gordon Widenhouse, Jr. From Richard L. Edwards dated 18 March 2005

4. FBI Polygraph Reports (numbered 0031-0032, 0042-0043)

5. Supplemental Affidavit of Stephen P. Lindsay

6. Supplemental Affidavit of Eric J. Foster

# EXHIBIT 1



**U.S. Department of Justice**

*United States Attorney*
*Western District of North Carolina*

| | |
|---|---|
| ***Headquarters:*** | ***Branch:*** |
| *Suite 1700, Carillon Building* | *Room 233, U.S. Courthouse* |
| *227 West Trade Street* | *100 Otis Street* |
| *Charlotte, North Carolina 28202* | *Asheville, North Carolina 28801* |
| *(704) 344-6222* | *(828) 271-4661* |
| *FAX (704) 344-6629* | *FAX (828) 271-4670* |

*Reply to: Asheville Office*

December 10, 2004

M. Gordon Widenhouse, Jr., Esquire
Rudolf Widenhouse & Fialko
312 West Franklin Street
Chapel Hill, North Carolina 27516

Shelagh Rebecca Kenney, Esquire
Center for Death Penalty Litigation, Inc.
201 West Main Street
Suite 301
Durham, North Carolina 27701

    *Re: United States v. Richard Allen Jackson*

Dear Mr. Widenhouse and Ms. Kenney:

  As I discussed with Mr. Widenhouse on the telephone today, enclosed please find FBI Form 302s relating to interviews of Kristy Delana Clement, William Darren Clement, Robert Louis Lunsford, Paul Thomas Candler, and Jeffrey Ervine Spivey; printouts from the Buncombe County Sheriff's Office concerning a citizen call that came in on December 15, 2003; and a cassette tape apparently also from December 15, 2003. The documents are Bates stamped CP0001 through CP0029. As we discussed, and as you will see, this concerns an allegation that Mr. Lunsford, a/k/a/ "Crazy Bob," assisted Richard Allen Jackson in the abduction and/or murder of Karen Styles, an accusation that Mr. Lunsford denies.

  As I also told Mr. Widenhouse, I apologize for my tardiness in producing this to you. I learned of this from the FBI in late September or early October, and I was going to deliver it to the 2255 counsel for Jackson, once they were appointed. By the time you two were appointed, however, I was caught up in a couple of other more immediate matters, as well as travel to Washington D.C. and to Maine for the last 10 days of November. It was only this week that I remembered that I had not handed this over yet.

  As I note in our opposition to Jackson's motion for leave to amend, which I am filing today, the United States obviously will not be objecting to Jackson's ability to file a claim based on this

information, since it was not made known to you before the November 16, 2004 deadline. Again, I apologize for the delay and for any inconvenience this might have caused you.

Sincerely,

GRETCHEN C. F. SHAPPERT
UNITED STATES ATTORNEY

RICHARD LEE EDWARDS
Assistant United States Attorney

# EXHIBIT 2

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    02/09/2004

     KRISTY DELANA CLEMENT, born 08/16/1972, social security account number 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, home address 125 Coffee Circle, Asheville, North Carolina, home telephone number 670.5821, was interviewed in the parking lot of the Five Points restaurant, Broadway Avenue, Asheville, North Carolina. After being advised of the identity of the interviewing agents and the purpose of the interview, she provided the following:

     KRISTY CLEMENT stated that she worked at the Mountain View restaurant starting in 1983 by busing tables. JD JACKSON then purchased the restaurant and CLEMENT worked there for another year to 1 1/2 years as a waitress. While CLEMENT worked at the restaurant, she came to know a dishwasher nicknamed CRAZY BOB, another dishwasher, RICHARD ALLEN JACKSON, and the cook, ALVIS CLARK, AKA SKIP. CLEMENT eventually became romantically involved with CLARK, who died three years prior to the interview.

     CLEMENT stated that CRAZY BOB, JACKSON, and CLARK all became friends while at work. CLEMENT did not know if JACKSON and CRAZY BOB had a relationship outside of the restaurant. CLEMENT did recall that JACKSON and CLARK had a casual relationship outside of work. CLEMENT stated that during this time period, she lived in a single wide mobile home located behind the restaurant. On occasion, JACKSON would come to CLEMENT's trailer to watch football games with CLARK.

     Immediately after the disapearance of KAREN STYLES, CRAZY BOB began working at the TACO BELL restaurant. CLEMENT ran into CRAZY BOB on several occasions, but CRAZY BOB never mentioned either JACKSON nor STYLES.

     CLARK always told CLEMENT to stay away from CRAZY BOB, because he did not trust him. CLEMENT could not articulate why CLARK did not trust CRAZY BOB.

     One to two weeks before JACKSON was arrested for the murder of KAREN STYLES, CLEMENT sold her trailer to JD JACKSON for $2,500.00. After she moved out, JACKSON, his wife, and two children moved in.

---

Investigation on   01/13/2004   at   Asheville, North Carolina

File # 70A-CE-73342        Date dictated
    SA MARK M. AYSTA
by   SA JAMES D. RUSSELL

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Case 1:00-cr-00074-MR   Document 242   Filed 04/28/05   Page 21 of 42   CP0001

FD-302a (Rev. 10-6-95)

70A-CE-73342

Continuation of FD-302 of __KRISTY DELANA CLEMENT__ , On __01/13/2004__ , Page __2__

On December 15, 2003 KRISTY CLEMENT and her brother DARREN CLEMENT had been drinking liquor, and they needed more Cherwine soda. KRISTY CLEMENT drove to the HOT SPOT gas station to purchase more soda, and ran into CRAZY BOB. KRISTY CLEMENT invited CRAZY BOB back to her brother's residence to continue drinking liquor.

While at DARREN CLEMENT's residence, all three individuals became very intoxicated. KRISTY CLEMENT asked CRAZY BOB if he was involved in the murder of KAREN STYLES. KRISTY CLEMENT does not know why she asked CRAZY BOB about the murder. However, CRAZY BOB made the statement, "Wait, wait, let me tell you something". At that point KRISTY CLEMENT told her brother to get a tape recorder out of the bedroom, a cassette tape from the answering machine, and placed the recorder in his shirt pocket. DARREN CLEMENT then removed the recorder from his shirt and placed it behind some items on the table in the living room.

During the subsequent conversation, CRAZY BOB stated that they had considered getting KRISTY CLEMENT and her sister. KRISTY CLEMENT understood this to mean that CRAZY BOB and JACKSON intended to abduct and kill KRISTY CLEMENT and her sister instead of STYLES.

DARREN CLEMENT then told CRAZY BOB to get out of his house, and called the Police. CRAZY BOB left and law enforcement officers arrived some time later. However, KRISTY CLEMENT believes CRAZY BOB hid in her vehicle until the Police left, because she found CRAZY BOB's hat the next morning on the passenger's side floorboard. The next morning, CRAZY BOB also returned to DARREN CLEMENT's residence to retrieve a jacket he left the evening prior.

KRISTY CLEMENT admitted that she only remembers pieces of conversation that evening, due to her state of intoxication.

KRISTY CLEMENT does not know CRAZY BOB's true name, and stated that he is a friend of TOMMY LNU, who works third shift at the HOT SPOT gas station.

FD-302 (Rev. 10-6-95)

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription    02/09/2004

      WILLIAM DARREN CLEMENT, aka DARREN CLEMENT, born 9/11/1962, was interviewed at his residence located at 15 Clement Cove Road, Asheville, North Carolina, telephone number 828.665.8599.  After being advised of the identity of the interviewing agents and the purpose of the interview, he provided the following:

      On December 15 or 16, 2003, DARREN CLEMENT and his sister, CHRISTY CLEMENT were at his residence consuming alcohol. DARREN CLEMENT stated that he had been drinking large quantities of liquor, in addition to taking prescription anti-depressant medication.  At some point in the evening, CHRISTY CLEMENT ran into a male nicknamed CRAZY BOB at the HOT SPOT gas station, and invited him to DARREN CLEMENT's residence to continue drinking.

      DARREN CLEMENT knew that CHRISTY CLEMENT, CRAZY BOB, and RICHARD ALLEN JACKSON, all worked together at the Mountain View restaurant in the past.

      As DARREN CLEMENT, CHRISTY CLEMENT, and CRAZY BOB consumed alcohol, CHRISTY CLEMENT told her brother that she had a hunch that CRAZY BOB had something to do with the murder of KAREN STYLES.  CHRISTY CLEMENT told DARREN CLEMENT to get a tape recorder and start taping their conversation.  DARREN CLEMENT then took the cassette tape out of the answering machine, located a micro cassette recorder, set it up behind some books on a coffee table, and commenced recording.

      DARREN CLEMENT does not recall much more about the evening, or about any subsequent conversation.  DARREN CLEMENT does not know what prompted his sister to tape record CRAZY BOB, or what motivated him to call the BUNCOMBE COUNTY SHERIFF's OFFICE repeatedly.

      DARREN CLEMENT stated that he did not know CRAZY BOB's name, and only that he was a friend of HOT SPOT employee TOMMY Last Name Unknown (LNU).

      DARREN CLEMENT stated that he is being treated for depression and is under the care of Dr. LESLIE SMART, whose office

---

Investigation on    01/13/2004    at   Asheville, North Carolina

File #   70A-CE-73342        Date dictated

      SA MARK M. AYSTA

by   JAMES D. RUSSELL

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Case 1:00-cr-00074-MR    Document 242    Filed 04/28/05    Page 23 of 42

FD-302a (Rev. 10-6-95)

70A-CE-73342

is located behind the Holiday Inn motel on Brevard Road in Asheville, North Carolina.

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   10/08/2004

PAUL THOMAS CANDLER, also known as (aka) TOMMY, born February 1, 1943, was interviewed at his residence located at 1159 Brevard Road, Asheville, North Carolina (NC), telephone number 828.665.0923. After being advised of the identity of the interviewing agents and the purpose of the interview, he provided the following:

One evening CHRISTY and DARREN LAST NAME UNKNOWN (LNU) arrived at CANDLER's residence. CHRISTY LNU had been drinking heavily, and was acting angry. CANDLER described CHRISTY LNU as a "mean drunk". BOB LUNSFORD and his son, JOHN LUNSFORD also came over to CANDLER's residence. As a result of CHRISTY LNU's behavior, CANDLER told CHRISTY LNU to leave, and DARREN LNU transported her home. CANDLER believes this was sometime between 8:00 pm and 9:00 pm. Shortly thereafter, BOB and JOHN LUNSFORD also left the residence.

At approximately 11:00pm CANDLER went to work, and did not witness an altercation between CHRISTY and DARREN LNU. Because he was working, CANDLER did not consume alcohol that evening.

Sometime after 2:00am, CANDLER received a telephone call from DARREN LNU. DARREN LNU advised that LUNSFORD was at his residence, and stated that he and someone else, later identified as RICHARD JACKSON, took KAREN STYLES to an old house under renovation in West Asheville, where they kept STYLES for a few days. This residence was one that LUNSFORD and another male worked on in the past. When JACKSON began torturing STYLES, LUNSFORD left.

During this conversation, DARREN LNU was very intoxicated. DARREN LNU told CANDLER that he made a tape of LUNSFORD talking about the incident, and believes LUNSFORD was going to kill him. CANDLER stated that DARREN LNU called him three times that evening, and was intoxicated during the telephone calls.

LUNSFORD resides with his brother, DON LUNSFORD in the JOSHUA RIDGE trailer park, located on Brevard Road. CANDLER stated that it is the first trailer on the left. LUNSFORD drives an older black Toyota pickup truck, and utilizes the telephone number 828.687.1463.

| | | |
|---|---|---|
| Investigation on | 01/13/2004 | at Asheville, North Carolina |

File # 70A-CE-73342                                    Date dictated

SA MARK M. AYSTA
by   SA ANDREW F. ROMAGNUOLO

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Case 1:00-cr-00074-MR   Document 242   Filed 04/28/05   Page 25 of 42

FD-302a (Rev. 10-6-95)

70A-CE-73342

Continuation of FD-302 of ___PAUL THOMAS CANDLER___ , On _01/13/2004_ , Page __2__

CANDLER stated that he has known LUNSFORD for the past ten years, and has never heard him talk of killing KAREN STYLES.

FD-302 (Rev. 10-6-95)

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription ___02/09/2004___

ROBERT LOUIS LUNSFORD, born 1/19/1955, #2 Joshua Ridge Road, Arden, North Carolina, telephone number 828.687.1463, was interviewed at his residence. After being advised of the identity of the interviewing agents and the purpose of the interview, he provided the following:

One evening before Christmas, 2003 LUNSFORD was at the residence of a friend, TOMMY Last Name Unknown (LNU). LUNSFORD had been consuming large quantities of alcohol and was intoxicated. Another friend, JOHN LNU was drinking at the residence with LUNSFORD and TOMMY LNU.

At some point in the evening, LUNSFORD ended up at the residence of DARREN CLEMENT, along with CLEMENT's sister, CHRISTY CLEMENT. DARREN CLEMENT was mixing drinks, and everyone was intoxicated. Out of nowhere, DARREN CLEMENT began talking about the death of KAREN STYLES, and accused LUNSFORD of being involved. LUNSFORD told DARREN CLEMENT to sit down, and he would tell him everything he knew.

LUNSFORD stated that after KAREN STYLES disappeared, and prior to the arrest of RICHARD ALLEN JACKSON, LUNSFORD was walking home from an evening of work at the TACO BELL, located on Brevard Road in Asheville, North Carolina. LUNSFORD was walking home with a teenage male who worked at the restaurant with him. After buying beer at the HOT SPOT, LUNSFORD stopped in the field of an industrial complex located behind the HOT SPOT. As LUNSFORD sat in the field drinking beer, the young male walked over to the HOT SPOT to make a telephone call.

As LUNSFORD sat alone in the field, he believes he heard footsteps approaching from the rear. Fearing that the same person who abducted KAREN STYLES was going to kill him, LUNSFORD ran away from the area. LUNSFORD made the statement that he thought the person (or people) approaching him from the rear were going to "sacrifice him". LUNSFORD immediately contacted PAT HEFFNER, an investigator from the BUNCOMBE COUNTY SHERIFF's OFFICE, and reported the incident.

---

Investigation on ___1/13/2004___ at ___Arden, North Carolina___

File # ___70A-CE-73342___          Date dictated _____

SA MARK M. AYSTA
by ___SA ANDREW F. ROMAGNUOLO___

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

70A-CE-73342

Continuation of FD-302 of     ROBERT LOUIS LUNSFORD     , On  1/13/2004  , Page    2

   Approximately two weeks later, LUNSFORD received a telephone call from HEFFNER who advised that the individual who killed KAREN STYLES had been arrested, and LUNSFORD did not have to worry when walking home from work.

   After relating the story to DARREN and CHRISTY CLEMENT, DARREN CLEMENT told LUNSFORD that he had tape recorded their conversation, and was going to notify the Buncombe County Sheriff's Office and have him arrested. LUNSFORD then left DARREN CLEMENT's residence on foot, and walked to a neighbor's residence. LUNSFORD called his son and asked him to pick him up. LUNSFORD's son arrived, and transported LUNSFORD back to his residence for the evening.

   LUNSFORD adamantly denied having anything to do in the abduction and murder of KAREN STYLES. LUNSFORD stated that rumors of his participation in the murder have circulated in the area for years, and LUNSFORD does not understand why. LUNSFORD asked to take a polygraph examination to verify his truthfulness.

FD-302 (Rev. 10-6-95)

-1-

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription ___10/08/2004___

JEFFREY ERVINE SPIVEY, born May 26, 1965, was interviewed at his residence located at 1191 Brevard Road, Asheville, North Carolina. After being advised of the identity of the interviewing agents and the purpose of the interview, he provided the following:

On the evening of December 14, 2003 SPIVEY was at his residence with PAUL THOMAS CANDLER, also known as (aka) TOMMY, when another friend BOB LAST NAME UNKNOWN (LNU) arrived. BOB had been consuming alcohol prior to his arrival. Over the course of the evening, BETTY PEICKO, an employee of PEARLMAN CARPET STORE, and DARREN LNU also arrived, and consumed large quantities of alcohol over a several hour period. CHRISTY LNU, DARREN LNU's sister also arrived, and an argument ensued between CHRISTY and DARREN LNU. DARREN LNU raised his hand as if to hit CHRISTY LNU, and then struck his own hand in front of her face. At that point SPIVEY told CHRISTY and DARREN LNU to leave, and BOB LNU left along with them.

SPIVEY later heard a rumor that BOB LNU implicated himself in a homicide, and that DARREN LNU made a tape about it.

SPIVEY has known BOB LNU for the past two years, and stated that BOB LNU generally acts normally. SPIVEY does not think BOB LNU would have been involved in a homicide, and has never heard him mention involvement in a murder. SPIVEY does not like DARREN LNU, and does not want to associate with him.

---

Investigation on ___01/13/2004___ at Asheville, North Carolina

File # 70A-CE-73342

Date dictated _____

SA ANDREW F. ROMAGNUOLO
by SA MARK M. AYSTA

---

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# EXHIBIT 3



**U.S. Department of Justice**

*United States Attorney*
*Western District of North Carolina*

| | |
|---|---|
| ***Headquarters:*** | ***Branch:*** |
| *Suite 1700, Carillon Building* | *Room 233, U.S. Courthouse* |
| *227 West Trade Street* | *100 Otis Street* |
| *Charlotte, North Carolina 28202* | *Asheville, North Carolina 28801* |
| *(704) 344-6222* | *(828) 271-4661* |
| *FAX (704) 344-6629* | *FAX (828) 271-4670* |

*Reply to: Asheville Office*

March 18, 2005

*BY HAND*

M. Gordon Widenhouse, Jr., Esquire
Rudolf, Widenhouse & Fialko
312 West Franklin Street
Chapel Hill, NC 27516

   *Re: United States v. Richard Jackson*

Dear Mr. Widenhouse:

   Enclosed please find the reports concerning the FBI's polygraphing "Crazy Bob," bearing Bates numbers CP0030 through CP0047. I received these reports just this week from the FBI. Please let me know if I can be of any further assistance.

       Sincerely,

       GRETCHEN C. F. SHAPPERT
       UNITED STATES ATTORNEY

       RICHARD LEE EDWARDS
       Assistant United States Attorney

CC:  Matthew Hellman
    Capital Case Unit

# EXHIBIT 4

FD-498 (Rev. 1-28-99)

# POLYGRAPH REPORT

████████████████████████████████████████

| Date of Report | Date of Examination | Case ID # |
| --- | --- | --- |
| 02/24/2004 | 02/19/2004 | 70A-CE-73342 – |

| Field Office/Agency Requesting Examination |
| --- |
| Charlotte |

| Authorizing Official | Date Authorized |
| --- | --- |
| SAC | 01/13/2004 |

| Examinee's Name (Last, First, Middle) |
| --- |
| Lunsford, Robert, Louis |

Case Title:
   Richard Allen Jackson;
   Karen Styles-Victim(Deceased);
   CGR-Homocide

Case Synopsis/Examiner's Conclusion:
   On October 31, 1994, Karen Styles went for a run, alone, in the Pisgah National Forest, but did not return. On November 25, 1994, Styles nude body was found in Pisgah National Forest, duct-taped to a tree. Subsequent investigation determined that Richard Allen Jackson stalked, raped, tortured, and ultimately shot and killed Styles. Jackson was convicted and sentenced to death in Federal Court. Jackson is awaiting the sentence to be carried out. Since his sentencing, rumors have surfaced that an associate of Jackson's, Robert Lunsford, was somehow involved in this crime. Case Agents have not identified any solid evidence linking Lunsford to this crime. Lunsford denies any involvement, and agreed to take a polygraph exam.
   On 02/19/04, Lunsford volunteered to come to the Asheville RA to take a polygraph examination. Lunsford was provided a FD-328 and FD-395, which he read and signed. During his pre-test interview, Lunsford stated that he takes a daily dose of Xanax for anxiety, but that he decided not to take his dose on this day, as he was afraid that it might cause problems for the polygraph exam.
   Lunsford was afforded a polygraph examination consisting of the following relevant questions:
   A.  Did you have anything to do with the abduction of Karen Styles?  (Answer-No).
   B.  Did you have anything to do with the shooting of Karen Styles?  (Answer-No).
   It was the opinion of the examiner that the recorded responses were inconclusive. During the post-test interview, Lansford stated that he was feeling shaky, as he had also refrained from taking all four of his normal doses of anxiety

Examiner's Name  SA Mark R. Rozzi

medication, the day prior to the polygraph examination. Lansford added that he had been on this medication continually since 1980. The examiner felt that Lansford was not medically fit to continue with any further testing on this date. Lansford was informed that the Case Agent would be re-contacting him, regarding any future polygraph examinations.

2

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
Case No. 1:00-CR-00074-1

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| vs. | ) |
| | ) |
| RICHARD ALLEN JACKSON | ) |

**SUPPLEMENTAL AFFIDAVIT OF STEPHEN P. LINDSAY**

Stephen P. Lindsay, being first duly sworn, does hereby depose and say:

1. I am an attorney licensed to practice law in North Carolina and I have been admitted to practice law since 1985. I practice with the law firm of Cloninger, Lindsay, Hensley & Searson, P.L.L.C. I am over the age of 18 and I am competent to make this affidavit. I reside in Asheville, North Carolina

2. I have recently learned of newly discovered investigative developments regarding a person known as "Crazy Bob," who was likely involved in the murder of Karen Styles. My investigative efforts during the preparation for Mr. Jackson's trial caused me to believe that more than one person was involved in the Styles abduction and murder. I first became concerned about this when I reviewed the photographs of Ms. Styles provided to me in discovery. Based upon my experience handling murder cases, having reviewed numerous cases in which death and decomposition were issues, and having had training in criminal justice and crime scene investigation, I was of the opinion that there was insufficient decomposition for the body of Ms. Styles to have been in the woods from the time of her disappearance until the time her body was found.

3. I was unable to make any meaningful progress into developing the existence of a second involved person. Without being able to make any third party link to a specific individual, the information we were developing, which included but was not limited to, the hair found at the scene, DNA issues, and time and manner of death, could not be effectively utilized in Mr. Jackson's defense. Rather, if introduced, I was of the opinion that the physical evidence, which could have supported the existence of an additional person, would have been interpreted by the jurors in a very negative way – a way that would have ensured that Mr. Jackson was sentenced to death.

4. To be more precise, Lester Roane, our ballistics expert, was of the opinion that the shell casing found near Ms. Styles' body could not be positively matched to the K-Mart rifle. Dr. Murray Marks, our expert in the field of forensic anthropology, was of the opinion that Ms. Styles' body had not sufficiently decomposed for her to have been deceased and in the woods from the time she disappeared to the time she was found. Dr. Marks works with a project at the University of Tennessee, Knoxville known as the "Body Farm." This program is unique to forensic anthropology in that it specifically focuses on the decomposition of human bodies in various settings. In that this program has existed for several years, Dr. Marks and his colleagues have collected a large amount of valuable data on decomposition, and they have been admitted as expert witnesses in numerous courts, both state and federal, and been allowed to render opinions regarding human body decomposition as it relates to time of death.

5. Given the information that we began to develop about ballistics, DNA, body decomposition, insect infestation (entomology), and so forth, had we been able to establish that there was another individual involved in the abduction/murder of Karen Styles, our defense at the guilt/innocense phase, and our arguments and presentation at the penalty phase, would have been markedly different.

6. Regarding the guilt/innocense phase, the existence of an additional participant would have freed us up to argue that Mr. Jackson did not personally cause the death of Ms. Styles. We would also have strongly contested whether Ms. Styles death occurred on federal land. If we could have established death away or off of federal land, federal jurisdiction and Mr. Jackson's eligibility for the death penalty would have been called into question. Finally, we would have argued that the gun the Government contended was used to kill Ms. Styles could not have been the murder weapon as it was returned to K-Mart prior to her death.

7. Regarding the penalty phase, had there been another person involved, we would have argued questionable culpability for Mr. Jackson, that he did not in fact kill Ms. Styles, that the person truly responsible for the crimes was the third person and that life in prison was sufficient for Mr. Jackson if he was only partially responsible for the outcome.

8. In short, the defense of Mr. Jackson at both phases of the trial would, without question, have been markedly different from what was presented had we been able to establish the involvement of another individual. It is also my opinion that with this additional information, the outcome of the past proceeding is called into question and the outcome of a new proceeding would likely be different.

Further Affiant Sayeth Naught.



Stephen P. Lindsay

Sworn to and Subscribed before me,
this the 26th day of April, 2005.

Notary Public

My Commission Expires:
6/21/05

lindsayaff

# EXHIBIT 6

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
#### Case No. 1:00-CR-00074-1

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
|  | ) |
| vs. | ) |
|  | ) |
| RICHARD ALLEN JACKSON | ) |

## <u>SUPPLEMENTAL AFFIDAVIT OF ERIC J. FOSTER</u>

Eric J. Foster, being first duly sworn, does hereby depose and say:

1.    I am an attorney licensed to practice law in North Carolina and I have been admitted to practice law since 1992. I am a solo practitioner and have been so since 1999. I am over the age of 18 and I am competent to make this affidavit. I reside in Asheville, North Carolina.

2.    On October 24, 2000, I was appointed to represent Richard Allen Jackson as co-counsel to Mr. Steve Lindsay. In mid-March, 2001, I requested to withdraw from such representation. This Court allowed my motion. Since the Court allowed me to withdraw from the case, I have not worked on behalf of Mr. Jackson in this or any other case.

3.    During the time I represented Mr. Jackson, I spent all of my time working on matters relating to the guilt-innocence phase of the trial. I did not work on developing the mitigation evidence for the case.

4.    During the time I represented Mr. Jackson, I investigated the forensic evidence in the case. My co-counsel, Mr. Steve Lindsay, had worked in the past with Dr. Murray Marks of the University of Tennessee. At that time, Dr. Marks was the director of the University's graduate program in forensic science dedicated to the study of human decomposition, commonly known as "the Body Farm" from its reference thereby in a popular novel.

5.    Mr. Lindsay and I went to Knoxville in late 2000 or early 2001 and met with Dr. Marks at the Body Farm. Dr. Marks explained to us his field of study and how he and his

students and colleagues could use scientific method to determine matters such as time and place of death. Since such an inquiry was relevant to Mr. Jackson's case, we asked Dr. Marks to consult with us regarding the death of the victim. Dr. Marks agreed to do so and asked us to provide what we had that was relevant to his field. We provided him with: (1) the crime scene photos; (2) the autopsy photos; (3) the autopsy report; and (4) the weather data from the days between the victim's disappearance and the discovery of her body.

6. A few weeks after sending what Dr. Marks requested, I contacted him regarding his opinion of what he could tell about time of death. I do not remember if I specifically asked him about place of death. Dr. Marks explained that establishing a time of death is an inexact science even when he is able to examine the crime scene, and that doing it from photographs would make such a determination even less precise. When I pressed him for his opinion as to the accuracy of the autopsy determination, he expressed surprise that the autopsy physician would estimate that the body had been exposed to the elements during the weather at the time for as much as four weeks. When I told him that the autopsy physician had testified that he was certain that the body had been outside for four weeks after death, Dr. Marks said that he would not testify definitively to that opinion given what he saw in the photographs. When I pressed him further for an estimate, Dr. Marks explained that it was merely an educated guess, but his best guess was two to three weeks.

7. Dr. Marks explained to me that scientists in the field of forensic entomology could often estimate time of death scientifically based on the presence of insects on a decomposing body. Dr. Marks recommended Dr. Jason Byrd, a forensic entomologist at Virginia Commonwealth University.

8. I contacted Dr. Byrd, who also agreed to consult with us on Mr. Jackson's case. I sent Dr. Byrd the same information that I had sent Dr. Marks. After Dr. Byrd reviewed the photos and reports, I asked him what he could tell about time of death. As did Dr. Marks, Dr. Byrd said that he is more confident about his opinion when he can examine the crime scene firsthand rather than photographs, but he shared Dr. Marks's opinion that the body did not appear to him to have been decomposing for four weeks in the elements given the weather in Asheville in October and November 1994. Dr. Byrd explained to me as best he could his methodology, including the significance of the amount of insect activity, the type of insect presence, and whether those insects were alive or dead. He mentioned that when he examines a crime scene firsthand, he can take samples of the insects and that when he examines a scene from photographs, he cannot always tell whether the insects in the photos are alive or dead. I remember only that these factors were significant in the analysis. I do not remember exactly what Dr. Byrd said about them specific to this case.

9. I have had no contact with Dr. Marks or Dr. Byrd about this or any other case

2

since I withdrew from Mr. Jackson's case in March, 2001.

Further Affiant Sayeth Naught.

Eric J. Foster

Sworn to and Subscribed before me,
this the 27 day of April, 2005.

Joanne Lynette Damond
Notary Public

My Commission Expires: 08/29/09

01-108.P24

3