# NOTE:

# THIS IS A PARTIALLY SCANNED DOCUMENT.

# PLEASE SEE THE CASE FILE FOR ATTACHMENTS, EXHIBITS, AFFIDAVITS OR OTHER MATERIAL WHICH HAS NOT BEEN SCANNED.

LHT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
#### 1:00-CR-00074-1
1:04 CV 251

FILED
ASHEVILLE, N. C.

APR 2 8 2005

U.S. DISTRICT COURT
W. DIST. OF N. C.

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| RICHARD ALLEN JACKSON | ) |

## SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION OF RICHARD ALLEN JACKSON TO VACATE CONVICTION AND SENTENCE PURSUANT TO 28 U.S.C. §2255

Richard Jackson, by and through his undersigned counsel, submits this supplemental memorandum in support of his previously filed motion to vacate his conviction and sentence. *See* 28 U.S.C. §2255. The primary purpose of this pleading is to present information and authorities that form the basis for many of the claims raised in the motion. A large number of materials are attached to this supplemental memorandum. In many of the issues discussed herein, Mr. Jackson has included excerpts from and references to these important materials. However, the full flavor of these materials cannot be gleaned solely from the portions incorporated in these arguments.[1] The supplemental materials include forty-one (41) affidavits

---

[1] The undersigned are mindful of this Court's directive that this supplemental pleading should not be unnecessarily repetitive of the comprehensive motion previously filed and have endeavored to abide by this instruction. Many of the excerpts from the attached materials are brief. A full understanding of the facts and opinions contained in the attached materials, particularly the forty-one affidavits, can only be developed from the materials themselves. The information contained in them, and the limitations inherent in written pleadings, underscores the necessity of an evidentiary hearing to resolve most of these claims that are intensely fact-based. *See United States v. Magini*, 973 F.2d 261, 264 (4th Cir. 1992); *see also Townsend v. Sain*, 372 U.S. 293, 312 (1963). In addition, Mr. Jackson has aimed this

(continued...)

from many people with important information, including Mr. Jackson's three trial lawyers, four

other lawyers with specialized training and experience relevant to pivotal issues in this case,

nine experts in various fields with particular education and experience in important areas

germane to this case (several of whom should have been engaged by trial counsel),[2] and

numerous lay people who could have offered relevant and compelling information about Mr.

Jackson had they been called as witnesses. Through these supplemental materials, Mr. Jackson

presents facts that entitled him to relieve in the form of either a new trial or a new sentencing

hearing. At the very least, he must receive an evidentiary hearing.

I.      **RICHARD JACKSON RECEIVED PRESUMPTIVELY
        PREJUDICIAL ASSISTANCE OF COUNSEL UNDER UNIQUELY
        UNACCEPTABLE CIRCUMSTANCES WHERE COMPETENT
        COUNSEL COULD NOT RENDER ASSISTANCE.**

As explained in his initial motion, Richard Jackson endured a situation where his lawyers

faced circumstances in which competent counsel could not render assistance and failed entirely

to subject the government's case as to guilt and sentence to meaningful adversarial testing. *Bell*

---

[1](...continued)
supplemental memorandum toward marshaling the pertinent facts to support his claims. He requests an
opportunity to file a reply to the anticipated response by the government, which will be directed toward a
discussion of the applicable legal authorities. To the extent necessary to facilitate leave to file a reply, Mr.
Jackson waives any statutory time constraints. *See* 28 U.S.C. §2266(b)(1)(C).

[2]      The undersigned have been able to secure the assistance of these experts despite this
Court's denial of the request for funds for expert assistance. Mr. Jackson respectfully submits he is
entitled to funds for these experts and renews his previous request. *See* 21 U.S.C. §848(q)(4)(B). Merely
because several of these experts have provided preliminary assistance does not remove the need for and
entitlement to funds for experts. With proper funding, these specialists can provide a fuller explanation of
the operative facts upon which they base conclusions and offer a more complete picture of Mr. Jackson's
situation in their respective fields. The information and opinions offered by these qualified professionals,
particularly in several critical areas that were left untouched by trial counsel, need to be developed more
completely to afford Mr. Jackson the legal representation and judicial review in post-conviction to which
he is entitled both by statute and fundamental fairness guaranteed by due process.

2

*v. Cone*, 535 U.S. 685, 696 (2002). If counsel is effectively absent, the deficient representation is prejudicial per se. This de facto absence of counsel resulted from an initial breakdown in the relationship between Stephen P. Lindsay and Eric J. Foster, the lawyers first appointed to represent Richard Jackson.[3] It continued when David G. Belser was appointed to replace Mr. Foster, but was given an inadequate amount of time to prepare for trial.

Sean P. Devereux, a respected and seasoned criminal defense lawyer in Asheville with considerable experience in capital litigation, has a great familiarity with this situation because he knows many of the players involved and lived and worked in the community where the crimes and the legal proceedings took place. He has also reviewed many of the materials in this action, including the section 2255 motion and the affidavits from Mr. Jackson's three attorneys, each of whom he knows well. His ultimate conclusion about the quality of the legal representation provides a salient preface to the issue involving the absence of counsel.

> The effort to convict Richard Jackson and take his life had been gathering force for seven years. A battalion of prosecutors, investigators and experts, state and federal, spared neither time nor expense in their preparations. Mr. Jackson's only effective advocate had 38 days to meet this onslaught. The result was a fiasco, no more than a semblance of a capital trial. The case against Mr. Jackson was compelling, without doubt, but under the circumstances revealed by the record here, he never had a chance of a life sentence.

---

[3]    This situation, in its totality of unique circumstances, presents the scenario contemplated in *Bell* where counsel is effectively absent, even though Mr. Jackson technically had two lawyers consistently appointed to represent him. To the extent the situation does not rise to this level, then the two-part inquiry under *Strickland v. Washington*, 466 U.S. 688 (1984), would apply. Mr. Jackson's lawyers acted in a myriad of improper ways, as outlined herein. The remaining issue would be the prejudice he suffered. Based on the missteps taken by the lawyers from the outset of the representation, the prejudice is readily apparent because the government's case, both at the guilt and penalty phases, went unchallenged in several critical areas and the defense presentation lacked focus and substance, especially in making the plea to spare Mr. Jackson's life. *See Boyde v. Brown*, ___ F.3d ___, 2005 WL 913434 (9th Cir. 2005)(finding ineffective assistance in effort to save client's life).

3

Affidavit of Sean P. Devereux, ¶27, Exhibit 85.

The genesis of the breakdown in the relationship between Mr. Lindsay and Mr. Foster began when Mr. Lindsay was initially appointed and requested that experienced co-counsel be assigned to assist him. As Mr. Lindsay explained, former Magistrate Judge Max O. Cogburn declined his request to appoint experienced second counsel. Affidavit of Stephen P. Lindsay, ¶2, Exhibit 27. Mr. Lindsay asked him to appoint experienced co-counsel, but he refused, saying he wanted to expand the number of attorneys with capital experience who would accept federal appointments. *Id.* Mr. Lindsay protested that this case was not appropriate for training someone in capital litigation and again urged the appointment of a lawyer who had capital experience as second counsel. Magistrate Judge Cogburn still refused and appointed Mr. Foster. *Id.*

Mr. Foster was unaware Mr. Lindsay had specifically requested that Mr. Foster not be appointed to assist him. Affidavit of Eric J. Foster, ¶3, Exhibit 12. Undoubtedly, this situation caused friction between Mr. Lindsay and Mr. Foster, despite Mr. Foster not knowing Mr. Lindsay had requested someone else be appointed to assist him. The breakdown in the communications between and relationship of Mr. Lindsay and Mr. Foster culminated in a lack of coordinated efforts to prepare the case. Lindsay Affidavit, ¶¶ 4, 7, 8, 12; Foster Affidavit, ¶¶ 9, 10, 13. When Mr. Belser was appointed to replace Mr. Foster, he "was very disappointed with the status of the trial preparations." Affidavit of David G. Belser, ¶4, Exhibit 4. A large number of pretrial motions had been filed and litigated, but most involved esoteric issues of law rather than material aspects of the case. *Id.* Some of the motions went beyond the limits of sound advocacy by asserting things that could not be supported by available facts. "To some extent, I felt that a great deal of energy in the pretrial efforts had been devoted to these matters at the

4

expense of more compelling areas, such as mental health and mitigation issues. In my opinion, many critical opportunities had been missed in the four months after Mr. Jackson was indicted and a lot of valuable time had been wasted." *Id.* Mr. Belser described the trial preparations that had occurred over these four months as creating "a desperate situation." *Id.*

Mr. Lindsay graphically explained the deteriorating conditions in his relationship with Mr. Foster. He had assumed Mr. Foster could handle research and motions. Lindsay Affidavit, ¶3, Exhibit 27. He had great difficulty having contact with Mr. Foster, who worked without a secretary, a facsimile machine, or a photocopy machine. Lindsay Affidavit, ¶4. Mr. Lindsay "became more and more frustrated with Mr. Foster's involvement as it was virtually impossible to have reasonable communication and contact with him." *Id.* Mr. Lindsay expressed disappointment in many of the ways in which Mr. Foster handled his responsibilities. Unfortunately, Mr. Lindsay "did not personally do any follow-up research to determine whether the motions, as written, were appropriate." Lindsay Affidavit, ¶5. Mr. Lindsay now recognizes that, given Mr. Foster's lack of experience in capital litigation, he should have been more attentive. *Id.* However, he noted that, "[h]ad experienced co-counsel been appointed, however, I would not have needed to be concerned with this review." *Id.* Mr. Lindsay was simply unable to supervise Mr. Foster adequately given the complexity of the case and his having to handle virtually everything about it. *Id.*

The inquiry is not whether Mr. Lindsay felt overwhelmed. Rather, it is whether the situation evolved into a state in which Richard Jackson was essentially without counsel. Mr. Devereux believes this happened. Devereux Affidavit, ¶8. Mr. Devereux was very familiar with the government's case against Mr. Jackson. He knew all of the attorneys involved in the

5

representation. He reviewed the contentions in the initial section 2255 motion filed by Mr. Jackson. He read the affidavits submitted by Mr. Jackson's three trial lawyers. He found Mr. Lindsay's description of the situation disturbing because of several internal inconsistencies. Mr. Lindsay, by his own descriptions, did not appear to be preparing either the guilt or the penalty phase aspects of the case, as he described Mr. Foster as dealing with the guilt phase and Mr. Belser as dealing with the penalty phase. Lindsay Affidavit, ¶¶3, 22. "If Mr. Lindsay was neither preparing for the guilt-innocence phase; nor able to contend with the stun gun evidence; nor meeting with Mr. Jackson in jail; nor making any other effort to reach a plea agreement; nor developing mitigation evidence, it is unclear what he was doing on his client's behalf." Devereux Affidavit, ¶8. Mr. Devereux's compelling observation reveals an absence of counsel[4].

Mr. Lindsay acknowledged being extremely overwhelmed and overworked during late December and early January of his representation in this matter. Lindsay Affidavit, ¶7. Because he was having to handle everything in the case and micro-manage Mr. Foster pursuant to the directions of the magistrate judge, Mr. Lindsay felt the relationship became "extremely strained". Mr. Lindsay eventually went to the district court, acknowledged he could not adequately supervise Mr. Foster, and admitted he would not be able to prepare for trial under the situation. "The limited confidence I had in Mr. Foster was gone. I was shouldering virtually all

---

[4]     Mr. Devereux relates his experience as co-counsel with Mr. Lindsay in a case tried just seven to eight months before Mr. Jackson's trial. Pam Laughon was also the mitigation specialist in that case. Mr. Devereux felt he shouldered at least half of the work in the guilt phase and the entire burden, along with Dr. Laughon, in the penalty phase. He concluded that Mr. Lindsay, who tends to leave the more tedious and mundane tasks to co-counsel, enjoys the faster and often more aggressive pace of the guilt phase, which is his strength, but does not have the patience or temperament toward "a degree of vulnerability" needed to resonate for the sentencing jury. Devereux Affidavit, ¶¶22-26. Indeed, this experience, in part, led Mr. Devereux to decline being co-counsel in this case. *Id.* ¶26.

6

of the responsibilities in preparing for trial. In fact, I told the district court I would have to work 'thirty hours a day' to provide Mr. Jackson with adequate representation because Mr. Foster simply lacked the experience to provide me with the necessary and proper support, even though he may have been doing the best he could." Lindsay Affidavit, ¶8. Unfortunately, at this juncture, the date for the trial had almost arrived and, even with newly appointed co-counsel, the defense effort was hopeless in disarray.

Mr. Foster concurred in the seriousness of the situation. By mid-March 2001, nearly five months into the representation by Mr. Lindsay and himself, it became apparent to him that it was necessary to withdraw from the case. This revelation dawned when he learned Mr. Lindsay had gone privately to the district court and said he did not believe Mr. Foster had the experience necessary to represent Mr. Jackson effectively. Foster Affidavit, ¶11. Under these circumstances, the relationship between Mr. Foster and Mr. Lindsay was irreparable and showed a situation in which Mr. Jackson effectively had no counsel at all.

This breakdown in the relationship and the ensuing appointment of Mr. Belser as substitute counsel with only a short time remaining before Mr. Jackson's trial began did little to alleviate this unacceptable situation and resulted in numerous inadequacies in the representation. Several of these deficiencies illustrate Mr. Jackson essentially had no counsel at all or, at least, was faced with a situation in which even competent counsel could not render assistance.

First, counsel failed to investigate and pursue the possibility of resolving this case through a plea agreement with the government. Mr. Belser explained that one aspect to the case that had received no attention before he was appointed was the possibility of entering into a plea of guilty with a resulting sentence of life imprisonment. Belser Affidavit, ¶6. Mr. Belser

7

expressed surprise that the deadline for pursuing this option had passed. He was not sure the lawyers had made any effort in this area. *Id.* Mr. Belser began working with the client about this possibility, involved the client's adoptive mother in the process, and eventually had the client in a position where he would accept a plea. Unfortunately, the government said this offer came too late. Belser Affidavit, ¶6.

Mr. Lindsay explained the possibility of a plea was not handled properly by him and Mr. Foster. Mr. Lindsay knew the attorneys who represented his client in the state proceedings had difficulty negotiating a guilty plea. Lindsay Affidavit, ¶11. However, Mr. Lindsay left this aspect of the representation to Mr. Foster despite knowing his co-counsel lacked experience in capital litigation. Lindsay Affidavit, ¶6. Mr. Foster had the majority of the communications with the client. Mr. Lindsay believed Mr. Foster discussed a resolution of the case through a plea bargain with the client, but did not recall having any such discussions with the client himself. He has now acknowledged he "should have had more direct contact with Mr. Jackson during this period of time." Lindsay Affidavit, ¶6. He likely could have obtained authority from Mr. Jackson to negotiate a plea for life without parole, since Mr. Belser was able to do so, if he had spent the necessary time with the client. *Id.* Mr. Foster had the primary communications and contact with the client in the early stages of the representation. Although there was not an initial offer from the government to resolve the case by plea of guilty, this possibility was mentioned after one of the hearings on pre-trial motions. Foster Affidavit, ¶5. Mr. Foster knew the option for resolving the case in this manner would only be available for a short time. He immediately mentioned the possibility of a plea to the client during a visit at the jail. When the client was not receptive to the idea, Mr. Foster "did not press him. I did not make a 'hard sell'

8

about it. Having no previous experience in capital litigation, I did not know how to press a discussion regarding a life-saving plea with the client." *Id.*

Experienced capital litigators understand the importance of making every effort to resolve a case through a plea bargain. It is always possible that the government will be willing to accept a guilty plea, especially in a capital case where a plea would result in a defendant being sentenced to life imprisonment. But the effort necessary to obtain this result is significant. "A client's trust cannot be assumed; it must be earned. In a situation like this case, it is imperative that both lawyers proceed in a most timely fashion and work very hard to develop a trusting and credible relationship with their client." Affidavit of C. Frank Goldsmith, Jr., ¶5, Exhibit 15; Affidavit of Sean P. Devereux, ¶10, Exhibit 85. Mr. Goldsmith explained this process takes considerable time, especially in a complicated and serious case like the one involving Mr. Jackson. Mr. Goldsmith believes Mr. Lindsay and Mr. Foster did not make any concerted effort in this area. Neither lawyer spent much time with their client during the early stages of their representation. Competent counsel would have, jointly and separately, spent considerable time with their client to build a trusting relationship with him, explain their knowledge of the facts and the law, exhibit a willingness to listen with patience and respect to the client, and then discuss candidly the possibility that a jury would return a sentence of death. *Id.* Mr. Goldsmith does "not believe this effort occurred in this case until after Mr. Belser was appointed, at which point it was apparently too late." *Id.* Mr. Devereux concurs. "In my experience, the key to working out a plea to life is developing the trust of the client. The only way to do this is to spend time with him in his jail cell." Devereux Affidavit, ¶10. Quite simply, the requisite effort

9

to resolve this case by plea agreement did not occur.[5]

Second, an inadequate effort was made to investigate and challenge the government's evidence about a stun gun being used in this crime. Mr. Belser recalled the government gave notice of intent to offer expert testimony in this regard and designated Dr. Robert Stratbucker as its expert witness. However, he did not recall any discussion or decision between him and Mr. Lindsay regarding who would handle this evidence. "There was no coordination of our effort with regard to this evidence. I do not recall talking with Mr. Lindsay about an expert in this area, or being involved in any ex parte communication with Mr. Lindsay and the presiding judge before trial about this area of expert testimony." Belser Affidavit, ¶10. Mr. Lindsay indicated he found a potential defense expert whom he identified as Robert Siciliano. Lindsay Affidavit, ¶19. However, Mr. Siciliano characterized himself as a "keynote inspirational speaker" with years of security training. Mr. Lindsay obtained a press kit from Mr. Siciliano.[6] Lindsay Affidavit, ¶19. However, Mr. Lindsay did not pursue obtaining authorization for funds to pay Mr. Siciliano as an expert. He thinks he assigned this matter to Mr. Foster if he was still on the case. *Id.* He had no recollection about specifically discussing the issue of an expert with Mr. Belser after he entered the case. Lindsay Affidavit, ¶20. No coordinated effort existed within the defense team about this critical evidence.[7]

---

[5] The failure to pursue an available, favorable plea bargain itself amounts to ineffective assistance of counsel. This deficiency is the basis for a separate issue in Mr. Jackson's motion to vacate.

[6] This press kit is attached as Exhibit 70. Even a cursory review of it reveals Mr. Siciliano, whatever his qualifications as a motivational speaker with a background in security, could not pass muster as an expert qualified to render an opinion about whether a person's injuries were caused by a stun gun. *See* Affidavit of Joseph H. Dyro, Ph.D., Exhibit 11; *see also* Arguments III and IV, *infra.*

[7] The failure to pursue an appropriate expert and challenges the government's evidence on

(continued...)

10

Again, Mr. Goldsmith explains that competent counsel would have quickly sought the assistance of a similar expert to advise them about the reliability of the proposed expert testimony and to assist them in understanding and litigating the admissibility of it. Goldsmith Affidavit, ¶6. Mr. Goldsmith had personal experience with this issue in a capital case himself. In that case, he and his co-counsel early researched stun guns, actually purchased and tested one, and investigated potential experts in the area. He found the efforts by defense counsel in this situation deficient because they did not seek the appointment of a defense expert, did not investigate the background, qualifications, and reputation of the government's proposed expert, and did not examine the testing, methodology, or opinions of the government's proposed expert from a scientific point of view. *Id.* Mr. Goldsmith confirmed it was not clear Mr. Lindsay and Mr. Belser even made a decision before trial about which one of them would handle this evidence. In his opinion, this lack of reasonably thorough preparation on such an important and potentially inflammatory issue amounted to ineffective assistance of counsel, especially because there was no coordination of effort with regard to this evidence. *Id.*

Donald H. Beskind, another highly experienced attorney and professor of evidence, reviewed various materials in this case. He explained the defense effort regarding the stun gun was woefully deficient. Affidavit of Donald H. Beskind, ¶¶4, 5. Mr. Beskind explained that litigators facing proffered expert testimony on a scientific or technical matter must investigate fully the reliability of the proposed scientific or technical evidence. He considered this effort a minimum requirement. Beskind Affidavit, ¶6. A district court must consider numerous factors

---

[7](...continued)
this matter itself amounts to ineffective assistance of counsel. This deficiency is the basis for a separate issue in Mr. Jackson's motion to vacate.

11

in determining whether to admit expert testimony. In Mr. Beskind's experience, competent representation requires consultation with an expert selected for her knowledge of the field whenever counsel has reason to believe the opposing party will be proffering testimony from an expert. Beskind Affidavit, ¶8. An attorney must become sufficiently familiar with the area in which proffered expert testimony will be made. An attorney should file a motion in limine to test the admissibility of the evidence. Competent representation requires presenting a clear case to the presiding judge as to why the evidence should be excluded. Beskind Affidavit, ¶¶9, 10. The defense counsel did not file or litigate a motion in limine regarding this proffered expert testimony. Mr. Beskind found this effort inadequate in understanding the relevant scientific and technical principles involved, particularly because counsel did not consult a competent expert in the field and did not litigate the admissibility of the proposed testimony under the relevant standards. Beskind Affidavit, ¶12.

Third, defense counsel made a decision to admit Mr. Jackson's concession without sufficient investigation and analysis. Both Mr. Goldsmith and Mr. Devereux explained the deficiency in this area. Goldsmith Affidavit, ¶7; Devereux Affidavit, ¶7. This effort was deficient, especially in light of Mr. Jackson's right to determine how to plead. *See Florida v. Nixon*, 125 S.Ct. 551 (2004).

Fourth, defense counsel made no serious effort to challenge the government's case. There was substantial evidence available with which the defense could have challenged the factual basis upon which the government attempted to prove Mr. Jackson's guilt. They could have challenged the government's evidence regarding ballistics, DNA, and body decomposition. They did not do so. Mr. Lindsay acknowledged that he and Mr. Belser had several discussions

about how to proceed in this effort. He found it difficult for Mr. Belser to provide meaningful input into trial strategy because Mr. Belser was struggling simply to review the discovery materials. Mr. Lindsay believes Mr. Belser never had sufficient time to ever review these materials. Lindsay Affidavit, ¶22.

Fifth, defense counsel did not thoroughly investigate and analyze potential mitigating evidence. Mr. Belser acknowledged the mitigation investigation was almost non-existent at the point he was appointed. He found this situation "most disturbing." Belser Affidavit, ¶8. He considered it to have been "of paramount importance to develop all available mitigating evidence. Yet, it seemed Mr. Lindsay and Mr. Foster had devoted almost all of their attention to the issue of guilt. This approach seemed seriously misdirected." *Id.* Although a mitigation investigator had been appointed, Mr. Belser felt "she had not devoted much time to this case before I was appointed. It appeared to me that there had been no direction to this phase of the representation." He felt Mr. Lindsay was handling this aspect of the representation. Unfortunately, Mr. Lindsay had the opposite view. According to Mr. Lindsay, "Mr. Belser was primarily focusing his efforts on the presentation of mitigation." Lindsay Affidavit, ¶22. Mr. Lindsay felt the mitigation specialist had sufficient experience that "she would proceed without the need for much supervision." *Id.* It is readily apparent that the defense team did not function as counsel for Mr. Jackson in the area of mitigation. Devereux Affidavit, ¶7. It was as if Mr. Jackson had no counsel at all.

Sixth, defense counsel failed to make an adequate showing of the admissibility of evidence regarding Mr. Jackson's biological sister. Shortly before trial, defense counsel learned of this evidence that they believed was extremely important. As Mr. Belser explained, they

13

located the adoptive parents of the biological sister. She had experienced the same environmental situations during her first 5-1/2 years of her life as had Mr. Jackson. She developed the same odd behavioral characteristics, including unusual facial expressions, rigid body movements, unusual emotional outbursts, an inability to socialize, and inappropriate fascination with sexuality at a young age, and an inability to conform her behavior in socially acceptable ways. Belser Affidavit, ¶16. She also showed signs of both suicidal and homicidal behavior, as did her brother. Her adoptive parents felt their experiences with her were just like the experiences of Mr. Jackson' adoptive parents. Belser Affidavit, ¶16. Mr. Belser felt this information was compelling. It would have allowed the jury to understand some of the situational and environmental conditions that shaped Mr. Jackson' life. It would have given the jury keen insight into his biological condition that contributed to his mental, emotional, and psychological condition. Belser Affidavit, ¶17. The defense had expert witnesses available who could have provided a link between the two siblings; they did not introduce it. "This decision was a mistake." *Id.* Mr. Lindsay concurred in this assessment of the situation. Lindsay Affidavit, ¶25. Mr. Lindsay had direct, personal contact with the adoptive parents of the biological sister. He found the "discussions with them were very enlightening." *Id.* He "believed her situation was so similar to Mr. Jackson's behavior that it would be compelling evidence during the penalty phase of his trial." *Id.* The district court indicated it would only admit the evidence if the defense produced expert testimony linking the two siblings in a biological or genetic fashion. Mr. Lindsay felt an expert was available but believed he had been released. Lindsay Affidavit, ¶24. To release an expert and fail to offer this compelling evidence was essentially the absence of counsel.

14

Seventh, defense counsel failed to offer surrebuttal evidence in response to a very damaging and inadmissible television interview with Mr. Jackson. Mr. Lindsay explained that the defense team was simply shocked when this evidence was introduced. According to Mr. Lindsay, "it was as if the air had been sucked out of the court room and I didn't come up with an appropriate response to the unanticipated, devastating content of the video." Lindsay Affidavit, ¶28. Mr. Lindsay felt he was the only member of the defense team who was capable of responding in this situation. *Id.* Mr. Belser described the defense team, including Mr. Lindsay, as "shell shocked." They did not respond with any evidence although they "should have done something else. We were just so stunned by the sudden development that we froze." Belser Affidavit, ¶22. Competent counsel must be prepared for such eventualities. A court can change its ruling and allow unexpected evidence to be admitted. Counsel must be prepared for such a situation. "Competent counsel would foresee and prepare for that possibility, but in this case, Mr. Jackson's counsel failed to do so." Goldsmith Affidavit, ¶13; Devereux Affidavit, ¶20.

Finally, defense counsel failed to challenge Mr. Jackson's guilty plea in state court in a proper form. Defense counsel knew this effort should have been made in state court, but failed to do so. Lindsay Affidavit, ¶11. Competent counsel would have recognized that federal law prohibits a challenge to a state judgment in a collateral proceeding. The state court judgment must be challenged in the appropriate state forum. Goldsmith Affidavit, ¶8; Devereux Affidavit, ¶15. This failure was a serious mistake by defense counsel as it let the jury hear Mr. Jackson had formally admitted guilt and been sentenced for these very crimes, perhaps the most devastating evidence that can be offered against a criminal defendant.

15

In addition to these critical missteps occasioned by the breakdown in the relationship between defense counsel and the late appointment of replacement counsel, there was an inadequate effort by defense counsel to investigate and challenge the government's case. Challenges could have been levied based upon an untested cigarette butt found at the scene, a hair found within 18 inches of the victim's body that was genetically inconsistent with her and Mr. Jackson, inconsistent and inconclusive DNA evidence, inconclusive ballistics evidence, and favorable evidence regarding body decomposition. Lindsay Affidavit, ¶17. The defense team was in such disarray it simply did not pursue this favorable evidence. There was no serious challenge to Mr. Jackson's confession, despite the fact that the government did not intend to introduce it and it had been excluded on constitutional grounds in state court. Finally, there was no effort made at developing an alternative perpetrator, for which there now appears to be newly discovered evidence. *See* Amendment to Motion to Vacate (with attachments) filed contemporaneously with this supplemental memorandum.

Under these circumstances, Mr. Jackson simply did not have counsel functioning in a competent way. He was essentially without counsel. For these reasons, his conviction must be set aside.

II. **RICHARD JACKSON RECEIVED CONSTITUTIONALLY INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS LAWYERS FAILED TO ADVOCATE FOR AND VIGOROUSLY ADVISE HIM TO ACCEPT A GUILTY PLEA THAT WOULD HAVE RESULTED IN A SENTENCE OF LIFE IMPRISONMENT WITHOUT PAROLE.**

Richard Jackson received constitutionally ineffective assistance of counsel when his lawyers failed to pursue favorable resolution of the charges through a plea of guilty to life

16

imprisonment without parole. This case could have been resolved in this manner. Early in the representation, Eric J. Foster, one of Mr. Jackson's initial lawyers, learned the government would be willing to resolve this case through a plea of guilty. After one of the first hearings on pretrial motions, the prosecutor mentioned a guilty plea with a sentence of life without parole was possible because the case was moving so quickly. Affidavit of Eric J. Foster, ¶5, Exhibit 12. However, this option would only be available for a short time. Mr. Foster believed the deadline for pursuing this option was late December 2000 or early January 2001. Foster Affidavit, ¶5. Although Mr. Foster mentioned this possibility to his client, he did not press the matter. Mr. Jackson was not receptive to the idea of admitting guilt and taking a plea. Mr. Foster acknowledged he "did not make a 'hard sale' about it." Foster Affidavit, ¶5. Mr. Foster had no previous experience in capital litigation and did not know how to press a discussion regarding a life-saving plea with his client.

Mr. Foster did not seek the assistance of lead counsel, Stephen P. Lindsay, in this effort. He also did not seek the assistance of other lawyers or any of Mr. Jackson's family members. Mr. Foster knew it had been difficult for the attorneys who represented Mr. Jackson in state court to convince him to take a very favorable plea. Foster Affidavit, ¶6. According to Mr. Foster, "my brief meeting with Mr. Jackson to discuss the possibility of a plea in federal court was insufficient. I should have taken more time to discuss a plea." Foster Affidavit, ¶6. Mr. Foster also recognized that due to his lack of experience in capital litigation, "I should have turned to more experienced capital litigators to discuss how best to proceed with effectively presenting this option to a reluctant client." Foster Affidavit, ¶6.

Furthermore, Mr. Lindsay, lead counsel in this matter, delegated most of the

17

responsibilities regarding trial issues to Mr. Foster in the early stages of the proceedings, including the responsibility for having most of the contact with the client. Mr. Lindsay did so despite having expressed reluctance to have Mr. Foster appointed as co-counsel. Affidavit of Mr. Stephen P. Lindsay, ¶2, Exhibit 26. Mr. Lindsay has now recognized his delegation of these responsibilities, particularly the role of having most of the contact with the client, was a serious error in judgment, especially where he implored the court to appoint experienced co-counsel because of the complexity and enormity of this case. Lindsay Affidavit, ¶2. Mr. Lindsay knew any effort to resolve this matter through a guilty plea had to occur quickly. At that point, Mr. Foster had done the majority of the communicating with Mr. Jackson. Lindsay Affidavit, ¶6. Mr. Lindsay recalled Mr. Foster discussed this possible resolution of the case with Mr. Jackson. But Mr. Lindsay does not remember if he talked to Mr. Jackson about it at all. Lindsay Affidavit, ¶6. Mr. Lindsay candidly conceded he "should have had more direct contact with Mr. Jackson during this period of time." Lindsay Affidavit, ¶6.

When David Belser later replaced Mr. Foster as co-counsel just more than a month before the trial began, he obtained Mr. Jackson's authorization to resolve this case through a plea bargain. At that point, the government was unwilling to consider this option. Because substitute counsel was able to bring Mr. Jackson along with this resolution, Mr. Lindsay admits he should have had more direct contact with Mr. Jackson. If he had been more actively involved with the client in the early stages, "it is likely I could have obtained his authority to negotiate a plea for life without parole." Lindsay Affidavit, ¶6.

The peril of having inexperienced counsel in this complicated case manifested itself in Mr. Foster's failure to succeed with a guilty plea. Mr. Belser was eventually appointed to

18

replace Mr. Foster with only a few weeks remaining before trial. He immediately recognized that one of the aspects of the case that had received no attention was the possibility of resolving it through a plea bargain. Affidavit of David G. Belser, ¶6, Exhibit 4. Mr. Belser understood the government had been willing to accept a guilty plea with a sentence of life imprisonment without parole. To his surprise, Mr. Lindsay and Mr. Foster had allowed the deadline for pursuing this option to pass. Indeed, Mr. Belser was "not sure the lawyers had made any effort in this area." Belser Affidavit, ¶6. Mr. Belser worked closely with the client and also sought the assistance of his mother in this effort. After some discussions with Mr. Belser, Mr. Jackson decided to take the plea, but the government said it was too late. Belser Affidavit, ¶6.

Unquestionably, trial counsel failed to pursue this resolution in a timely and conscientious manner. Competent counsel would have recognized the importance of achieving this positive result in a capital case. It is always possible the government will be willing to accept a guilty plea, especially in a capital case where a plea would result in a defendant being sentenced to life imprisonment without parole. Affidavit of C. Frank Goldsmith, Jr., ¶5, Exhibit 15; Affidavit of Sean P. Devereux, ¶¶ 9, 10 Exhibit 85. Mr. Goldsmith believes that Mr. Lindsay and Mr. Foster did not make a conscientious effort to obtain Mr. Jackson's trust. This "trust cannot be assumed; it must be earned." Goldsmith Affidavit, ¶5. It is imperative for both lawyers to proceed in a timely fashion and work hard to develop a trusting and credible relationship with the client. The process takes considerable time, which is considerably longer if the case is complicated and serious. Neither lawyer spent much time with the client during the early stages of the representation. Failing to do so resulted in a lack of competent representation. Goldsmith Affidavit, ¶5. In Mr. Goldsmith's opinion, competent counsel would

19

have spent considerable time, jointly and separately, with the client to build a trusting relationship, to explain their knowledge of the facts and the law, to listen closely to the client's views, and then to discuss candidly the likelihood of a successful result and the wisdom of pleading guilty. Mr. Goldsmith does not believe this effort occurred in Mr. Jackson's case until substitute counsel was appointed, when it was too late. Goldsmith Affidavit, ¶5. Mr. Devereux agreed with this analysis. Devereux Affidavit, ¶10.

Mr. Jackson's lawyers well knew he would be reluctant to accept a plea of guilty. He faced similar charges in state court and eventually accepted a guilty plea. However, it took the dedicated and consistent efforts of his trial lawyers to reach this result. Affidavit of J. Calvin Hill, ¶¶1, 3, 5, 6, Exhibit 17; Affidavit of J. Robert Hufstader, ¶¶4, 5, 6, Exhibit 18. Indeed, Mr. Hill and Mr. Hufstader enlisted the aid of several other lawyers with considerable experience in capital litigation to convince Mr. Jackson to accept this favorable resolution in state court. These lawyers spent considerable time with Mr. Jackson. They were eventually able to convince him of the wisdom of accepting the plea bargain. Affidavit of Stephen P. Freedman, ¶6, Exhibit 14; Affidavit of Staples Hughes, ¶¶6, 10, 11, 12, Exhibit 19; Affidavit of Malcolm R. Hunter, Jr., ¶¶2, 4 , Exhibit 20. The state court lawyers also relied on Mr. Jackson's mother in their effort, who was instrumental in convincing Mr. Jackson to accept the favorable resolution in state court. Affidavit of Sally Jackson, ¶4, Exhibit 23. Mr. Jackson's federal lawyers were well aware of these developments, as they obtained affidavits from each of the lawyers involved in the state litigation to support several pretrial motions in the federal case. Thus, they knew it would be difficult to convince Mr. Jackson to accept a favorable plea in the federal case. Nevertheless, they did not take the conscientious and timely action they knew would be

20