**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION**

**CIVIL NO. 1:04CV251
(1:00CR74)**

| | | |
|---|---|---|
| **RICHARD ALLEN JACKSON,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **Vs.** | ) | <u>**MEMORANDUM OF**</u> |
| | ) | <u>**OPINION AND ORDER**</u> |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| | ) | |

**THIS MATTER** is before the Court on Petitioner's motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255, filed November 16, 2004.

**I.  PROCEDURAL HISTORY OF THIS ACTION**

Included in the prayer for relief of Petitioner's motion are requests for discovery and an evidentiary hearing, along with a motion for leave to file amendments to the petition.  In addition to his § 2255 petition, Petitioner also filed motions for leave to interview jurors and for the production of

records from the Buncombe County Department of Social Services

("DSS").  The undersigned required the Government to file response to

these motions/requests.  *See* **Order, filed November 22, 2004.**

Thereafter, Petitioner's counsel requested "necessary funds to retain the

assistance of experts."  **Petitioner's Motion for Funds for Expert**

**Assistance, filed December 21, 2004.**[1]

Considering the Petitioner's motions and the Government's

response, the undersigned denied each of the above requests, except that

Petitioner was allowed to file amendments to his § 2255 motion without the

Court deciding whether such amendments would relate back to the date of

filing.[2]  *See* **Order, filed January 31, 2005;** *see also***, Petitioner's**

**Amendment to Motion to Vacate, and Supplemental Memorandum,**

---

[1] Although this motion should have been properly filed in the civil action, it was filed only in the Petitioner's criminal case.

[2] The Court noted in the Order that the time periods provided in 28 U.S.C. § 2266 could be argued to apply to motions pursuant to 28 U.S.C. § 2255 where the death penalty has been imposed.  "Out of an abundance of caution and in the absence of any waiver by the Petitioner," the Court opted to follow the time parameters provided in the statute.  **Order,** *supra***, at 6 n.4.**  In response, the Petitioner waived any time periods which may have been applicable pursuant to 28 U.S.C. § 2266.  **Petitioner's Motion for Extension of Time to File Supplemental Materials, filed March 11, 2005, at 5 ("[T]he [Petitioner] waive[s] any time periods prescribed in 28 U.S.C. § 2266[.]").**

**filed April 28, 2005; Second Amendment to Motion to Vacate, filed under seal July 17, 2006.**

In May 2005, the undersigned granted the Petitioner's motion for Government funds to retain the services of a private investigator. **Petitioner's Motion for Private Investigator, filed April 28, 2005; Order, filed May 12, 2005 (granting motion and limiting expenditure to $1,000 plus reasonable expenses);** *see also*, **Order, filed August 19, 2005 (re-entering the May 12, 2005, Order for lack of service of the original order on Petitioner's counsel).** Thereafter, the Petitioner filed a motion for an extension of time to file further amendments and supplemental materials supporting his § 2255 motion along with a motion for an *ex parte* hearing on the issue of experts. **Petitioner's Motion for Extension of Time to File Supplemental Materials, filed November 16, 2005; Petitioner's Motion for *Ex Parte* Hearing to Seek Additional Funds for Private Investigator and Other Necessary Expert Assistance, filed December 5, 2005.** By Orders entered on June 16, 2006, the Court denied the Petitioner's motions for an *ex parte* hearing and additional funds for experts and new deadlines were provided for the filing of additional

claims by the Petitioner and responses by the Government.  **Order, filed under seal June 16, 2006; Order, filed June 16, 2006.**

Petitioner then filed renewed motions for the appointment of experts. *See* **Petitioner's Motions to Appoint Experts (fingerprint expert, forensic audiology, forensic anthropology), filed under seal July 17, 2006;** *see also***, Petitioner's Explanation regarding Renewed Motions, filed under seal August 4, 2006.**  The Court again denied the relief sought.  **Order, filed under seal August 15, 2006.**

The Government's response to the § 2255 petition was filed on November 15, 2006; Petitioner's reply thereto was filed January 16, 2007. **Government's Response in Opposition to Petitioner's Motion to Vacate Conviction ("Government's Response"), filed November 15, 2006; Petitioner's Reply to Government's Response ("Petitioner's Reply"), filed January 16, 2007.**  The  case is, therefore, ready for disposition.

## II.  PROCEDURAL HISTORY OF THE UNDERLYING CRIMINAL CASE

On October 31, 1994, Karen Styles disappeared from a hiking trail in the Pisgah National Forest.  ***United States v. Jackson*, 327 F.3d 273, 279**

(4th Cir.), *cert. denied*, 540 U.S. 1019 (2003).  Three weeks later, her body was discovered by a hunter.  *Id*.  She had been killed by a single bullet to the head and had suffered ten stun-gun wounds to her body, nine of which were inflicted close to the pubic area.  *Id*.  Officers found a spent Remington .22 caliber rifle casing near the body which they ultimately traced to a local K-Mart.  *Id*.  The records maintained by the K-Mart showed that a .22 rifle and ammunition had been sold to the Petitioner on October 28, 1994.  *Id*. at 279-80.  After voluntarily accompanying police to the Buncombe County Sheriff's Department for an interview on December 20, 1994, the Petitioner confessed twice to murdering Styles.  *Id*. at 280.

The State of North Carolina prosecuted the Petitioner on charges of first degree murder, first degree kidnaping and first degree rape.  *Id*.  After a jury trial, the Petitioner was found guilty on all counts and the jury recommended the death penalty.  The trial court, following the jury's recommendation, sentenced Petitioner to death on November 6, 1995.  *Id*.  On appeal, the North Carolina Supreme Court reversed the Petitioner's conviction and ordered a new trial based on its conclusion that the police violated the Petitioner's right not to be interrogated after he invoked the

right to counsel.  **State v. Jackson**, **348 N.C. 52, 497 S.E.2d 409,** *cert.*

*denied*, **525 U.S. 943 (1998).**

After the reversal and remand for a new trial, the State of North

Carolina entered into a plea agreement with the Petitioner on March 3,

2000, pursuant to which he pled guilty to second degree murder, first

degree rape, and second degree kidnaping.  **Jackson**, **327 F.3d at 281.**

The plea bargain included a stipulated prison sentence of 31 years with

credit for five years already served.  **Id**.

On October 2, 2000, the United States obtained an indictment,

superseded on November 6, 2000, charging the Petitioner with using a

firearm during and in relation to crimes of violence, that is, murder,

kidnaping and aggravated sexual abuse, in violation of 18 U.S.C. §§

924(c), 924(j)(1), and 7(3).[3]  **Bill of Indictment, filed October 2, 2000;**

*see also*, **Superseding Indictment, filed November 6, 2000.**  The

Petitioner's jury trial began on April 30, 2001.  The guilt phase of the trial

lasted six days with the jury unanimously finding that the Petitioner

---

[3] Section 924(j)(1) provides that a "person who, in the course of a
violation of [924(c)], causes the death of a person through the use of a
firearm, shall (1) if the killing is a murder (as defined in section 1111), be
punished by death or by imprisonment for any term of years or for life[.]"

committed the crimes of kidnaping, aggravated sexual abuse, murder with malice aforethought and with premeditation during the perpetuation of kidnaping and sexual abuse, and in so doing, used a firearm. **Verdict Sheet, filed May 7, 2001.** The sentencing phase of the trial lasted two more days with the jury answering the Special Verdict Form with a unanimous verdict of death. **Special Verdict Form Regarding the Punishment to be Imposed on the Defendant, filed May 9, 2001.** On May 14, 2001, the undersigned imposed the judgment of death. **Judgment and Order, filed May 14, 2001.**

The Petitioner appealed and on March 18, 2003, the Fourth Circuit Court of Appeals affirmed the Petitioner's conviction and sentence. *Jackson*, **327 F.3d at 279.** The Fourth Circuit made the following rulings in the direct appeal:

1.     The trial court did not err in denying the Petitioner's motion to dismiss the indictment for prosecutorial vindictiveness in light of the circumstances surrounding the State and federal prosecutions;

2.     The trial court did not err in denying the Petitioner's motion to dismiss based on double jeopardy grounds;

3.      The Petitioner's constitutional rights were not violated when the trial court struck a venire member who gave ambiguous answers to questions about his beliefs on the death penalty;

4.      The trial court did not err by refusing to declare a mistrial based on the alleged prosecutorial misconduct of calling a witness who gave possibly fabricated testimony and the Government did not engage in prosecutorial misconduct by calling the witness;

5.      It was not reversible error to admit the expert testimony of Dr. Robert Stratbucker as to stun-gun evidence;

6.      Any error in the admission of evidence of other acts was harmless;

7.      The trial court did not abuse its discretion by excluding testimony concerning the mental condition of the Petitioner's sister during the sentencing phase of the trial;

8.      The trial court abused its discretion in permitting the Government to show the entire videotaped interview of the Petitioner during the sentencing phase in rebuttal of mitigation evidence; however, the error was harmless;

9.     Trial counsel did not render ineffective assistance of counsel by making the comment during closing argument that "justice in this case says death;"

10.     The trial court did not err by allowing the jury to consider multiple intent factors, and thus, did not unconstitutionally skew the weighing process towards the death penalty;

11.     The statutory aggravating circumstance of "substantial planning and premeditation" was not unconstitutionally vague;

12.     The jury instructions during the sentencing phase did not violate the Federal Death Penalty Act or the Eighth Amendment;

13.     The indictment was not defective for failing to allege the aggravating circumstances necessary for the imposition of the death penalty; and

14.     The trial court did not err in denying the Petitioner's motion to be returned to State custody to finish his pre-existing sentence before being subjected to the federal sentence of death.

*Id.* at 294-307.

## III.  STANDARDS OF REVIEW

Section 2255 provides:

A prisoner in custody under sentence of a court established by
Act of Congress claiming the right to be released upon the
ground that the sentence was imposed in violation of the
Constitution or laws of the United States, . . . or that the
sentence was in excess of the maximum authorized by law, or
is otherwise subject to collateral attack, may move the court
which imposed the sentence to vacate, set aside or correct the
sentence.

**28 U.S.C. § 2255(a).**  In order to obtain relief pursuant to this statute, a

petitioner must show the "'existence of an error of constitutional magnitude

which had a substantial and injurious effect or influence on the guilty plea

or the jury's verdict.'"  **Humphress v. United States, 398 F.3d 855, 858**

**(6th Cir. 2005) (quoting Griffin v. United States, 330 F.3d 733, 736 (6th**

**Cir. 2003)).**  The bulk of the Petitioner's claims here are related to

ineffective assistance of counsel.  Where the claims relate to other

allegations of error, the standard of review is stated within the discussion of

that claim.

**A.   Ineffective assistance of counsel.**

Most of the Petitioner's claims relate to ineffective assistance of counsel at the trial level.  In considering Petitioner's claims that he did not receive adequate assistance of counsel,

> [f]irst, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

***Strickland v. Washington*, 466 U.S. 668, 687 (1984).**  Unless a defendant makes both showings, his claim of ineffective assistance of counsel must fail.  ***Id.***  Thus, a defendant must show that counsel's performance fell below objective standards of reasonableness and that, but for his conduct, there was a reasonable probability the result would have been different.  ***Id.* at 688; *Hill v. Lockhart*, 474 U.S. 52 (1985); *Fields v. Attorney Gen. of State of Md.*, 956 F.2d 1290 (4th Cir. 1992).**  If the defendant fails to make the first showing, there is no need to consider the second.  ***Strickland*, 466 U.S. at 697**.

In addition, the Petitioner also argues that trial counsel's conduct was *per se* prejudicial.

Generally, to establish ineffective assistance of counsel, a defendant must show that counsel's performance was deficient, and counsel's performance prejudiced the defense. However, prejudice need not be shown in certain limited situations. [*United States v. Cronic*, 466 U.S. 648, 659-60 (1984)] notes four situations where courts have found *per se* ineffectiveness: (1) where there has been a "complete denial of counsel;" (2) where the accused is denied the presence of counsel at "a critical stage" such as arraignment; (3) "[when] counsel entirely fails to subject the prosecution's case to meaningful adversarial testing;" and (4) where circumstances are so prejudiced against the defendant that competent counsel could not render effective assistance.

***Conklin v. Schofield*, 366 F.3d 1191, 1201 (11ᵗʰ Cir. 2004) (other citations omitted).**  In the Fourth Circuit, the factors are slightly modified as follows: prejudice is presumed when (1) there was no lawyer present during a critical stage; (2) the attorney failed to subject the prosecution's case to meaningful adversarial testing and thus might as well have been absent; and (3) even competent counsel could not provide effective assistance under the circumstances.  ***Lenz v. Washington*, 444 F.3d 295, 303-04 (4ᵗʰ Cir. 2006); *Glover v. Miro*, 262 F.3d 268, 275 (4ᵗʰ Cir. 2001) ("'[A]lthough counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the**

**trial.'" (quoting *Cronic*, 466 U.S. at 659)).**  Here, the Petitioner alleges that his attorneys "faced circumstances in which competent counsel could not render assistance and failed entirely to subject the government's case as to guilt and sentence to meaningful adversarial testing." **Petitioner's Supplemental Memorandum, *supra*, at 2 (citing *Bell v. Cone*, 535 U.S. 685, 696 (2002)); *see also*, Petitioner's Motion to Vacate, *supra*, at 4-5 (also citing *Bell* and *Cronic*).**

"*Cronic* was meant to cover those cases in which prejudice was to be assumed [whereas] *Strickland* would address cases in which prejudice needed to be shown." **Van v. Jones, 475 F.3d 292, 308 (6ᵗʰ Cir. 2007), cert. denied, 128 S. Ct. 708 (2007).**  "In [those] rare cases [under *Cronic*], it is appropriate to presume that the deficient performance resulted in prejudice without requiring any demonstration that the deficiency prejudiced the defense." **Malcom v. Houston, 518 F.3d 624, 627 (8ᵗʰ Cir.), cert. denied, 129 S. Ct. 397 (2008).**  "When [the Supreme Court] spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, [the Court] indicated that the attorney's failure must be complete." **Bell, 535 U.S. at 696-97.**  As for the fourth factor listed in *Cronic*, "[t]he presumption of prejudice afforded

under *Cronic* is limited . . . to those cases where defendant was subject to a pretrial and trial process so fundamentally flawed that no lawyer of any quality could provide constitutionally adequate counsel." **Johnson v. Bradshaw, 205 F. App'x 426, 433 (6th Cir.), cert. denied, 128 S. Ct. 83 (2007).** "A finding of *per-se* prejudice under any of these [*Cronic*] prongs is 'an extremely high showing for a criminal defendant to make.'" **Glover, 262 F.3d at 275 (quoting Brown v. French, 147 F.3d 307 313 (4th Cir. 1998)).**

In Petitioner's § 2255 motion, whether trial counsel rendered effective performance is a mixed question of law and fact which requires the application of legal principles to the historical facts of the case. **Strickland, 466 U.S. at 698.** "[T]he § 2255 motion . . . will be ruled upon by the same district judge who presided at trial. The judge, having observed the earlier trial, should have an advantageous perspective for determining the effectiveness of counsel's conduct and whether any deficiencies were prejudicial." **Massaro v. United States, 538 U.S. 500, 506 (2003).**

**B.    Affidavits from attorneys.**

In support of his motion, the Petitioner has submitted affidavits from six attorneys who have opined as to the effectiveness of representation provided by Eric Foster, Steven Lindsay and David Belser, each of whom were involved in the representation of the Petitioner.

Donald H. Beskind, averred:

> In my opinion, Mr. Jackson's trial lawyers did not provide constitutionally competent representation in the way they litigated the issue of the admissibility of the testimony from Dr. Stratbucker.
>
> . . .
>
> In my opinion, trial counsel's inadequate understanding of the relevant scientific and technical principles involved, failure to obtain or consult with a competent expert in the field, and failure to litigate under the factors identified in *Daubert* [*v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)], particularly in a case where their client was charged with a crime that carried a possible death sentence, was woefully inadequate representation.
>
> . . .
>
> In my opinion, competent counsel would have known or learned that even if the evidence was inadmissible before the jury; such evidence was admissible before a judge considering whether to admit evidence about the defendant's sister.

**Exhibit 6, Affidavit of Donald H. Beskin,** *attached to* **Petitioner's Supplemental Memorandum, ¶¶ 5, 11, 19.**

C. Frank Goldsmith, Jr., averred:

Under the circumstances, competent counsel would have sought a continuance.

. . .

From the information provided to me, I do not believe Mr. Lindsay and Mr. Foster made any concerted effort [to resolve the case through a plea bargain]. . . .  Competent counsel would have, jointly and separately, spent considerable time [trying to convince the Petitioner to plead guilty].

. . .

In my opinion, this lack of reasonably thorough preparation on [the stun gun issue] amounts to ineffective assistance of counsel.

. . .

The failure to tell the client [about the strategy of conceding guilt] and get his consent to these actions was ineffective.

. . .

Competent counsel would have [filed a motion for appropriate relief in state court]. . . .  It was ineffective assistance of counsel to make this challenge in the wrong court.

. . .

To the extent that defense counsel were concerned about the introduction of the videotaped interviews of their client by the government mental health experts, defense counsel rendered ineffective assistance of counsel in failing to develop and present to the jury the lay and expert evidence that was necessary in order to present their client's mental condition to the jury and to meet the expected testimony from the government's expert.

. . .

[T]rial counsel was ineffective in not presenting . . . mitigating evidence.

. . .

In my opinion, the failures of Mr. Lindsay and Mr. Belser outlined above amounted to the ineffective assistance of counsel for Mr. Jackson.  None of these acts of commission or omission is supported by an objectively reasonable basis.

**Exhibit 15, Affidavit of C. Frank Goldsmith, Jr., attached to *id*., ¶¶ 4-9, 12, 15.**

Attorney Thomas F. Loflin, III, also provided an affidavit.  ***See* Exhibit 28, Affidavit of Thomas F. Loflin, III, *attached to id*.**  In December 2006, Loflin was suspended from the practice of law for a three year period; the suspension was stayed pending his compliance with certain conditions.  ***See***  www.ncbar.com/discipline.  The Court excludes his affidavit.

Susan T. Parke, who is the wife of David Belser, one of Petitioner's trial attorneys, also provided an affidavit.  ***See* Exhibit 34, Affidavit of Susan T. Parke, *attached to id*., ¶ 3.**  Although Parke refers to the Petitioner in her affidavit as "our client," Parke was not appointed to represent the Petitioner.  In fact, David Belser requested the Court appoint Parke as a jury selection expert and the motion was denied.  Belser thereafter submitted a voucher seeking payment for Parke's services as a jury selection expert.  That claim for her services was denied since her request for appointment had been denied.  Although Parke has provided an affidavit in which she opines as to the effectiveness of both her husband and Steve Lindsay, the undersigned rejects her opinion for the reasons stated *infra*.

Claire Rauscher provided an affidavit in which she opined that the Petitioner's attorneys in the *second state court* prosecution rendered ineffective assistance of counsel. **Exhibit 36, Affidavit of Claire Rauscher,** *attached to id.*

Sean P. Devereux, also provided an affidavit in which he opined as follows:

> In my opinion, Richard Jackson's lawyers were ineffective in failing to seek a postponement of his trial.
>
> . . .
>
> I am dumbfounded by Mr. Lindsay's failure to prepare for the government's evidence about the stun gun. . . .
>
> . . .
>
> The failure to anticipate and prepare to meet the stun gun evidence amounts to grossly deficient representation.
>
> . . .
>
> It was ineffective assistance of counsel to make this challenge [to the state guilty plea] in the wrong court.
>
> . . .
>
> Defense counsel's decision to forego the use of all expert mental health testimony was unreasonable. . . . To the extent that defense counsel were concerned about the introduction of the videotaped interviews of their client by the government's mental health expert, defense counsel rendered ineffective assistance of counsel in failing to address their concerns.
>
> . . .
>
> Mr. Jackson's only effective advocate [David Belser] had 38 days to meet this onslaught. The result was a fiasco, no more than a semblance of capital trial.

**Exhibit 85, Affidavit of Sean P. Devereux, *attached to id.*, ¶¶ 6, 11, 13, 15, 16, 27**.

The Petitioner has not identified in what capacity these affidavits are offered. If the Petitioner intends to offer testimony through these attorneys' affidavits as lay witnesses, then their testimony is "limited to those opinions or inferences which are . . . not based on . . . specialized knowledge within the scope of Rule 702[,]" that is, their opinions are not offered as expert testimony. **Fed. R. Evid. 701 & 702.** However, each attorney has offered his or her expert opinion as a lawyer as to whether or not the trial attorneys for the Petitioner rendered ineffective assistance of counsel.[4] As a result, these legal opinions may not be accepted as lay testimony. ***Hirst v. Inverness Hotel Corp.*, 544 F.3d 221 (3d Cir. 2008)**. It, therefore, appears that the Petitioner has offered the affidavits of these expert witnesses under the guise of lay witness testimony. ***Id.* at 227 (Rule 701(c) was added to "eliminate the risk that the reliability**

---

[4] It is worth noting that each attorney frequently prefaced their comments as being based on information provided to them. Thus, their opinions were not based on individual perception or first hand knowledge. ***Hirst v. Inverness Hotel Corp.*, 544 F.3d 221 (3d Cir. 2008); *Provenzano v. Singletary*, 148 F.3d 1327, 1331 (11th Cir. 1998) (the affidavit was "conspicuous for what it does not say").**

**requirements set forth in Rule 702 will be evaded through the simple
expedient of proffering an expert in lay witness clothing . . . by simply
calling an expert witness in the guise of a layperson.").**  The Court
rejects the affidavits as lay witness testimony.

Moreover, the Petitioner has merely attached these affidavits as
exhibits; there has been no effort to qualify these attorneys as experts in
the defense of death penalty cases.  **Fed. R. Evid. 702.**[5]  Assuming the
attorneys do qualify as experts, "testimony in the form of an opinion or
inference otherwise admissible is not objectionable because it embraces
an ultimate issue to be decided by the trier of fact."  **Fed. R. Evid. 704(a).**
"'That said, an expert witness cannot give an opinion as to [his or] her *legal
conclusion*; *i.e.*, an opinion on an ultimate issue of law.'" ***Nationwide
Transp. Fin. v. Cass Info. Sys. Inc.,* 523 F.3d 1051, 1058 (9th Cir. 2008)
(quoting *Hangarter v. Provident Life & Accident Ins. Co.,* 373 F.3d 998,**

---

[5] Rule 702 provides that "[i]f . . . specialized knowledge will assist the
trier of fact to understand the evidence or to determine a fact in issue, a
witness qualified as an expert by . . . training, or education, may testify
thereto in the form of an opinion . . . if (1) the testimony is based upon
sufficient facts or data; (2) the testimony is the product of reliable principles
and methods, and (3) the witness has applied the principles and methods
reliably to the facts of the case."

**1016 (9ᵗʰ Cir. 2004)).** "[O]pinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible." *United States v. McIver*, **470 F.3d 550, 562 (4ᵗʰ Cir. 2006).** That is precisely what each attorney has done in his or her affidavit by opining that trial counsel rendered ineffective assistance of counsel. As a result, the undersigned will exclude these affidavits. *See, e.g., Newland v. Hall*, **527 F.3d 1162, 1207 (11ᵗʰ Cir. 2008) (affidavits from trial counsel and other attorneys regarding what constitutes effective assistance in capital cases are not dispositive and have little weight);** *United States v. Barile*, **286 F.3d 749, 760 (4ᵗʰ Cir. 2002) (role of the district court is to distinguish opinion testimony that embraces the ultimate issue of fact from opinion that states a legal conclusion, that is, specialized legal meaning);** *United States v. Chapman*, **209 F. App'x 253 (4ᵗʰ Cir. 2006) (district court did not err in excluding expert testimony concerning securities law),** *cert. denied*, **127 S. Ct. 2286 (2007);** *McIver*, **470 F.3d at 562 (collecting cases);** *DiBella v. Hopkins*, **403 F.3d 102, 121 (2d Cir. 2005) (testimony that defendant's conduct was extortion excluded);** *Archuleta v. Lemaster*, **37 F. App'x 391, 393 (10ᵗʰ Cir. 2002) (expert testimony as to whether trial counsel provided**

**ineffective assistance rejected as advising the court about the proper application of existing law to the facts and the ultimate issue of trial counsel's effectiveness);** *United States v. Wilson*, **133 F.3d 251 (4th Cir. 1997) (district court should not have allowed expert opinion as to what the law means or how it is interpreted).**

**C.     The necessity for an evidentiary hearing.**

"If [a § 2255] motion is not dismissed, the judge must review the answer, any transcripts and records of prior proceedings, and any materials submitted . . . to determine whether an evidentiary hearing is warranted."  **Rule 8, Rules Governing Section 2255 Proceedings for the United States District Courts.**  In this case, the Petitioner has expanded the record to voluminous proportions.  He has filed multiple amendments to the motion and exhibits in support thereof.  In addition, the expansive record of the proceedings, including the pleadings, pretrial, and trial transcripts, have been placed before and reviewed by the Court.

"A hearing is required when a movant presents a colorable Sixth Amendment claim showing disputed material facts and a credibility determination is necessary to resolve the issue."  ***United States v. Coon,***

**205 F. App'x 972, 973 (4ᵗʰ Cir. 2006) (citing *United States v.***

***Witherspoon*, 231 F.3d 923, 925-27 (4ᵗʰ Cir. 2000)) (other citations**

**omitted).** A hearing is not required unless the Sixth Amendment claim

shows "disputed facts involving inconsistences *beyond the record*[.]"

***United States v. Robinson*, 238 F. App'x 954, 955 (4ᵗʰ Cir. 2007) (citing**

***United States v. Magini*, 973 F.2d 261, 264 (4ᵗʰ Cir. 1992)) (emphasis**

**added).** Conclusory allegations contained within affidavits do not require a

hearing. ***Strong v. Johnson*, 495 F.3d 134, 139-40 (4ᵗʰ Cir. 2007).** And,

trial counsel's statements in affidavits filed years after the trial (in which

counsel in effect "fall on their swords") do not create credibility issues when

"trial counsel's documented contemporaneous statements show the

contrary." ***United States v. Streater,* 70 F.3d 1314, 1321 (D.C. Cir.**

**1995).** "Thus, no hearing is required if the petitioner's allegations 'cannot

be accepted as true because they are contradicted by the record,

inherently incredible, or conclusions rather than statements of fact.'"

***Arredondo v. United States*, 178 F.3d 778, 782 (6ᵗʰ Cir. 1999) (quoting**

***Engelen v. United States*, 68 F.3d 238 240 (8ᵗʰ Cir. 1995)); *Brown v.***

***United States*, 261 F. App'x 865, 869 (6ᵗʰ Cir. 2008) ("the record itself**

**offered sufficient evidence to contradict the petitioner's claims").** In

addition, "[w]here, as here, the judge considering the § 2255 motion also conducted the trial, the judge may rely on his . . . recollections of the trial." ***Arredondo*, 178 F.3d at 782 (citing *Blanton v. United States*, 94 F.3d 227, 235 (6th Cir. 1996)).**

As the Court which presided over all pretrial proceedings as well as the trial of the action, the undersigned is uniquely qualified to compare the contentions of ineffective assistance of counsel with the contemporaneous conduct and statements of counsel. Moreover, concerning the other issues raised in this motion, it is clear from the pleadings, files and records that the Petitioner is not entitled to any relief; therefore, the undersigned has concluded that a hearing is not required. "'A § 2255 motion 'can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.'" ***United States v. Regenos*, 405 F.3d 691, 694 (8th Cir. 2005) (quoting *Sanders v. United States*, 341 F.3d 720, 722 (8th Cir. 2003) (quoting *Engelen*, 68 F.3d at 240)).**

# IV.  DISCUSSION

## A.    Ineffective assistance of trial counsel.

The Petitioner has argued both that counsel were *per se* ineffective and also that they were ineffective under the *Strickland* standard.  The Court addresses each instance of alleged ineffectiveness below.  The Court finds that trial counsel at no point during their representation rendered *per se* ineffective assistance of counsel.  The Court also finds, pursuant to the *Strickland* standard, that trial counsel at no point during their representation rendered deficient performance.  As a result, it is unnecessary for the Court to address whether the Petitioner has been prejudiced by counsel's deficient performance.

### 1.    Lack of experience of trial counsel; inadequate preparation for trial; failure to request a continuance.

On October 19, 2000, Steve Lindsay (Lindsay) was appointed to represent the Petitioner.  On October 26, 2000, Eric Foster (Foster) was appointed as the second attorney in this capital case.  Lindsay filed an affidavit in connection with this motion in which he averred, in part:

> I asked Magistrate Judge Cogburn to appoint second counsel who had experience in capital litigation. . . .  I specifically requested that David Belser be appointed as co-counsel.

Magistrate Judge Cogburn told me he wanted to expand the number of attorneys with capital experience who would accept federal appointments. . . .  Instead, he appointed Eric J. Foster on 26 October 2000.

. . .

I felt I could trust Mr. Foster with research and motions as he had been a law clerk to a federal judge.

. . .

Over time, the relationship between Mr. Foster and me became extremely strained.  I felt as if I was having to handle everything in this case and micro-manage Mr. Foster all the while "training" him as instructed by Magistrate Cogburn.  It became apparent that there had been a breakdown between Mr. Foster and our client[.]  It came to a point where I advised the district court that I had not and could not adequately supervise Mr. Foster and did not believe Mr. Foster had adequate experience to serve as co-counsel in a capital prosecution as complicated as this case.

. . .

[I] asked the district court to replace Mr. Foster.

. . .

Mr. Foster moved to withdraw, and the district court granted the motion.  David G. Belser was appointed to replace Mr. Foster on 23 March 2001.

. . .

Mr. Foster was allowed to withdraw and the district court appointed Mr. Belser as co-counsel and continued the trial for a short time.  *We told the district court that it would be virtually impossible for Mr. Belser to be prepared as trial was still only five weeks away.*  The district court communicated to Mr. Belser and me that no other continuance of the trial date would be allowed.  I believed that a motion to continue would have been denied and that even making it would have angered the district court.

**Exhibit 27, Affidavit of Steven P. Lindsay, *attached to* Petitioner's**

**Supplemental Memorandum, ¶¶ 2-3, 8, 12-14 (emphasis added).**

The docket record (contemporaneously maintained by the Clerk) reveals that on March 20, 2001, Lindsay filed a motion to continue the case from the April 9, 2001, trial setting, citing the recent appointment of new counsel (Belser) and the impossibility of Belser being "properly prepared" for an April 9 trial setting. **Petitioner's Motion to Continue, filed March 20, 2001.** On March 21, 2001, the motion was allowed and the case was continued "from its peremptory setting of April 9, 2001" to a peremptory setting of April 30, 2001. **Order, filed March 21, 2001 (citing 18 U.S.C. §§ 3161(h)(8)(A), (B)(i), & (B)(iv)).** Lindsay specifically requested the appointment of Belser who agreed to and accepted the appointment with full knowledge that the case was peremptorily set for trial on April 30, 2001. Lindsay averred that he and Belser requested the continuance from the April 9, 2001, trial setting, received a continuance to an April 30, 2001, setting, and did not believe another continuance would have been granted. **Lindsay Affidavit, *supra*, ¶ 14.** Thus, Lindsay's sworn statement that, "[w]e told the district court that it would be virtually impossible for Mr. Belser to be prepared as trial was still only five weeks away," is contrary to

the representations made to the Court at the time.[6]  Allegations made in

support of a § 2255 motion need not be accepted "when trial counsel's

documented contemporaneous statements show the contrary." ***Streater,***

**70 F.3d at 1321; *Arredondo*, 178 F.3d at 782 (allegations which are**

**contradicted by the record do not warrant relief); *Regenos,* 405 F.3d**

**694.**

The Court has also considered the affidavit of David Belser

concerning his failure to move for a continuance of the trial date.  In that

affidavit, Belser acknowledged, among other things, that he has significant

experience in capital cases.

> I was appointed [to represent the Petitioner] on 23 March 2001
> to replace [Eric] Foster, who had been allowed to withdraw.  At
> the time I discussed begin (*sic*) appointed, I told the judge that I
> could not be *fully prepared by the established trial date of 9
> April* 2005 (*sic*).  The judge continued the trial to 30 April 2005
> (*sic*) and it is my recollection that he told Steve Lindsay and me
> there would be no further continuances and indicated if I did not
> accept the appointment, he would find someone else.  *I agreed
> to be appointed* because Mr. Lindsay, who had first been
> appointed to represent Mr. Jackson, asked me to accept the
> appointment because he needed an experienced lawyer to help
> him due to the complexity of this case.  We began jury
> selection only thirty-eight (38) days after I was appointed.
>                                         . . .

---

[6] In addition, as discussed *infra*, other contemporaneous statements
on the record show the contrary.

> I simply did not have enough time to prepare for the trial. . . . I should have moved for a continuance. But I did not do so because the judge had made it very clear from the outset of my involvement that the case would not be continued.
>
> . . .
>
> I have litigated countless criminal trials and a large number of capital cases. I have never felt as unprepared as I was in this case due to the inadequate time to get ready for trial[.]

**Exhibit 4, Affidavit of David Belser, *attached to* Petitioner's Supplemental Memorandum, ¶¶ 3, 14, 24 (emphasis added).**

Thus, Belser states he agreed to accept appointment in this capital case with full knowledge that the trial would begin 38 days after his appointment. *Id.* ¶ 3. He does not allege that he told the Court that he could not be ready by *April 30*, 2001; indeed, he states only that he advised the Court that he could not be "fully prepared" by the *April 9*, 2001, trial date. *Id*. And, he acknowledges that he agreed to be appointed. *Id.* **("I agreed to be appointed because Mr. Lindsay . . . asked me . . . because he needed an experienced lawyer to help him[.]").** Despite the assurances provided to the Court at the time of appointment, Belser now claims he was rushed into trial. However, Belser admits in his affidavit that from the date of his appointment, if not before, he was well aware of the April 30, 2001, trial date and that the Court would grant no further

continuances.  Belser's allegations made in support of Petitioner's § 2255 motion need not be accepted "when trial counsel's documented contemporaneous statements show the contrary."  **Streater, 70 F.3d at 1321; Arredondo, 178 F.3d at 782; Regenos, 405 F.3d 694.**

In fact, Belser's contemporaneous statements in open court are telling.  On April 6, 2001, a hearing was held on the Government's motion to strike the Petitioner's notice of intent to offer expert testimony relating to mental disease or defect bearing upon guilt and punishment.  **Transcript of Motions Proceeding held April 6, 2001, filed August 6, 2001.**  At that hearing, Belser made the following statements to the Court:

> I think we should deal as a threshold issue with one of the government's main objections to the notice, that they believe it is part of a strategy to delay the trial.  *I can tell the court that if the court allows us to file – use expert witnesses in the guilt phase – it will not necessitate the continuance of the trial.  <u>I do not plan to file a motion to continue on this basis or any other basis including my own involvement in the case for nearly six weeks</u>.  I will not file a motion to continue.  <u>We are ready to proceed on April the 30th</u>.*
>
> . . .
>
> And, again, I want to reiterate, the bottom line is *<u>we do not intend to move to continue the case on this or any other basis.  We will be here to try the case on whatever issues the court allows us to do on April the 30th</u>.*

**Id. at 2, 14 (emphasis added).**

_____These statements made in the weeks prior to trial were contemporaneous as opposed to the allegations contained in Belser's sworn affidavit, made in the context of hindsight and to support a § 2255 motion.[7] ***Strickland*, 466 U.S. at 689 (Trial counsel's conduct must be evaluated from "counsel's perspective at the time" with the court making "every effort . . . to eliminate the distorting effects of hindsight[.]").** Belser's contemporaneous statements show not only that he felt he was adequately preparing for trial, but also that he did not believe a continuance was necessary in order to be prepared for trial. His assurance to the Court that "[w]e are ready to proceed on April the 30th" is a far cry from his recent revelation that "I have never felt as unprepared as I was in this case due to the inadequate time to get ready for trial[.]" ***Newland*, 527 F.3d at 1207 (trial counsel's admissions of error in a habeas petition are not controlling); *Wilson v. United States*, 2007 WL 2237673 (D. Ariz. 2007) (contemporaneous statements carry**

---

[7] This observation also applies to Lindsay's allegation that, "[w]e told the district court that it would be virtually impossible for Mr. Belser to be prepared as trial was still only five weeks away." **Lindsay Affidavit, *supra*, ¶ 14.** Lindsay was present at the April 6, 2001, hearing; he heard Belser's comments, but said nothing to contradict Belser's assurances to the Court that they would be ready for trial. ***See generally*, Transcript, *supra.***

**substantial weight);** *Dzinchveladze v. United States*, **2007 WL 549439 (S.D.N.Y. 2007) (contemporaneous statements credited over representations made by counsel in § 2255 petition);** *Montag v. United States*, **2003 WL 22075759 (D.Minn. 2003) (contemporaneous evidence credited over accusation in § 2255 petition).** Belser agreed to the appointment as counsel and entered this case with full knowledge of the trial date, and assured the Court at the time that he was prepared for the April 30, 2001, trial date.

Although Belser and Lindsay now assign issues which they could have explored had they pursued a continuance, the discussion within this decision shows that their conduct at the time of trial did not fall below objective standards of reasonableness. **United States v. Hedgepeth, 418 F.3d 411, 423 (4ᵗʰ Cir. 2005) (A district court's denial of a continuance is reviewed for "abuse of discretion;" even if such an abuse is found, the defendant must show that the error "specifically prejudiced" his case in order to prevail.);** *Chandler v. United States*, **218 F.3d 1305, 1313 (11ᵗʰ Cir. 2000) ("To state the obvious: the trial lawyers in every case could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or**

'**what is prudent or appropriate, but only what is constitutionally compelled.'" (quoting _Burger v. Kemp_, 483 U.S. 776, 794 (1987), quoting _Cronic_, 466 U.S. at 665 n.38)).**  In fact, the affidavits filed by counsel constitute little more than hindsight and appear to be intentional attempts to obtain a reversal.  _**Strickland**_**, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."); _Marquard v. Sec'y for Dep't of Corr._, 429 F.3d 1278, 1304 (11th Cir. 2005) ("'[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take.'" (quoting _Chandler_, 218 F.3d at 1315)).**  "'It is common practice for petitioners attacking their death sentences to submit affidavits[.]'"  _**Id.**_** at 1305 (quoting _Waters v. Thomas_, 46 F.3d 1506, 1513-14 (11th Cir. 1995)); _Newland_, 527 F.3d at 1207 (trial counsel's concession of error is not controlling); _Gilliam v. Sec'y for Dep't of Corr._, 480 F.3d 1027, 1034 (11th Cir. 2007) (it is not**

**dispositive that trial counsel refuses to characterize his decision as strategic),** *cert. denied***, 128 S. Ct. 1697 (2008).**  However, even when the affidavits are those of former counsel, a petitioner must meet the high burden of showing that "no competent counsel would have taken the action" that was taken.  *Chandler,* **218 F.3d at 1315;** *see also Burket v. Angelone***, 208 F.3d 172, 190 (4ᵗʰ Cir. 2000) ("The standard is therefore not what later courts with the benefit of hindsight believe should have been accomplished in earlier proceedings, but instead whether counsel at the time acted within the liberal bounds of competent representation.").**

Lindsay has not averred that he told the Court he would be unprepared for trial on April 30, 2001.  Belser has not averred that he informed the Court that he could not be ready for trial on April 30, 2001.  The only averment is that Belser could not be "fully prepared" on April 9, 2001.  And, the representations made to the Court by both counsel at a hearing on April 6, 2001, that they would be ready for trial on April 30 are directly contrary to the allegations now made years after the fact and in an

attempt to obtain habeas relief.[8]  "To prove abridgment of his Sixth

Amendment right to effective assistance of counsel based upon the district

court's allegedly wrongful denial of continuance, [the Petitioner] must prove

first that the district court abused its discretion in denying the continuance

motion and second that the denial 'specifically prejudiced' his case."

***United States v. Stewart*, 256 F.3d 231, 244 (4th Cir. 2001).**  Thus, the

cases do not support a finding that the Court would have abused its

discretion had a continuance been denied.  *Id.*  Nor has the Petitioner

shown that the lack of a continuance specifically prejudiced his case.  In

---

[8] One case cited by the Petitioner dealt with the failure of the Court to grant a continuance, a circumstance which involves a different standard of review.  **Petitioner's § 2255 Motion, at 32 (citing *State v. Rogers*, 352 N.C. 119, 529 S.E.2d 671 (2000)).**  In *Rogers*, the attorney requested a continuance, unlike this case in which the attorneys did not make such a request.  Indeed, one of the attorneys here accepted the appointment with the knowledge that a continuance would not be granted.  *Id.* **(Defendant's repeated requests for a continuance were denied; two attorneys were assigned 34 days before trial; one of them had no capital experience, the other had never been lead counsel in a capital case; one investigator and no experts were appointed; none of the numerous witnesses were interviewed; the case involved multiple crimes committed in various locations over a two day period.).**  The other case cited by the Petitioner, *Aquino v. Baldwin*, is an Oregon case with no precedential value.  **Petitioner's Motion, *supra.***  However, assuming it did have such value, it involved an attorney who failed to request a continuance in order to await the results of fingerprint analysis which could have disproved the identification of the defendant as the perpetrator. Nothing remotely as dramatic has been alleged here.

fact, every cited example of omission was either refuted on the record at the time or is refuted now by a review of the extensive work done by counsel prior to trial which is discussed *infra*.  The Petitioner has not shown ineffective assistance under either the *per se* or the traditional *Strickland* standard.

Moreover, Belser's contemporaneous attorney voucher disclosed that he spent 123 hours interviewing witnesses, 131.1 hours consulting with investigators and experts, 217.5 hours reviewing records, and 145.75 hours doing legal research and writing.  **Attorney Voucher, filed August 27, 2001.**  It is also interesting to note that Belser moved for leave to file the vouchers under seal or with redactions.  ***Ex Parte* Motion to Seal Payment Vouchers, filed under seal August 17, 2001.**  Finding no good cause to justify sealing the attorney voucher, Belser's request was denied and the voucher was filed as part of the public record.  ***See* Order, filed August 27, 2001.**  The amount of time spent in trial preparation as shown by the voucher is contemporaneous evidence of record.

The Court finds that trial counsel had adequate time to prepare for trial and were not ineffective by failing to move for a further continuance.

The Court makes this finding both as to the allegation of *per se*

ineffectiveness and pursuant to the *Strickland* standard.

There is also an allegation that Foster was ineffective due to a lack of

experience.  On March 14, 2001, Lindsay made the following statements

during an *ex parte* hearing attended by Foster.

**THE COURT**: This morning in the argument, . . . there was some mention about Mr. Foster acting in a training capacity of some sort.  And this being a capital case, . . . if the Court should consider further as to whether there should be a more experienced attorney involved or whether we should pursue this farther or just what the situation is. . . .  I don't want any questioning hereafter by the defendant on some motion about ineffective assistance of counsel, and they almost routinely do that whether counsel's appointed or retained, and I thought I would make inquiry about that.

**LINDSAY**: I want to be fair with everybody involved in this litigation.  When I was first contacted or talked to Magistrate Cogburn about becoming involved in this case, I knew at that time that there were going to be a limited number of lawyers who could become . . . involved just because, for example, Mr. Stewart was one of the trial counsels Mr. Jackson had before and there would be a reluctance to appoint him in this case. . . .  I had talked to Magistrate Cogburn about appointing Mr. Devereux as co-counsel . . . .  Mr. Devereux indicates that his family attends church with the Styles family[.]  I had asked for David Belser to be appointed and a conversation I

had with Judge Cogburn was that he would not do that[.]

. . .

[Eric Foster] has worked very hard on this case. [H]e has done a lot of research. He has obviously done a lot to prepare for this case. But the limitation that it has provided is the inability for me to sit down with somebody who has been through a capital case before and say: how do you think this would play in a capital setting[.] . . . [Eric] Foster is working as hard as he possibly can. That doesn't change the fact that he does not have capital experience. . . . I don't want to sit here telling your Honor that he's not doing his job because he is doing everything that he possibly can, given the limitation that he doesn't have any capital experience. And, so, I'm not going to sit here and criticize him because he really is doing the best that he can.

. . .

**THE COURT**: You have indicated to the Court that it would have been more comfortable for you and less stressful for you to have the opportunity to have someone who was more experienced. Do you feel that the defendant is in any way being deprived of adequate representation in this case[?]

**LINDSAY**: I would say the – probably more tha[t] I'm being deprived of an opportunity for a meaningful life at this point, but that always goes along with handling capital litigation, Your Honor. . . . [I]s the defendant being deprived? No[.] . . . [S]o he's going to get a good trial. He's going to get good representation. Mr. Foster is doing everything that he can. I appreciate his input on things. At the same time,

the only thing I'm saying is is (sic) that there really is – I'm feeling a big burden on me because I'm the one with the capital experience. . . . *I think I'm providing effective representation. I think he's getting effective representation,* if that answers your Honor's questions.

. . .

**THE COURT**: Yes. I have seen absolutely nothing that suggests to me that his representation is in any way being compromised. If I were making an evaluation at this point, I would say that perhaps Mr. Foster lacks some restraints that he would normally possess [in a non-capital setting] and is being certainly adequately zealous. If he had prior experience, he probably could have done more. Mostly, I can't think of any area that has been left unexplored. . . . I think you are doing a splendid job. And, of course, I have been through many capital cases, two since being on the federal bench, but numerous ones at the state level and I do have a good feel for whether or not a defendant is being adequately represented. And if I felt for a minute that [the defendant wasn't] being adequately represent[ed], I wouldn't hesitate to take appropriate action[.]

**Transcript of Motions Proceedings held March 14, 2001, filed August 6, 2001, at 112-117 (emphasis added).**

Thus, at the time, Lindsay felt there were a limited number of attorneys available to work with him on the case, Foster was doing a good job but lacked capital experience, and the Petitioner was getting adequate,

effective assistance of counsel. Moreover, the undersigned specifically

inquired as to the issue of effectiveness of counsel, was reassured by

Lindsay, and noted for the record that both counsel had zealously

represented their client. As a result, the complaints raised now appear to

amount to little more than an attempt to create issues. **Streater, 70 F.3d

at 1321; Arredondo, 178 F.3d at 782; Regenos, 405 F.3d 694.**

Two days after the March 14 hearing, Foster filed an *ex parte* motion

to withdraw stating that the Petitioner had

> little or no trust in [Foster]. Prior to March 14, 2001, this lack of a
> working relationship between [Foster] and [the Petitioner] did not
> seem to hinder the working relationship between the two defense
> attorneys, as[Lindsay] had the primary responsibility of
> communicating with [the Petitioner], and [the Petitioner] and his
> family have a trusting relationship with [Lindsay]. . . . [Foster]
> assures the Court that until March 14, 2001, [Foster] has had no
> indication that the fact that [the Petitioner] could only work with one of
> his attorneys did, in fact, hinder the ability of both defense attorneys
> to provide [the Petitioner] with adequate representation. Moreover,
> [Foster] before March 14, 2001, had never heard such an opinion
> from [Lindsay].
> . . .
> Having had little or no working relationship with [the Petitioner]
> since the beginning of the case, [Foster] has been preparing to
> serve as an "assistant" to [Lindsay] from the outset.
> . . .
> Moreover, [Foster] contacted staff members at the Center for
> Death Penalty Litigation, who assured him that a motion to
> withdraw would not be selfish, in that they have witnessed
> numerous capital cases in which the two defense attorneys –
> no matter how competent – did not get along, and the result

has uniformly been a diminished defense for the defendant.  As
for the latter, the Court must note that the first time [Foster]
became aware of [Lindsay's] lack of confidence in [Foster's]
ability to aid the defense was two days ago, March 14, 2001.

***Ex Parte* Motion to Withdraw as Counsel, filed under seal March 16,**

**2001.**  By this motion, Foster alleges the Petitioner and his family trusted

Lindsay and had a good working relationship with him; Foster was

prepared to and did serve in the role of a research and writing assistant;

and it is not unusual for capital attorneys to disagree.  In fact, Foster's

motion, submitted two days after Lindsay's statements in open court,

reinforces Lindsay's contemporaneous comments to the Court.  It goes

without saying that Lindsay's representations to the undersigned during the

March 14, 2001, hearing supports the conclusion that the Petitioner was

receiving effective assistance of counsel.  Indeed, the undersigned made

that finding at the time.  Nonetheless, the Court allowed Foster to withdraw

and appointed Belser *only* after Belser agreed to take the appointment with

full knowledge of the case, its stage of preparation, and the April 30, 2001,

trial date.

Based on the various affidavits prepared in support of this motion,

the Petitioner claims there is a presumption of prejudice, that is, that

counsel's conduct was *per se* prejudicial because of a lack of preparation

for the trial and the short period of time Belser was involved in the case prior to trial. As noted above, the Court finds that the contemporaneous statements made by counsel on the record in open court refute that argument.

In addition, despite the characterization that Belser was in the case for only 38 days before trial, and thus, incapable of being prepared, it is noteworthy that Lindsay had represented the Petitioner since October 2000. **_Cronic_, 466 U.S. at 649 (young real estate lawyer who had 25 days to prepare for complex mail fraud case was not _per se_ ineffective despite limited time to investigate, prepare and interview witnesses); _State v. Morgan_, 359 N.C. 131, 144, 604 S.E.2d 886, 894 (2004) ("By the time attorney Elmore was appointed as second chair, attorney Young had already been involved in the case for over a year.").** Moreover, the Petitioner had confessed on two different occasions and there had been a previous state court trial; thus, the evidence was not new. **_Trice v. Ward_, 196 F.3d 1151, 1161 (10th Cir. 1999) (four months to prepare for a capital case was not _per se_ prejudicial as defendant had twice confessed and the preparation**

**time was less than other cases especially in light of the substantial evidence against him.).**

Moreover, both Belser and Lindsay were privy to the records from the state proceedings. The names, addresses, and testimony of fact witnesses as well as the names, addresses, *curriculum vitae*, and testimony of expert witnesses were available to counsel. Access to this information affected the amount of time necessary for counsel to prepare for Petitioner's federal trial. It also assisted their ability to form an opinion as to which trial strategy would most likely result in a life imprisonment *versus* a death sentence.

As noted from Belser's attorney voucher and the contemporaneous pretrial motions, the quantity of work done in preparation for trial is grossly understated by the Petitioner, trial counsel, and habeas counsel. ***Prevatte v. French*, 459 F. Supp. 2d 1305, 1343 (N.D. Ga. 2006), *aff'd*, 547 F.3d 1300 (11th Cir. 2008).** At the time of Petitioner's trial, both Lindsay and Belser were experienced attorneys each of whom had handled numerous capital cases. Belser agreed to take the appointment with the knowledge that he would go to trial on April 30, 2001. ***Glover*, 262 F.3d at 278 ("'late appointment of counsel' fails to justify 'a presumption of ineffective**

**assistance of counsel.'" (quoting *Praylow v. Martin*, 761 F.2d 179, 181-83 (4th Cir. 1985)).** By the time of Belser's appointment, as noted below, numerous experts had been appointed on behalf of the Petitioner.[9] The Government maintained an open file policy during the case; thus, discovery and investigation of the factual issues was not an insurmountable task, as now represented. ***Prevatte*, 459 F. Supp. 2d at 1343 ("[T]he prosecution maintained an 'open file,' and defense counsel were well-aware of what the evidence against Petitioner would be.").** "Indeed, the Supreme Court has long emphasized that late appointment of counsel does not *ipso facto* trigger a rule of *per-se* prejudice." ***Glover*, 262 F.3d at 279.**

> [R]eviewing courts must generally regard trials . . . through a particularized and individualized lens rather than through some broad-brush presumption of prejudice. Courts should not presume prejudice where the facts show otherwise, and *Strickland* has the bedrock virtue of looking at prejudice to the defendant in *each* case.

***Id*. at 279-80.**

The Court, therefore, finds that the relationship between Lindsay and Foster, the "late" appointment of Belser, and the failure of Lindsay and

---

[9] Dr. Seymour Halleck; Claudia Coleman; Dr. Page Hudson; Mark Cunningham; Lester Roane; Pam Laughon; and Ronald Ostrowski.

Belser to request a continuance was not *per se* prejudicial.[10]  **Trice, 196 F.3d at 1161;  Avery v. Alabama, 308 U.S. 444, 446 (1940) ("[T]he fact, standing alone, that a continuance has been denied, does not constitute a denial of the constitutional right to assistance of counsel."); Chambers v. Maroney, 399 U.S. 42, 54 (1970).**  The Court also finds that trial counsel rendered effective assistance of counsel pursuant to the *Strickland* standard.

The Petitioner also claims that he received *per se* ineffective assistance of counsel due to Foster's inexperience, Lindsay's performance during the six months prior to the appointment of Belser, and Belser's complete lack of preparation for trial.  To the extent not already addressed above, these claims are discussed *seriatim*.

Regarding Foster's alleged inexperience, Foster has appeared in this Court on numerous occasions and has represented many criminal defendants in felony cases.  **McFarland v. Scott, 512 U.S. 1256 (1994).**

_____

[10] The Court is compelled to note that during an in chambers conference prior to Belser's appointment, both Lindsay and Belser assured the undersigned that they would be prepared for trial on April 30, 2001, in the event that Belser was appointed.  Although the Court does not rely on this conference in making the rulings herein, it is, nonetheless, most troubling to the Court that neither Lindsay nor Belser included this information in their respective affidavits.

While this may have been his first federal death penalty case, that is not as compelling as Petitioner claims.  ***See* 18 U.S.C. § 3005 ("Whoever is indicted for [a] capital crime shall be allowed to make his full defense by counsel; and the court . . . shall promptly, upon the defendant's request, assign 2 such counsel, of whom *at least 1 shall be learned in the law applicable to capital cases*[.]") (emphasis added).**  Lindsay is a seasoned capital litigator in both state and federal courts.  ***United States v. Fields*, 483 F.3d 313, 348 n. 32 (5th Cir. 2007) ("Indeed, as a practical matter, state courts often are the only place that attorneys can gain significant capital experience.").**  Moreover, the federal death penalty statute is quite young by comparison with the state statute.  ***Id.***  In 14 years on the federal bench, the undersigned has presided over only three federal death penalty cases.  It is thus not unusual that in the initial stages of this case, Lindsay had difficulty associating with other counsel who had federal capital experience.  Nor does the fact that Foster lacked such experience render him ineffective; indeed, it may well be that the inexperienced lawyer is more cautious, less cynical, and more zealous.  ***Cronic*, 466 U.S. at 665 ("Every experienced criminal defense attorney once tried his first criminal case. . . .  The character of a particular lawyer's experience**

**may shed light in an evaluation of his actual performance, but it does**

**not justify a presumption of ineffectiveness[.]")**.

Moreover, while Foster may exude the persona of "Rumpole of the

Bailey"[11] and although the Petitioner may not have liked him, Foster was

dogged and zealous in his representation of the Petitioner. ***Morris v.***

***Slappy*, 461 U.S. 1, 14 (1983) ("[T]he Sixth Amendment [does not]**

**guarantee[] a 'meaningful relationship' between an accused and his**

**counsel.");** ***accord*, *Plumlee v. Masto*, 512 F.3d 1204 (9th Cir.),** ***cert.***

***denied*, 128 S. Ct. 2885 (2008);** ***United States v. Mutuc*, 349 F.3d 930,**

**934 (7th Cir. 2003) ("The Sixth Amendment does not guarantee a**

**friendly and happy attorney-client relationship.  The fact that Fennerty**

**and Mutuc did not get along does not translate into an inability of**

**Fennerty to zealously defend his client[.] . . .  Mutual admiration**

**societies are not constitutional guarantees and conclusory**

**statements that Fennerty 'took a dive' shows antagonism toward the**

**lawyer but, without more, does not show antagonism from the lawyer**

**toward the client." (citing *Morris*, 461 U.S. at 14));** ***United States v.***

---

[11] "Rumpole of the Bailey" is a British television series featuring the fictional character Horace Rumpole, a zealous London barrister who ably defends any and all clients.

***John Doe No. 1***, 272 F.3d 116, 122 (2d Cir. 2001); ***United States v.***

***Burns***, 990 F.2d 1426, 1437 (4th Cir. 1993).

Foster is a bright attorney dedicated to pursuing the best defense

available to his clients.  His reputation for such representation is borne out

by the pleadings he prepared in this case.  Under Foster's watch, the

following were submitted for ruling on by this Court: (1) a motion for a

ballistics expert, which was granted; (2) a motion for a crime scene

investigator, which was denied as redundant based on the fact that the

same services were to be performed by two other experts; (3) a motion for

the appointment of a forensic pathologist, which was granted; (4) a motion

for the appointment of a forensic anthropologist, which was denied;[12] (5) a

motion for the appointment of an expert in DNA analysis, which was denied

without prejudice to renewal because the Government agreed to provide

such analysis; (6) a motion for the appointment of an expert in

_____

[12] Belser and Lindsay assign as error the failure to use the testimony of Dr. Murray Marks to refute stun gun evidence and to show that the victim's body had not been present in the forest for as long as contended by the Government.  But, the Court denied the attorneys' motion for the appointment of this expert; thus, no blame may be attributed to them.  ***See*** **Order, filed under seal December 4, 2000.**  The Court also denied a motion for the appointment of a different expert in stun gun evidence. **Transcript of Proceedings held December 14, 2000, filed under seal March 18, 2002, at 59-64.**

mathematics, which was granted in part; (7) a motion for a forensic

psychologist, which was granted;[13] (8) a motion for a mitigation expert,

which was granted;[14] (9) a motion for the appointment of an expert on the

issue of future dangerousness, which was granted;[15] (10) a motion for the

issuance of subpoenas, which was granted as to the Petitioner's military

records, prison records, DSS records, juvenile records and medical

_____

[13] Despite the early appointment of this expert, Belser has cavalierly opined that "almost no attention [was] given to the issue of Mr. Jackson's mental health" prior to the time he became involved in the Petitioner's representation.  **Belser Affidavit, *supra*, ¶ 7.**

[14] Again, despite the early appointment of a mitigation expert, Belser averred:

> I did not feel any significant progress had been made on the mitigation investigation by the time I was appointed. . . .  [The Petitioner] had confessed to this murder, been convicted of it in an earlier state trial, and had later pled guilty to it in state court after the first conviction was reversed on appeal.

**Belser Affidavit, *supra*,  ¶ 8.**  These facts recited by Belser in his affidavit makes the hindsight criticism of counsel even more disturbing since Belser acknowledges the Petitioner's prior confessions and convictions involving the same crime.

[15] Belser claims that counsel failed to call as a witness an expert on prison behavior "who could have given compelling testimony about . . . [the Petitioner's] lack of future dangerousness in the prison setting." **Belser Affidavit, *supra*, ¶ 20.**  Although such an expert was appointed early in the case, "'[t]he decision whether to call a particular witness is almost always strategic, requiring a balancing of the benefits and risks of the anticipated testimony.'"  ***Horton v. Allen*, 370 F.3d 75, 86 (1st Cir. 2004) (quoting *Lema v. United States*, 987 F.2d 48, 54 (1993)).**

records, but denied as to the medical records for the Petitioner's birth

mother and biological sister;[16] (11) a motion for supplemental discovery,

which was denied; (12) a motion for additional pretrial discovery, which

was granted in part and denied in part; (13) a response opposing the

Government's motion for a mental health examination of the Petitioner for

rebuttal purposes; (14) a motion to prohibit further evaluation of the

Petitioner, which was denied; (15) a motion to dismiss on double jeopardy

grounds, which was denied; (16) a motion to dismiss based on

prosecutorial vindictiveness, which was denied; (17) a motion to dismiss

based on pre-indictment delay, which was denied; (18) a motion to dismiss

based on failure to obtain Petite Policy approval, which was denied; (19)

motions to dismiss the indictment as time barred, to dismiss the

Government's notice of intent to seek the death penalty as cruel and

---

[16] Belser averred:
Either shortly before or just after the trial began, we learned
that [the Petitioner] had a biological sister who was almost the
same age. . . . I felt this information . . . was compelling
mitigation. It would have allowed the jury to understand some
of the situational and environmental conditions that shaped [the
Petitioner's] life.

**Belser Affidavit,** *supra*, **¶¶16-17.** Obviously, early in the trial, defense
counsel attempted to subpoena records relevant to this issue. The fact
that the undersigned refused to issue those subpoenas cannot be laid at
the feet of counsel.

unusual punishment, and to prohibit evidence of victim impact, all of which were denied; (20) a motion to preclude expert testimony regarding stun guns, which was denied; (21) a motion to suppress the state court plea, which was denied; (22) a motion to suppress a statement made to officers, which was denied as moot; (23) a motion to suppress statements made to family members in the presence of Reverend Sexton, which was denied; (24) and a motion to suppress statements made to inmates, which was denied. As stated by both Lindsay and Foster, Foster's role was to do the legal research and writing as well as the motions practice in the pretrial setting.

In fact, a review of the transcript from the pretrial conference conducted on December 14, 2000, shows that, even at that early stage, the following issues had been raised by Foster and Lindsay: a juror questionnaire; mental health, mitigation, and future dangerousness experts and a private investigator, all of whom were approved; DNA testing of a shirt found near the scene of the crime, which was allowed; the approval of Dr. Halleck as a mental health expert who was scheduled to interview the Petitioner in early January 2001; the approval of a forensic psychologist; the approval of Dr. Page Hudson as a forensic pathologist; and the Court

was advised that the Petitioner would object to the testimony of a stun gun expert for lack of scientific validity.[17]  *See generally***, Transcript of Proceedings held December 14, 2000, filed under seal March 18, 2002.**

Petitioner's arguments concerning Foster's performance are inconsistent.  On one hand, he claims Foster was so inexperienced that no trial preparation was done.  The pretrial practice discussed above shows that argument to be without merit.  On the other hand, Petitioner claims the procedural history of the case was complex and warranted pretrial motions to attack issues such as the legality of the indictment and double jeopardy.  As noted above, both such attacks were carried out.  The Court finds that the allegation the Petitioner received ineffective assistance of counsel, either *per se* or pursuant to the *Strickland* standard, due to Foster's inexperience is directly contradicted by the contemporaneous record of his performance.

---

[17] This is in direct contrast with Belser's claim that the stun gun issue was simply ignored.  **Belser Affidavit,** *supra***, ¶ 10.**

**2.    Ineffective assistance regarding the mental health defense.**

The Petitioner also claims that the lack of preparation for a mental health defense, either during the guilt or penalty phase of trial, was ineffective assistance of counsel.  Belser avers that "there had been almost no attention given to the issue of Mr. Jackson's mental health." **Belser Affidavit,** *supra***, ¶ 7.**  To the contrary and as noted above, as early in the case as the December 2000 pretrial conference, both Lindsay and Foster advised the Court they were considering whether to assert a mental health defense and had already scheduled an interview of the Petitioner by the defense expert for early January 2001.  **Transcript of Proceedings held December 14, 2000, filed under seal March 18, 2002, at 51-52.**  At the March 14, 2001, hearing, Lindsay brought to the Court's attention the fact that the deadline for determining expert witnesses had passed but new information from the Government necessitated another mental health expert for rebuttal purposes at sentencing as well as to show a lack of future dangerousness. **Transcript of Motions Proceedings held March 14, 2001, filed August 6, 2001, at 102-111**.  That motion was granted.

Belser blithely opines that the deadline to give notice of intent to offer mental health evidence in the guilt phase was simply "missed" by Lindsay

and Foster.  **Belser Affidavit,** *supra***, ¶ 5 ("I was very surprised that the**

**deadline for giving notice of an intent to offer mental health evidence**

**had passed without this notice being given.").**  However, during the

hearing on April 6, 2001, Belser referred to two expert mental health

reports from the state court proceedings in 1995, in which the experts

opined that the Petitioner had the specific intent to commit capital murder.

**Transcript of Motions Proceeding held April 6, 2001, filed under seal**

**August 6, 2001, at 4-5.**  Lindsay and Foster were both aware that, if

called, these two experts would testify the Petitioner had the specific intent

to commit first degree murder should the defense place the Petitioner's

mental health in issue during the guilt phase of the trial.  The determination

not to raise the issue of mental health during the guilt phase of the trial was

a strategic decision by counsel to avoid the damning expert testimony

introduced during the state trial.  *Gilliam***, 480 F.3d at 1034 ("That**

**defense counsel has refused to characterize the decision as strategic**

**is not dispositive; the record shows that he investigated the facts,**

**prepared . . . witnesses, assessed the jury and concluded that they**

**would be unreceptive[.]");** *Raley v. Yist***, 470 F.3d 792 (9**[th]** Cir. 2006),**

***cert. denied*, 128 S. Ct. 59 (2007).** In short, whether trial counsel was

ineffective in making a strategic decision

> is a question of law to be decided by th[is] [C]ourt[.] . . .
> Accordingly, it would not matter if a petitioner could assemble
> affidavits from a dozen attorneys swearing that the strategy
> used at his trial was unreasonable. The question is not one to
> be decided by plebiscite, by affidavits, by deposition, or by live
> testimony. It is a question of law to be decided by . . . this
> Court, [the court which presided over the trial.]

***Provenzano*, 148 F.3d at 1332.**

When the Government gave notice that it might call these two expert

witnesses, defense counsel had to determine quickly whether to change

course. Indeed, at the April 6, 2001, hearing, Belser told the Court:

> [O]nly on this Monday, April the 2nd, was a subpoena served
> on Dr. Berlin [who testified at the state trial] to testify for the
> Government in this case. . . . And it's Dr. Berlin's expectation
> that he would be called to testify by the government basically
> as a fact witness to testify concerning his prior testimony and
> particularly with respect to any admissions that Richard
> Jackson may have told him during the course of his evaluation
> that may relate to the crime or his mental state at the time of
> the crime. *To that extent, the government just recently has
> chosen to inject a mental health issue into the guilt phase of
> the trial.*
> > . . .
> Another reason why the notice is coming at this date in the
> case is because of our recent receipt very late of basic
> discovery material in the case. Only on March the 21st, long
> after the Court's imposed deadline for notice of intent to file the
> notice of experts in the guilt phase have we received a ballistics
> report from the government, which I would pass up to the

Court.  The report is dated on March the 19th.  It's faxed to Mr. Lindsay on March the 21st.  And for the first time in the case, we now are told that there – at least according to the FBI, there's a ballistics match in the case and that there's now physical evidence to link Mr. Jackson to the crime.  This is the first indication in the 7 years of this investigation that that is the case.  That is brand new information to us to which we have to respond.  We also point out to the Court in the documents that I'm going to pass up to the Court that the bits of physical evidence that were examined by the FBI, the bullet fragments, the cartridge case, and the gun were not even retrieved by the FBI from the Buncombe County Sheriff's Department and sent off for analysis until February the 14th.  The report is dated March the 19th and we get it on March the 21st, long after the deadline imposed by the Court.  Absolutely new information that *would obviously cause us to reexamine the potential defenses in the case*.

**Transcript of Motions Proceeding held April 6, 2001,** *supra***, at 6-8**

**(emphasis added).**  Belser provided additional reasons why counsel had to re-evaluate whether to change their minds about a mental health defense during the guilt phase.  The Petitioner had moved to suppress a statement provided by his wife, but in early March 2001, that motion had been denied.[18]  According to Belser, her description of the Petitioner would "dovetail very concisely" with Dr. Berlin's report.  ***Id.* at 9-10.**  Contrary to the averments now made in hindsight, at the time, defense counsel had

---

[18] As will be discussed below, that statement included an allegation that the Petitioner had used a stun gun on his wife during an aggressive sex act.

consciously and conscientiously determined not to raise the issue of Petitioner's mental health during the guilt phase due to the overwhelming evidence of his ability to form specific intent evidence that would be presented by two experts from the state trial. Only when additional physical evidence directly connecting the Petitioner to the crime was presented in discovery did counsel have to re-evaluate this decision. In the face of such direct evidence, counsel made the decision to explore the mental health defense. Thus, at that time, counsel sought and obtained permission to file a late notice pursuant to Federal Rule of Criminal Procedure 12.2.

Having received permission to inject that defense, counsel then conscientiously evaluated whether to actually do so, recognizing that this would open the door to the Government's current expert, Dr. Park Dietz. As Belser acknowledged during the April 6 hearing, "if we inject mental health into the guilt phase of the trial, [the Government] would be able to use Dr. Dietz' report and evaluation [of the Petitioner], including statements of the [Petitioner], for any purpose they wanted to."[19] *Id*. **at 25.** Again, the

---

[19] If mental health evidence was injected during the guilt phase, it would be available during the penalty phase.

Court finds the representations made by Belser in open court at the time of the prosecution show the reasonableness and effectiveness of defense counsel. **Lundgren v. Mitchell, 440 F.3d 754, 773 (6th Cir. 2006) ("Given counsel's information at the time of trial, there is no evidence to support the conclusion that counsel's decision was unreasonable."); Bryan v. Mullin, 335 F.3d 1207, 1223 n.23 (10th Cir. 2003) ("'[W]here it is shown that a challenged action was, in fact, an adequately informed strategic choice, we heighten our presumption of objective reasonableness and presume that the attorney's decision is nearly unchallengeable.'" (quoting Bullock v. Carver, 297 F.3d 1036, 1047 (10th Cir. 2002)); Provenzano, 148 F.3d at 1332.**

Belser has now averred that the decision not to offer expert testimony about the Petitioner's mental health "was a mistake." **Belser Affidavit, supra, ¶ 17.** However, the contemporaneous record shows a deliberate and professional decision on the issue of mental health. On April 19, 2001, the United States and defense counsel entered into a consent order pursuant to which the expert report of Dr. Dietz was disclosed to defense counsel. **Joint Sealed Consent Order, filed April 19, 2001.** After reviewing Dr. Dietz' report, watching the videotapes of his interviews with

the Petitioner, and after discussing of the contents of those interviews with the defense experts, defense counsel withdrew their notice of intent to offer evidence of mental condition during the penalty phase of the trial. ***See Withdrawal of Notice of Intent to Offer Expert Testimony on Mental Disease, Defect or Condition and Disavowal of Intent to Offer Such Expert Testimony, filed May 8, 2001; Trial Transcript Vol. VI, at 1264-67.*** Defense counsel obviously made a strategic decision to avoid having Dr. Dietz testify during the penalty phase and to prevent the showing of the videotapes of his interviews with the Petitioner to the jury. It is obvious that Dr. Dietz' report and accompanying videotapes were so damaging that defense counsel could not run the risk of placing this evidence in front of the jury during the penalty phase of the trial. While defense counsel now harangue their failure to inject mental health into the penalty phase, it is clear that the strategic decision made at the time prevented the testimony of Dr. Dietz, testimony which would have been extremely prejudicial to their efforts to convince the jury that the Petitioner should receive life in prison *versus* the death penalty.

Habeas counsel claim that trial counsel should have "dealt with" Dr. Dietz' expert opinion through experts of their own. Trial counsel did, in

fact, have mental health experts who had examined the Petitioner. Dr. Seymour Halleck averred that he reviewed Dr. Dietz' report and considered the psychiatrist's expert opinion to be "flawed." **Exhibit 16, Affidavit of Seymour L. Halleck, M.D., *attached to* Petitioner's Supplemental Memorandum, ¶ 5.** Nothing more specific is provided. Trial counsel also read Dr. Dietz' report and made the strategic decision that his report and the videotapes, which are not mentioned by Dr. Halleck, were too damning to risk presenting to the jury.

Claudia Coleman, Ph.D., was also a mental health expert who examined the Petitioner. **Exhibit 9, Affidavit of Claudia R. Coleman, Ph.D., *attached to id*.** Although she opined that she could have explained the Petitioner's mental health and disorders, she did not aver that she had reviewed Dr. Dietz' report.

For the reasons stated, the Court does not find that trial counsel were ineffective in their handling of the mental health aspects of this case, whether considered as *per se* ineffectiveness or pursuant to the *Strickland* standard.

### 3. Ineffective assistance concerning the mitigation aspect of the sentencing phase.

Next, the Petitioner attacks the investigation and presentation of mitigation evidence during the sentencing phase of the trial.

> When the issue is the adequacy of counsel's investigation for the sentencing phase of a capital trial, "hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made."  To assess the thoroughness of counsel's investigation and counsel's overall performance, the Court must conduct an objective review measured for "reasonableness under prevailing professional norms."
>
> . . .
>
> [Three recent Supreme court] cases stand for three important principles.  First, the question is not whether counsel did *something*; counsel must conduct a full investigation and pursue reasonable leads when they become evident.  Second, to determine what is reasonable investigation, courts must look first to the [American Bar Association (ABA)] guidelines, which serve as reference points for what is acceptable preparation for the mitigation phase of a capital case.  Finally, because of the crucial mitigating role that evidence of a poor upbringing or mental health problems can have in the sentencing phase, defense counsel must pursue this avenue of investigation with due diligence.

*Wilson v. Sirmons*, 536 F.3d 1064, 1083-85 (10th Cir.), *reh'g en banc granted*, 549 F.3d 1267 (10th Cir. Dec. 2, 2008) (citing *Rompilla v. Beard*, 545 U.S. 374, 381 (2005); *Wiggins v. Smith*, 539 U.S. 510, 523 (2003); and *Williams v. Taylor*, 529 U.S. 362, 396 (2000)) (other citations omitted).  Nonetheless, neither this trilogy of cases nor

*Strickland* requires "defense counsel to 'investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing.'" **Gray v. Branker, 529 F.3d 220, 228-29 (4th Cir. 2008) (quoting *Wiggins*, 539 U.S. at 533).** "Instead, [the cases] impose[ ] upon counsel 'a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" **Id. (quoting *Strickland*, 466 U.S. at 691).** And, while ABA Guidelines may be relevant in determining what constitutes reasonable performance, "they certainly cannot be dispositive in and of themselves." **Meyer v. Branker, 506 F.3d 358, 372 (4th Cir. 2007), *cert. denied*, 128 S. Ct. 2975 (2008).**

> The ABA Guidelines suggested that one avenue of investigation that counsel should consider is the condition of the defendant's mental health. ABA Guidelines 11.8.3.F.2, 11.8.6.B. The Guidelines also advised that "[t]he assistance of one or more experts (*e.g.*, social worker, psychologist, psychiatrist, investigator, etc.)" in the investigation, development, and presentation of relevant mitigating evidence "may be determinative as to [the] outcome" at sentencing. ABA Guideline 11.8.6 cmt.; *see also id*. 1.1 cmt., 5.1.1.A.v, 11.4.1. Counsel's "strategic choices made after thorough investigation ... are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." In evaluating an ineffective assistance claim, a court "must judge the reasonableness of

counsel's challenged conduct on the facts of the particular
case, viewed as of the time of counsel's conduct."

***Gray*, 529 F.3d at 229 (quoting *Strickland*, 466 U.S. at 690-91).**

"When a petitioner alleges, as [Jackson] does here, that his counsel

should have put forth additional evidence in mitigation, we assess

prejudice by 'reweigh[ing] the evidence in aggravation against the totality of

available mitigating evidence.'" ***Strickland v. Branker*, 284 F. App'x 57,**

**63 (4th Cir. 2008) (quoting *Wiggins*, 539 U.S. at 534), *cert. denied*, 129**

**S. Ct. 902 (2009).**

During the December 14, 2000, pretrial hearing with Lindsay and

Foster, the undersigned advised counsel their requests for a mitigation

expert, a private investigator and an expert on future dangerousness would

be granted. **Transcript of December 14, 2000, Proceedings, *supra***. On

December 28, 2000, the undersigned entered a formal order granting the

Petitioner's *ex parte* motion, made through trial counsel, for the

appointment of experts, including Dr. Pamela Laughon as a mitigation

expert and Dr. Seymour Halleck as a forensic psychiatrist. ***Ex parte***

**Order, filed December 28, 2000.** Although Dr. Halleck was appointed as

a mental health expert, his investigation and report of necessity included mitigation evidence. **Halleck Affidavit, *supra.***

On January 25, 2001, the undersigned granted the Petitioner's *ex parte* motion, made through trial counsel, for the issuance of subpoenas for the Petitioner's records from the United States Navy, the North Carolina Department of Corrections, the Buncombe County Detention Facility, the North Carolina Department of Social Services, the Juvenile Court for Buncombe County, the Blue Ridge Mental Health Center and the Buncombe County Health Department. **Sealed Order, filed January 25, 2001.** The undersigned denied counsel's request for subpoenas for the DSS records of the Petitioner's birth mother and biological sister, finding the records to be privileged. ***Id.***

On March 15, 2001, trial counsel's motion for the appointment of an expert on the issue of future dangerousness was granted. **Sealed Order, filed March 15, 2001.** Although this expert was appointed on the issue future dangerousness, he also included mitigation evidence in his report.

During the *ex parte* portion of the April 6, 2001, hearing, Lindsay advised the Court that the defense team had spent "a significant amount of time" developing mitigation evidence. **Transcript of Motions Proceeding**

**held April 6, 2001,** *supra***, at 29**.  Lindsay reported that as a result of their investigation, they had learned through discovery and from DSS significant mitigation information "that was unknown to earlier attorneys" involved in the state court action.  *Id*. **at 30.**  It is worth noting that trial counsel discovered this information even though the undersigned denied the motion for subpoenas.  Lindsay advised that he had located Petitioner's biological sister and he had spoken with her adoptive parents.  *Id*.  That sister was reported to have significant mental health problems, including autism.  Moreover, the sister had a history of suicide attempts similar to those of the Petitioner.  *Id*. **at 30-31.**  Counsel also had located the Petitioner's biological mother and learned her personal history as well as the facts surrounding the Petitioner's birth and removal from his mother.  *Id*. **at 31.**  Moreover, trial counsel had located and spoken with the very first foster family with whom the Petitioner had been placed and this foster mother referred to him as being autistic.  *Id*. **at 32.**  As a result of this information, counsel requested and received the appointment of Dr. Claudia Coleman as an expert witness in neuropsychology.  *Id*. **at 33-35;** *see also***, Sealed Order, filed April 6, 2001.**  In addition to her evaluation and testing results, Dr. Coleman's report contained mitigation evidence.

*See* **Exhibit 79, Psychological Evaluation performed April 2, 3, and 13, 2001,by Claudia R. Coleman, Ph.D.,** *attached to* **Petitioner's Supplemental Memorandum.**

Trial counsel and/or their experts and investigators spoke with members of the Petitioner's extended family, both his biological and adopted families, as well as foster families. *See* **Exhibit 2, Affidavit of Phillip Allen,** *attached to* **Petitioner's Supplemental Memorandum, ¶ 24; Exhibit 10, Affidavit of Rosanna Drake,** *attached to id.* **¶¶ 20-21; Exhibit 24, Affidavit of Esther Jenkins,** *attached to id***. ¶ 7; Exhibit 25, Affidavit of Pamela Laughon, Ph.D.,** *attached to id***. ¶¶ 6, 7, 8, 9, 10, 11, 14; Exhibit 29, Affidavit of Helen Marlowe,** *attached to id.* **¶ 13; Exhibit 79, Jackson Psychological Evaluation,** *supra.*

Thus, trial counsel investigated the Petitioner's mental health as well as his early childhood, adolescence, naval experience, marriage and ability to function as a young adult. In so doing, trial counsel used the services of a private investigator, social services, psychologist, psychiatrist, neuropsychologist, and expert on the question of future dangerousness. Among the areas investigated and reported on were the Petitioner's medical history, educational history, employment and training history,

family and social history, prior adult and juvenile correctional experience, and moral and cultural influences.  **See, ABA Guidelines, *supra*, at 11.4.1.C, 11.8.3.F.2, 11.8.6.B, 11.8.6 cmt.; 1.1 cmt. 5.1.1.A.v, 11.4.1.; 1 ABA Standards for Criminal Justice 4-4.1, cmt. P.4-55 (2d ed. 1982).**

In the face of this clear record of thorough investigation, Belser averred there was a lack of direction and inadequate attention in developing mitigation evidence.  **Belser Affidavit, *supra*, ¶¶ 8, 15.** According to Belser, Dr. Laughon did not adequately fulfill her responsibility as the mitigation expert.  However, he does not specify in what manner she failed except for a general allegation that "she had not devoted much time to this case before I was appointed."  ***Id.* ¶¶ 8, 15.**

Contrary to Belser's sworn statement, Lindsay opined that "Pam Laughon was our mitigation specialist.  *Both Mr. Belser and I had worked with her in other cases* and assumed she would proceed without the need for much supervision."  **Lindsay Affidavit, *supra* ¶ 22 (emphasis added).** "It is certainly within the 'wide range of professionally competent assistance' for an attorney to rely on properly selected experts."  ***Fields v. Brown*, 431 F.3d 1186, 1205 (9th Cir. 2005) (quoting *Harris v. Vasquez*,**

**949 F.2d 1497, 1525 (9th Cir. 1990)),** *cert. denied,* **128 S. Ct. 1875**

**(2008).**

Moreover, Dr. Laughon has provided an affidavit concerning her

performance as the mitigation specialist.

> Although we discussed mitigation evidence that I was
> developing during the course of my interviews, Mr. Lindsay
> never indicated to me what mitigation he and co-counsel
> intended to present at penalty phase . . . .  He permitted me
> considerable latitude in interviewing whatever mitigation
> witnesses might be appropriate. . . .  I conducted numerous
> interviews in this case and provided those in written form to Mr.
> Lindsay promptly and regularly during my preparation.
> . . .
> I located and interviewed a number of [the Petitioner's]
> biological maternal relatives[.]
> . . .
> I believe I started gathering critical penalty phase evidence in
> this case about a month or so before trial, and I recall working
> intensively on this case during that time.  In the process of
> interviewing witnesses and reviewing records, I believe I
> uncovered an astonishing amount of compelling information
> about [the Petitioner's] life history, and in particular his genetic
> heritage.
> . . .
> In my opinion, the strongest mitigation evidence located for [the
> Petitioner] was the history of his early childhood years, during
> which he was placed in foster care by social services.
> . . .
> Although I do not usually testify in my capital cases, I have
> been asked on occasion to provide information to the jury that I
> have collected in the process of my own investigation[.]
> . . .
> On the night before the penalty phase of [the Petitioner's] trial,
> Mr. Lindsay contacted me in the evening to inform me that

although we had numerous witnesses prepared to testify the next day, he and Mr. Belser had decided that only [the Petitioner's] adoptive mother would testify at penalty phase.

**Exhibit 25, Affidavit of Pamela Laughon, Ph.D.,** ***attached to***

**Petitioner's Supplemental Memorandum,** ***supra***, **¶¶ 4, 6, 7, 9, 13, 14.**

To the extent that the Petitioner claims trial counsel did not adequately investigate mitigation evidence, "[i]n judging the defense's investigation . . ., hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made and by giving a 'heavy measure of deference to counsel's judgment.'" ***Rompilla***, **545 U.S. at 380-81 (quoting** ***Strickland***, **466 U.S. at 689, 691).** Dr. Laughon as well as the other experts have averred to considerable efforts on their parts and they have identified numerous individuals with whom each of them spoke. Contrary to Belser's accusations years after the fact, trial counsel, personally and through their court-appointed experts, conducted a thorough investigation into mitigation.[20] Not only were leads

---

[20] The Petitioner argues that the small amount paid to Dr. Laughon shows that she did not adequately perform her job, citing to the large sums paid to experts in other capital cases. Although the undersigned limited the amount to be paid to Dr. Laughon, she obviously completed her assigned task to her satisfaction. ***See*** **Laughon Affidavit,** ***supra.*** Neither defense counsel nor Dr. Laughon requested additional funding.

followed, counsel were able to pierce the veil of a closed adoption, find the Petitioner's biological mother and sister, and speak not only with them but with his extended biological family. In addition, the foster families with whom he was placed were also consulted.

The crux of the Petitioner's argument is not that an inadequate investigation occurred but that having uncovered this extensive evidence, trial counsel made the strategic decision to rely solely on the testimony of the Petitioner's adopted mother, Sally Jackson. As noted by Lindsay:

> We had a number of lay witnesses available who could have described Mr. Jackson's placement in numerous foster homes during his first five and one-half years, his emotional and psychological condition during the time that he lived with J.D. and Sally Jackson, his adoptive parents, and his adaptation to society after he moved out of the Jackson house and lived on his own.

**Lindsay Affidavit,** *supra,* **¶ 26.** For the reasons that follow, however, this strategic decision by both Lindsay and Belser to limit mitigation evidence to the testimony of the Petitioner's mother was not ineffective assistance of counsel. *Wiggins,* **539 U.S. at 523 ("Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background** *was itself reasonable.***");** *Correll v. Ryan***, 539 F.3d 938 (9th Cir. 2008),** *cert. denied,* **129 S. Ct.**

**903 (2009) (decision not to present *any* mitigation evidence can be excused as a strategic decision if it is supported by reasonable investigation); *Provenzano*, 148 F.3d at 1332; *Gilliam*, 480 F.3d at 1034-35 (the fact that "defense counsel has refused to characterize the decision as strategic is not dispositive; the record shows that he investigated the facts, prepared mitigating witnesses, assessed the jury and concluded that they would be unreceptive to additional evidence[.]"); *King v. Cockrell*, 33 F. App'x 703 (5th Cir. 2002) (trial counsel's decision not to present mitigation evidence is not *per se* ineffective assistance of counsel (citing *Crane v. Johnson*, 178 F.3d 309, 314 (5th Cir. 1999)).**

In contrast to the decision made at the time of trial, Belser now pronounces counsel ineffective for failing to call a number of witnesses. First, Belser claims that the parents of the Petitioner's biological sister should have been called as mitigation witnesses to show that she had autism and other unusual behaviors. **Belser Affidavit, *supra*, ¶ 17.** In actuality, the undersigned ruled that without expert testimony linking the conditions of the two siblings, the evidence was inadmissible. Lindsay averred that, "[a]t that point, we had announced that no expert testimony

would be offered on Mr. Jackson's behalf.  I did not believe we could offer this expert testimony based upon our representation that we would not offer expert evidence." **Lindsay Affidavit,** *supra***, ¶ 24.**  Lindsay was correct; the introduction of evidence concerning the Petitioner's mental health would have resulted in the Government's use of Dr. Dietz in rebuttal. *Strickland v. Branker***, 284 F. App'x at 63 (introducing such testimony would have likely prompted the government to introduce damaging rebuttal evidence).**  Moreover, on appeal, this evidentiary ruling was affirmed.  *Jackson***, 327 F.3d at 299.**

Closely related to this claim is the allegation that trial counsel failed to adequately present the full picture of the Petitioner's childhood experiences, both before and after adoption.  However, Sally Jackson did present evidence of the Petitioner's early childhood.  Although counsel now claim evidence of sex abuse should have been presented, the Petitioner remained vague about having been sexually abused.  Moreover, trial counsel were both wary of presenting extensive evidence of the Petitioner's childhood because after age five, he grew up in a wealthy family with loving parents.  *Yarbrough v. Johnson***, 520 F.3d 329, 340-41**

**(4th Cir.),** *cert. denied*, **128 S. Ct. 2993 (2008).** As Lindsay

acknowledged:

> A constant concern for the defense was the impression that had been created during the state court proceedings, and that would likely occur in the federal trial, that the victim had come from a salt of the earth, financially challenged family and that Mr. Jackson had been raised in a fairly well off family who had been able to provide him with significant mental health treatment and care. The perception that "given the wealth of this family and the treatment that they provided, Jackson is simply evil and therefore must executed" was first and foremost on the "concern list" for the defense. Former defense counsel for Mr. Jackson at the state level had indicated to me that they believed this perception was a significant factor in Mr. Jackson getting a death sentence in state court. I felt that we needed to find some way to show that this perception was wrong.

**Affidavit of Stephen P. Lindsay, Offer of Proof, filed May 6, 2002, ¶ 5.**

Thus, there was little or no evidence that the Petitioner's crime was

attributable to his suboptimal childhood. *Yarbrough*, **520 F.3d 341.**

> "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are *attributable* to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." . . . A jury hearing this evidence might therefore be led to find [the Petitioner] more culpable for his criminal acts, rather than less.

***Id.* at 343 (quoting *Wiggins*, 539 U.S. at 535) (other citations omitted).**

It thus appears that Belser and Lindsay's strategic decision followed the

same reasoning applied by both the Supreme Court and the Fourth

Circuit.[21]  ***See, e.g. Howard v. Moore*, 131 F.3d 399, 421 (4th Cir. 1997)**

**(failure to introduce evidence in mitigation that might have hurt as**

**much as it might have helped is not ineffective assistance of**

**counsel).**

Belser also opines that other "non-expert witnesses who could have

given helpful testimony" should have been called.  **Belser Affidavit, *supra*,**

**¶ 19.**  Those witnesses are not identified however, and in what manner

their testimony would have been "helpful" is not disclosed.  ***Bassette v.***

***Thompson*, 915 F.2d 932, 940-41 (4th Cir. 1990) (failure to identify**

**witnesses and/or the substance of their testimony does not establish**

**ineffective assistance of counsel); *accord*, *Beaver v. Thompson*, 93**

**F.3d 1186, 1195 (4th Cir. 1996) (no ineffective assistance where no**

**proffer is made of what favorable evidence or testimony would have**

**been produced); *Bell v. Outlaw*, 2008 WL 4510587 (E.D.N.C. 2008).**  Nor

is an ineffective assistance claim established on a general claim that

additional witnesses should have been called in mitigation.  ***Bassette,* 915**

**F.2d at 940-41.**

---

[21] Nor is this the first time that Belser has made the strategic decision to limit mitigation evidence.  ***See, e.g., Wilson v. Ozmint*, 352 F.3d 847 (4th Cir. 2003).**

Other witnesses are identified; for example, the testimony of extended family and fellow co-workers. As previously noted, Dr. Laughon has averred that she interviewed "a number" of the Petitioner's biological relatives, including his aunt who cared for him in early childhood. **Laughon Affidavit,** *supra***, ¶ 6.** She reported discovering "an astonishing amount of compelling information" from which she gleaned that Petitioner had "a history of significant mental health problems in his biological family." *Id.* **¶ 7.** One of his foster parents, she reported, referred to the Petitioner as the "'little autistic boy.'" *Id.* **¶ 9.** And, Dr. Laughon averred that she could have testified that relatives of a person with an autistic disorder, like the Petitioner's biological sister, have a higher chance of having autism. *Id.* **¶ 13.** However, as previously noted, placing such evidence before the jury in the penalty phase would have opened the door to Dr. Dietz' testimony. Obviously, despite the current remonstrations, counsel made a strategic decision to avoid his testimony.

The Petitioner's biological mother, Rosanna Drake, has provided an affidavit in which she states that she was prepared to testify during the sentencing phase of the trial. **Drake Affidavit,** *supra***, ¶ 21.** She states that she would have testified about her own difficult life and her inability to

take care of the Petitioner after his birth resulting in his removal by DSS
when he was a baby. *Id.* ¶ 3. Despite these claims of instability, Drake
would have testified that she was raising the Petitioner's daughter. *Id.* ¶ 2.
Again, trial counsel's strategic decision to place the testimony of Sally
Jackson before the jury in mitigation as opposed to Drake's cannot be
second-guessed.

As noted below, Sally Jackson presented substantial evidence of the
Petitioner's early childhood, upbringing and young adulthood. Thus, the
content of any testimony such as that identified above would have been
cumulative. *Wilkinson v. Polk*, 227 F. App'x 210, 218 (4th Cir. 2007),
*cert. denied*, 128 S. Ct. 881 (2008); *McHone v. Polk*, 392 F.3d 691 (4th
Cir. 2004). Where it has been included in the record herein, the
undersigned has reviewed the state court testimony of these witnesses.
That review shows that their testimony would indeed have been
cumulative. Moreover, the testimony heard by the state court jury did not
prevent it from imposing the death sentence in that trial. *See* **Exhibit 41,
Testimony of Carolyn Ayers (co-worker); Exhibit 42, Testimony of
Joseph Christopher Ballard (co-worker); Exhibit 43, Testimony of
Robert William Barcafer (friend); Exhibit 46, Testimony of Samuel**

**Paul Cannon (co-worker/supervisor); Exhibit 52, Testimony of Shirley Brown Jenkins (DSS supervisor); and Exhibit 54, Testimony of Captain William A. Stafford (Buncombe County Detention Facility supervisor), all *attached to* Petitioner's Supplemental Memorandum, *supra*.** In what manner their testimony in this trial would have precluded a similar finding by the jury is not explained and is nothing more than speculation.

Next, habeas counsel claim that trial counsel were ineffective because they failed to offer the state court testimony of the Petitioner's deceased adoptive father. It is first noted that, despite having heard this testimony in the state trial, the jury there imposed the death sentence. Moreover, a review of the deceased father's testimony discloses that on cross-examination, the father testified that when the Petitioner was 19 or 20 years old, he was arrested for trespassing at the home of a young girl whose mother had ordered him to leave but he did not do so. **Exhibit 49, Testimony of James Dwight Jackson, Jr., *attached to id.*, at 859.** In addition, the Petitioner had a strained relationship with his father who sent him to military school. ***Id*. at 860-62.** The Petitioner's father testified that he had more than once referred to the Petitioner as manipulative. ***Id*. at**

**879, 882**.  Moreover, as early as age 15, the Petitioner ran up about $300 in phone calls to 1-900 phone-sex numbers on his parents' telephone.  **Id. at 883**.  **Howard, 131 F.3d at 421; Jones v. Catoe, 9 F. App'x 245, 254 (4th Cir. 2001) (petitioner is not prejudiced by the failure to introduce evidence in mitigation that would have hurt as much as it helped) (citing Howard).**  Placing evidence before the jury of behavior tantamount to stalking a girl at a young age and the use of telephone sex lines certainly would have been more damaging than helpful.

> "The decision whether to call a particular witness is almost always strategic, requiring a balancing of the benefits and risks of the anticipated testimony.  The witness may not testify as anticipated or the witness's demeanor or character may impress the jury unfavorably and taint the jury's perception of the accused; or the testimony, though sympathetic, may prompt jurors to draw inferences unfavorable to the accused."
>
> . . .
>
> Considering the possible danger to the defense from calling these witnesses, the decision to bypass them reasonably could be viewed as legitimate trial strategy. . . .  [T]rial strategy does not constitute ineffective assistance unless counsel's decision was "so patently unreasonable that no competent attorney would have made it."

**Horton v. Allen, 370 F.3d 75, 86-87 (1st Cir. 2004) (quoting Lema v. United States, 987 F.2d 48, 54 (1st Cir. 1993) and Phoenix v. Matesanz, 233 F.3d 77, 82 n.2 (1st Cir. 2000)).**

Habeas counsel also attack the decision of trial counsel to use only the testimony of the Petitioner's adoptive mother, Sally Jackson, in mitigation. Despite counsel's claims now that this decision constituted ineffective assistance of counsel, the Fourth Circuit found on direct appeal that the testimony of Sally Jackson, "was broad-ranging, and the conclusions that could have been made [concerning mitigation] covered everything from Jackson's childhood, his disabilities, his mental condition, his intelligence, his remorse, his ability to hold jobs, his social deficiencies, and more." ***Jackson*, 327 F.3d at 293-94.** A review of Mrs. Jackson's testimony shows that she addressed the following issues: the social and business background of Mr. and Mrs. Jackson; their inability to have children; their experience of raising foster children; the Petitioner's childhood experiences both before and after being fostered and subsequently adopted; his inappropriate behavior as a child; his extended adopted family; his inappropriate sexual behavior as a child; his close relationship with his adoptive mother; his educational difficulties; his inability to concentrate; his depression and repeated suicide attempts; his inability to get along with others; his discharge from the military due to

mental problems;[22] his inability to keep a job; his marriage and his two children; his closeness to his children before his arrest;[23] the fact that at the time of the crime, he was in a deep depression; an accident at the restaurant just before the crime during which he was burned resulting in the prescription of pain killers; the fact that he tried to commit suicide during the time at issue; the impact of the arrest on the Petitioner's father resulting in a heart attack;[24] his father's subsequent death; the fact that the Petitioner's parents supported him financially even into adulthood; and the Petitioner's propensity to make calls to sex lines resulting in high phone bills. **Trial Transcript, Vol. VII, filed August 6, 2001, at 1327-71.**

"Although defense counsel did not introduce all of the mitigating evidence now pointed to by [the Petitioner], the mitigation witness[] touched on

---

[22] Indeed, trial counsel inserted Petitioner's mental health into the penalty phase through his mother's testimony without incurring the Government's use of Dr. Dietz in rebuttal.

[23] In fact, 12 jurors found as a mitigating factor that the Petitioner had a son and a daughter, and 11 jurors found as a mitigating factor that his execution would have a severe impact on his children and his mother. ***See*** **Order, filed January 31, 2005, at 4 n.3;** *see also* **Special Verdict Form Regarding Punishment, filed May 9, 2001, at 8.**

[24]In fact, Mrs. Jackson's testimony covered the areas claimed by the Petitioner to have been omitted: the failure to read into the record his father's testimony from the state court trial, and his emotional connection to his children.

[every] topic[] to which [he] refers[.]" ***Moore v. Reynolds*, 153 F.3d 1086, 1099 (10th Cir. 1998).** The decision to rely solely on the testimony of Sally Jackson was not "so patently unreasonable that no competent attorney would have made it." ***Horton*, 370 F.3d at 87 (quotation omitted).**

Although Belser claims there was confusion as to which attorney was responsible for handling the mitigation evidence, both the affidavits of counsel and the trial transcript disclose that trial counsel conferred and made a deliberate decision to rely solely on Sally Jackson's testimony. Moreover, the Fourth Circuit found her testimony wide-ranging and effective mitigation evidence.

> A complete review of Sally Jackson's testimony leads to the conclusion that the jury could have received the impression that Richard Jackson was not smart, that he had mental problems, including sexual problems, that he was loved as a child and reacted with love, trying to overcome his mental disabilities, and that he was remorseful whenever he did wrong. This, in particular, was revealed by the testimony of Richard's apologies to his mother when he repeatedly tried to commit suicide, the testimony of Richard's attempt to commit suicide after the murder of Styles, and the testimony of his crying in the jail when he was visited by Sally Jackson with a minister, as well as Sally Jackson's own remorseful approach, intending to visit the victim's family.

***Jackson*, 327 F.3d at 292.** Or as noted by Lindsay:

> Near the end of the presentation of evidence at the penalty phase, Mr. Belser and I decided not to offer any evidence other

> than the testimony of Sally Jackson.  We had a number of lay witnesses available who could have described Mr. Jackson's placement in numerous foster homes during his first five and one-half years, his emotional and psychological condition during the time that he lived with J.D. and Sally Jackson, . . . and his adaptation to society after he moved out of the Jackson house and lived on his own.  *Although these witnesses were available, we did not call them.*

**Lindsay Affidavit,** *supra*, **¶ 26 (emphasis added).**  Counsel thus had mitigation witnesses available as a result of their investigation but made a considered, deliberate decision not to use any mitigation witness other than Sally Jackson.[25]

The Court does not find that limiting the mitigation evidence to the testimony of Sally Jackson was either *per se* prejudicial or ineffective pursuant to the *Strickland* standard.  In fact, it was trial strategy which the undersigned finds as a matter of law was not ineffective assistance of counsel.  ***Provenzano*, 148 F.3d at 1332-33 (the strategical decision of which witnesses to call "'is the epitome of a strategic decision, and it**

---

[25] Belser has also averred, rather carefully, that there were mitigation witnesses available but "I do not recall why we did not call any of them as witnesses." **Belser Affidavit,** *supra*, **¶ 19.**  Like Lindsay, he admits the attorneys decided to rely "solely on the testimony of our client's adoptive mother, Sally Jackson." ***Id.***

**is one that [the courts] will seldom, if ever, second guess[.]'" (quoting**
***Waters*, 46 F.3d at 1512)).**

The Petitioner also claims that the failure to use the testimony of the expert in future dangerousness constitutes ineffective assistance of counsel. The morning the penalty phase of the trial began, the Government announced that it would not rely on future dangerousness as an aggravating factor to be presented to the jury in support of the death penalty. **Trial Transcript, Vol. VII,** *supra*, **at 1271**. As a result, the Government stated that it would not call two witnesses it had intended to call on that issue. ***Id*. at 1272**. The first of those witnesses was James Pruette, a fellow inmate who would have testified that Jackson kept pornography in his cell and laughed about the short prison sentence he had received in state court for Karen Styles' murder after the North Carolina Supreme Court reversed his death penalty and remanded the case for a new trial. **Motion in Limine to Exclude Evidence, filed May 8, 2001, at 2.** The second witness was Captain Dennis Daniels who would have testified that the Petitioner received pornography while in prison. *Id*. The Government announced that neither witness would be called *unless* there was any "allegation or evidence offered by the defense to suggest

that defendant had remorse for what he did or that defendant poses no future danger to the community or that this crime was in any way related to his exposure to pornographic materials." **Trial Transcript, Vol. VII, *supra*, at 1273.** At the time of the trial, Belser admitted on the record in open court that the testimony of those two witnesses would be "overwhelmingly prejudicial[.]" *Id.* **at 1277.**

By contrast, in the affidavit filed in support of this motion, Belser averred:

> We also had James E. Aiken available as an expert in prison behavior who could have given compelling testimony about Mr. Jackson's excellent adjustment to incarceration and *his lack of future dangerousness* in the prison setting. I know this type of evidence is very important to a capital sentencing jury. Mr. Aiken was in the courtroom during the penalty phase. However, Mr. Lindsay and I did not call him. *I do not know why we did not use him as a witness*. I do not think it would have been inconsistent with our agreement not to offer expert testimony about Mr. Jackson's mental health or opened the door to unfavorable evidence. We just neglected to use him as a witness, which was a mistake.

**Belser Affidavit, *supra*, ¶ 20 (emphasis added).** In contrast to Belser's affidavit, submitted years after the fact,[26] it is patently clear from the

---

[26] The Court is compelled to note the repeated inconsistences between Belser's statements to the Court during the trial and those contained in his affidavit, sworn to under penalty of perjury.

contemporaneous record that Belser and Lindsay did not call Aiken as a

witness in order to avoid the Government's use of the two witnesses noted

above as well as the reintroduction of the aggravating factor of future

dangerousness. Thus, the decision not to present evidence related to

remorse or future dangerousness cannot be said to be *per se* ineffective

assistance of counsel.[27] Nor does it qualify as ineffective assistance under

the *Strickland* standard.

At the conclusion of Mrs. Jackson's testimony, Belser attempted to

make a proffer of evidence to the Court concerning Pruette's testimony in

an effort to show that it would be improper rebuttal evidence. This shows

that before deciding once and for all not to use Aiken's testimony, Belser

tried to receive an advance ruling.

> With respect to the possible testimony in rebuttal of Mr.
> Pruette, the government of course has said it did not intend to
> call him except in rebuttal . . . to rebut any evidence of
> remorse expressed by Richard Jackson, any evidence that he
> was not a danger to the community . . ., or any evidence that
> this crime was in any way related to pornography. . . . We can't
> make a decision with [the Petitioner] about what kind of
> evidence to put on, including whether or not to introduce certain
> aspects of the records, unless we know what the court might do

---

[27] In fact, Sally Jackson did manage to include evidence about
remorse and lack of future dangerousness in her testimony. Nonetheless,
the prosecution did not offer these two witnesses in rebuttal.

on that issue.  So, what I would ask the Court to do is [to rule on the admissibility of his testimony].  Otherwise, we would be in a position of having not to offer evidence of remorse, not to offer evidence of lack of future dangerousness, or anything else because of not knowing what the ruling might be.

. . .

We would need to know in general whether, if we put up evidence for remorse, which we would be expected to do, or if we put up evidence of lack of future dangerousness, which we would be expected to do, then if Mr. Pruette testifies in the way that the government expects him to, whether that would be improper in rebuttal.  Otherwise, we would have to forego the constitutional right to put up that kind of mitigating evidence.

**Trial Transcript, Vol. VII,** *supra***, at 1372-74.**  In other words, before Belser decided whether to place further evidence before the jury, he wanted an advisory ruling from the Court as to whether rebuttal evidence from the witness Pruette would be allowed.  The undersigned refused to make a ruling prior to the proffer of the evidence.[28]  As a result, defense counsel made a strategic decision not to offer this mitigating evidence in order to avoid the obviously damaging testimony of Pruette.  ***Lovitt v.***

---

[28] This ruling by the Court also disposes of Belser's current lament that an expert on prison behavior related to the issue of future dangerousness was available but not called.  **Belser Affidavit,** *supra***, ¶ 20.**  As noted in his comments to the Court during trial, if Belser opened the door to the issue of future dangerousness, the Government would have offered Pruette's testimony in rebuttal.  However, that was a strategic decision which defense counsel was required to make which does not rise to the level of ineffective assistance.

***True***, 403 F.3d 171, 180 (4th Cir. 2005) (**"This strategy of not risking a more determined prosecutorial onslaught . . . was sensible" and not ineffective assistance of counsel.).** "'Trial counsel is too frequently placed in a no-win situation with respect to possible mitigating evidence at the sentencing phase of a capital case.'" ***Id*. at 181 (quoting *Bunch v. Thompson*, 949 F.2d 1354, 1364 (4th Cir. 1991))**. "Therefore, '[t]he best course for a federal habeas court is to credit plausible strategic judgments.'" ***Id*. (quoting *Bunch*).** The Fourth Circuit "refuse[s] to place defense lawyers in this [no-win] position." *Id*.

The next morning, the Government objected to the plans of defense counsel to call the adoptive parents of the Petitioner's biological sister, the Allens, to testify that the sister has Asperberger Syndrome, a variation of autism. **Trial Transcript, Vol. VIII, filed August 6, 2001, at 1378.** The Government argued that the evidence would be inadmissible unless the defense had an expert which could opine that there is genetic link between siblings which resulted in both siblings having that syndrome. *Id.* The Court asked Lindsay whether the defense had an expert witness who could testify about the relationship between siblings having this disorder. *Id*. **at 1379.** Lindsay responded that there was such a witness "but in light of our

notice that we were not going to be offering any expert mental health testimony, we have none at this point."[29]  *Id.*  Likewise, Belser has averred that he did not present any expert testimony which would have linked the Petitioner's childhood conditions with those of his biological sister "because we had earlier informed the district court and the government that we would not present expert testimony about Mr. Jackson's mental, emotional and psychological condition [during the penalty phase].  This decision was a mistake." **Belser Affidavit,** *supra***, ¶ 17.**

Although Belser now characterizes this strategic decision as a "mistake," in actuality, and as discussed at length above, the defense faced a Hobson's choice.  If mental health evidence was introduced during the penalty phase of the trial, then the Government could introduce such evidence in rebuttal.  Introducing the expert testimony linking the Petitioner

---

[29] This statement on the record at the time of trial is more reliable than Belser's comment years later that "[i]t never occurred to me to make a preliminary showing of this expert link[.]"  **Belser Affidavit,** *supra***, ¶ 18.** Obviously, both Belser and Lindsay "thought about it" because they were constantly re-evaluating whether they should run the risk of introducing mental health evidence during the penalty phase.  In fact, the record shows that even in the face of having made their decision not to do so, these competent, clever counsel endeavored to find alternative methods to introduce such evidence.  ***See* Trial Transcript, Vol. VIII,** *supra***, at 1380-83.**  The fact that the Court did not allow the admission thereof cannot be blamed on them.

to his sister would have resulted in the introduction of Dr. Dietz' testimony. Defense counsel, therefore, had to decide whether to risk the rebuttal testimony of Dr. Dietz, testimony about which they most certainly had grave concerns.

Moreover, the reports of the Petitioner's mental health experts would not have supported the necessary link between the sister's condition and the Petitioner's mental health. Based on her evaluation of the Petitioner, it was Dr. Coleman's opinion that he had some behaviors "often seen in autistic individuals" but did not diagnose him as autistic. *See* **Exhibit 79, Jackson Psychological Examination,** *supra***, at 11**. She also reported that there are familial links for disorders such as autism but diagnosed him as suffering with "probable" attention deficit hyperactivity disorder. *Id***. at 12**. Dr. Seymour Halleck noted, variously, the Petitioner's propensity "in buying pornographic magazines and using them for masturbation purposes" and he opined that although no diagnosis of a sexual disorder was made, he believed the Petitioner "has serious sexual problems." **Exhibit 82, Report of Seymour L. Halleck, M.D.,** *attached to* **Petitioner's Supplemental Memorandum at 8, 15**. He did not diagnose the Petitioner with autism. Moreover, assuming *arguendo* that there was a

biological link between the two siblings which could have been established by an expert, trial counsel were not ineffective for determining that the dangers involved in introducing such evidence, and thereby inviting Dr. Dietz' testimony, outweighed the benefits. Indeed, Dr. Halleck's report of serious sexual problems weighed in favor of the prosecution, not the defense.

Belser now opines that he should have made a proffer of the evidence pursuant to Federal Rule of Evidence 104[30] outside the hearing of the jury. **Belser Affidavit,** *supra*, **¶ 18.** As noted above, the proffer would have been futile in the absence of expert testimony actually linking the sister's alleged mental condition with that of the Petitioner. More importantly, a proffer of the evidence would have been futile in view of the decision to avoid the introduction of Dr. Dietz' testimony. Trial counsel were not ineffective in making this choice. Therefore, there was no *per se* or other ineffective assistance of counsel.

Finally, on the issue of mitigation evidence, the Court will "'reweigh the evidence in aggravation against the totality of available mitigating

---

[30]That Rule provides that "[p]reliminary questions concerning the qualification of a person to be a witness, . . . or the admissibility of evidence shall be determined by the court[.]" **Fed. R. Evid. 104(a).**

evidence.'" ***Strickland v. Branker*, 284 F. App'x at 63 (quoting *Wiggins*, 539 U.S. at 534).** The jury unanimously found that the victim's death occurred during the commission of the crime of kidnaping. **Special Verdict Form Regarding Punishment, *supra*, at 3.** The jury also unanimously found that the Petitioner committed the offense in an especially cruel manner because it involved torture or physical abuse. *Id*. Finally, the jury found as an aggravating factor that substantial planning had been involved. *Id*. The jury also found as a non-statutory factor that the crime had caused injury, harm, and loss to the victim's family. *Id*. **at 4.**

In mitigation, the jury unanimously found that the Petitioner did not have a significant prior criminal history. *Id*. They rejected any mental health impairment. *Id*. Out of 23 non-statutory mitigating factors, the jury unanimously found six of them. *Id*. **at 6-9.** A majority of the jurors found five other such factors. *Id*. A minority of them found another two such factors. *Id*. Thus, the jurors found thirteen out of a possible twenty-three mitigating factors, that is, almost sixty percent of the total mitigating factors were found by the jury. Among those factors were the following: Petitioner was in DSS custody for the first five years of his life; strange episodic behavior at an early age which did not diminish; inappropriate sexual

language; great familial love despite significant emotional problems; a discharge from the Navy due to mental problems; continued sexual problems with age; heavy sedation in the days prior to the murder; full cooperation with the authorities; a truthful statement about the crime to authorities; remorse during his confession to the authorities; the behavior of a perfect inmate during seven years of imprisonment; and a son and daughter, as well as his mother, who would be severely impacted by his death. Despite these mitigating factors, and their almost sixty percent existence, the jury unanimously voted to impose the death sentence. *Id.* at 11.

In undertaking the reweighing of "the evidence in aggravation against the totality of available mitigating evidence [in order to] assess prejudice," the Court must "evaluate the totality of the evidence–'both that adduced at trial, and the evidence adduced in the habeas proceeding[s].'" ***Pinholster v. Ayers*, 525 F.3d 742, 766 (9th Cir. 2008) (quoting *Wiggins*, 529 U.S. at 536).** The Petitioner's biological sister has autism but he has not been so diagnosed. Dr. Coleman diagnosed the Petitioner as having bipolar disorder, depressive disorder in remission, "probable" attention deficit

hyperactivity disorder, and personality disorder.[31]  **Exhibit 79, Jackson**

**Psychological Examination,** ***supra***, **at 12-13**.  Dr. Halleck diagnosed the

Petitioner as having a recurrent depressive disorder, attention deficit

hyperactivity disorder, probable bipolar disorder, and a personality disorder.

**Exhibit 82, Report of Dr. Halleck, at 14-15.**  Although Dr. Halleck did not

make a diagnosis of a sexual disorder, he clearly opined that the Petitioner

had "serious sexual problems."  ***Id***. **at 15.**  The Petitioner's sister, like the

Petitioner, displayed inappropriate sexual behavior; but, this evidence

weighs against the Petitioner, not for him.  His deceased father's testimony

from the state court trial would have shown an early tendency to stalk young

women and make telephone calls to sex lines.  ***Moody v. Polk***, **408 F.3d**

**141, 151 (4ᵗʰ Cir. 2005) (additional mitigating evidence discounted**

**because it "is 'a double-edged sword that might as easily have**

**condemned [the petitioner] to death as excused his actions'" (quoting**

***Byram v. Ozmint***, **339  F.3d 203, 210 (4ᵗʰ Cir. 2003)).**  The testimony of

Petitioner's ex-wife would have shown his use of stun guns during sex.  The

---

[31] She also diagnosed "possible pervasive developmental disorder,"
referred to parenthetically as "atypical autism or subthreshhold symptoms."
**Exhibit 79, Jackson Psychological Evaluation,** ***supra***, **at 12.**  The
undersigned does not accept this to be a diagnosis of autism.

other testimony may have shown additional abuse during early childhood; however, it would have been duplicative of the testimony placed before the jury by Sally Jackson. **Buckner v. Polk, 453 F.3d 195, 207 (4th Cir. 2006), cert. denied, 127 S. Ct. 1817 (2007).** Nonetheless, the love, care, nurturing and consistent mental health treatment he received from the Jackson family remains unchallenged. Despite all the alleged evidence of mental impairment, suicide attempts, failed behavior in public and military schools, as well as unsuccessful attempts at adult independence, the aggravating evidence before the jury remained intact. And, the introduction of the mental health evidence would have opened the door to Dr. Dietz' testimony. **Bowie v. Branker, 512 F.3d 112, 121 (4th Cir. 2008) (the purported mitigating evidence must be discounted as "double-edged," for had it been introduced, the Government could have introduced its mental health expert), cert. denied, 128 S. Ct. 2972 (2008).** Moreover, the jury would have been allowed to view the videotape of Dr. Dietz' interview of the Petitioner, a tape which almost certainly would have made the FOX news interview of the Petitioner seem benign. **Cagle v. Branker, 520 F.3d 320, 327 (4th Cir.) (the attorneys decided after investigation**

that calling the defendant's family "would only open the door to devastating rebuttal evidence"), *cert. denied*, 129 S. Ct. 763 (2008).

> [A]fter accounting for [the Petitioner's] largely cumulative and otherwise unsympathetic evidence – we are left basically where we started. The balance of the aggravation – mitigation scale remains unchanged, and [the undersigned] do[es] not find that presenting this undisclosed mitigating evidence to the jury would have altered the result of these proceedings or that there is a reasonable probability that even one juror, having reviewed this evidence, would have reached a different result.

*Beuke v. Houk*, 537 F.3d 618, 646 (6th Cir. 2008) (citations omitted); *accord*, *Emmett v. Kelly*, 474 F.3d 154, 160 (4th Cir.) ("In death sentence challenges such as this, 'the question is whether there is a reasonable probability that, absent the errors, the sentencer – including an appellate court, to the extent it independently reweighs the evidence – would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" (quoting *Strickland*, 466 U.S. at 695)), *cert. denied*, 128 S. Ct. 1 (2007).

Here, the very evidence which counsel claims should have been used not only would have conflicted with the mitigation strategy used by defense counsel at the time of trial, it also would have placed additional negative factors in front of the jury. *Gray*, 529 F.3d at 236 (noting that where

**mental health evidence would have revealed "no additional negative factors to the jury and would have virtually no downside for defense strategy," it should have been used).** Having conducted an objective weighing process, the undersigned does not find that there is a reasonable probability that the additional mitigating evidence would have outweighed the Government's evidence in support of the death penalty. *Id*. That is, "the potential mitigating evidence is insufficient to outweigh the overwhelming aggravating evidence." *Pinholster*, **525 F.3d at 766;** *Bowie,* **512 F.3d at 120 (the additional evidence does little to undermine the evidence supporting the aggravating factors found by the jury).**

**4.     Ineffective assistance in failing to secure additional experts.**

The next assessment of blame against trial counsel is a circular argument to the effect that if counsel had secured additional experts, those experts would have provided additional information to the mental health experts who would have changed their opinions as to the Petitioner's mental health diagnoses. *Gilliam*, **480 F.3d at 1035 (even if other experts may have been more compelling, such fact does not establish**

**that the failure to retain those experts was unreasonable).**  Or, as phrased by habeas counsel, "[i]n light of defense counsel's failure to provide their mental health experts with all relevant records concerning their client, they were not in a position to make a reasonable decision to not use mental health experts in the sentencing phase of trial."  **Motion to Vacate, at 83.**  This argument continues to overlook the strategical decision not to introduce evidence of the Petitioner's mental health in order to avoid the damning rebuttal evidence.

In addition, the assumption that additional experts would have been appointed by the undersigned is conclusory, speculative, and erroneous.  In fact, when the Petitioner sought the appointment of such experts in connection with this post-conviction proceeding, the motion was denied.  In refusing to appoint an expert in early childhood development, the undersigned wrote:

> Contrary to Petitioner's claims, there were actually several mental health experts appointed by the undersigned who had the expertise to testify as to early childhood development and the impact of the Petitioner's young life as mitigation evidence. Dr. Seymour Halleck, an expert in forensic psychiatry, and Pam Laughon, Ph.D., clinical psychologist, were appointed on December 28, 2000; Mark Cunningham, Ph.D., forensic and clinical psychologist, was appointed on March 15, 2001; and Claudia Coleman, Ph.D., forensic and neuropsychologist, was

appointed on April 6, 2001. . . . Petitioner has failed to show the necessity for yet another expert opinion.

**Order, filed January 31, 2005, at 13-14.** The undersigned also refused to appoint an expert in autism.

In support of this request, counsel notes that "[f]ive of the twelve jurors did not find as a mitigating circumstance that Jackson would go into strange episodes during which he would become rigid, with his eyes blank and body shaking, and that these episodes did not lessen as he grew older." The fact is that seven of the twelve jurors *did* find this as a mitigating factor. Petitioner has not stated in what manner a diagnosis of autism would have impacted his defense. Again, the only allegations are conclusory, speculative and vague.

*Id.* at 14-15 (citation omitted).

Thus, it is highly unlikely that this Court would have approved of the appointment of additional experts at the time of trial. To claim otherwise is nothing more than sheer speculation.

Moreover, at the time of trial, Lindsay reported to the Court that trial counsel had uncovered evidence of the biological sister and mother and asked for additional testing. **Transcript of Motions Proceeding held April 6, 2001,** *supra***, at 29-37**. The additional testing was approved, and the Court appointed Dr. Coleman and Dr. Halleck to do so. *Id*. Although counsel now claim that the Petitioner's records from the Blue Ridge Mental Health Center were not provided to his mental health experts, Dr. Halleck's

report shows that he did, in fact, review at least a portion of those records. *See* **Exhibit 82, Dr. Halleck's Report,** *supra***, at 1-2**. Although Dr. Coleman has averred that she did not have these records at the time of trial, she also avers that her subsequent review of them confirms her diagnosis of a developmental disorder. **Coleman Affidavit,** *supra***, ¶ 11.** Both doctors list the voluminous documents and records reviewed by them as part of their evaluations of the Petitioner.

Habeas counsel also claim that the medical and mental health records of the biological mother should have been obtained and reviewed by the mental health experts. However, as noted above, based on Lindsay's report to the Court concerning the biological sister and mother, additional testing was performed on the Petitioner. Although habeas counsel argue that the sister's records would have supported the appointment of a geneticist and a pharmacologist, it is highly unlikely that the undersigned would have approved such appointments. Moreover, the stated purpose for those experts was to produce evidence of a developmental disorder. Since Dr. Coleman had already diagnosed a developmental disorder, such evidence would have been duplicative and cumulative. ***Gardner v. Ozmint***, **511 F.3d 420, 427 (4th Cir. 2007)**

**(additional experts would have offered the same evidence),** *cert.*

*denied,* **129 S. Ct. 125 (2008).**  To the extent the argument is that the

Petitioner has autism, like his biological sister, at no point have counsel

explained how a diagnosis of autism would have changed the legal strategy

of not placing the Petitioner's mental health before the jury.  *Id.* **at 428 (the**

**jury found three aggravating factors – kidnaping, criminal sexual**

**conduct and torture – which outweigh any additional mitigating**

**evidence).**

It bears noting that by not placing the Petitioner's mental health in

issue, trial counsel avoided the testimony of Dr. Frederick Berlin who

testified during the state court trial.[32]  Dr. Berlin testified that the Petitioner

had a sexual disorder, a delusional disorder, attention deficit disorder and

recurrent periods of depression.  **Exhibit 44, Testimony of Frederick**

**Berlin, M.D.,** *attached to* **Petitioner's Supplemental Memorandum,**

*supra***, at 1666.**  Dr. Berlin testified, however, that none of these conditions

excused the Petitioner's conduct and he knew what he was doing.  *Id.* **at**

**1664.**  Dr. Berlin described the Petitioner's sexual disorder as being

---

[32] Dr. Berlin actually testified for the defense at the state trial.  The content of his testimony shows why trial counsel in this court did not want the Government to call him as a witness.

"preoccupied and obsessed with looking at sexually explicit magazines." *Id.* at 1667.

> He spends, it appeared, an exorbitant amount of monies in making phone calls to lines where you can call for sexual gratification. He acknowledged to me that he would spend hours going off into the woods masturbating, looking at these magazines, kind of his way of making love. He'd do it even though he had the availability of a loving partner and somebody he could be with at home. . . . So, I think he's very troubled and disturbed in the sexual arena and making a diagnosis is just shorthand to say that that would need to be addressed. Certainly if he would come to me as a patient in any context, talking about spending thousands of dollars on making these phone calls, complaining how in the face of his wife objecting, it's difficult for him to desist, going off and spending time with magazines masturbating when he could with his wife in a loving situation[.]

*Id.* at 1667-69. Dr. Berlin also testified to things that the Petitioner told him during the examination. For example, the Petitioner admitted that he masturbated while watching the victim. *Id.* at 1696. The Petitioner told Dr. Berlin that raping the victim, he thought she would be better off dead than living after having been raped. *Id.* at 1697 ("He'd also read about how women who were raped are ruined for life . . . . He began, he tells me, pondering back and forth, my God, if I leave her this way, will she be in such agony the rest of her life? Would she be better off dead?").

This testimony amounted to a confession and would have prominently reiterated the Petitioner's behavior to the jury.

In addition, as discussed at length *infra*, the use of mental health evidence would also have resulted in the introduction of Dr. Dietz' testimony and the videotape of his examination of the Petitioner. **Cagle, 520 F.3d at 327; Bowie v. Branker, 512 F.3d at 121.** The Court finds the argument that additional experts would have resulted in a different trial strategy to be nothing more than speculation. The Petitioner has failed to show that counsel were ineffective either under a *per se* or *Strickland* standard.

**5. Ineffective assistance in failing to adequately interview Sally Jackson.**

Habeas counsel claim that the trial attorneys failed to properly interview Sally Jackson, and as a result, mitigating evidence to which she could have testified was not placed before the jury. Among the evidence which she failed to recount are the following: that the Petitioner was afraid of the dark as a child; at the same time, he had a heightened sensitivity to light; the Petitioner's voice frequently became extremely loud; at about age six, Mrs. Jackson learned that when the Petitioner became unduly agitated, black coffee calmed him down; the Petitioner suffered from extreme mood

swings daily; and the Petitioner became so difficult during high school that his father began to drink more frequently. **Petitioner's Motion, at 92-93.** Without any citation to authority, habeas counsel make the conclusory statement that this information "would have been important for the jury's consideration" and should have been furnished to the mental health experts. ***Id*. at 93.**

As previously recounted, both the undersigned and the Fourth Circuit have found that Mrs. Jackson gave compelling mitigation testimony during the sentencing phase of the trial. She testified to the following: when the Petitioner first came to them, he used inappropriate language; he became easily over-excited and agitated, then he would calm down; in order to get him to calm down, they would usually have to remove the stimulating factor, such as television; his language and behavior both became worse instead of better; from an early age, the Petitioner would inappropriately and excessively masturbate; the Petitioner was never a good student; the teen years were the worst; at times, the Petitioner's voice would become inappropriately loud; and during the teen years, the Petitioner was depressed and tried to kill himself several times. ***See* Trial Transcript, Vol. VII, *supra*, at 1332-47**. The Court is unable to ascertain in what manner

the anecdotes cited by habeas counsel constitute anything other than cumulative evidence. *Chandler*, **218 F.3d at 1313 ("[T]he trial lawyers, in every case, could have done something more or something different.").**

To the extent that the allegation is that Mrs. Jackson was not adequately prepared by counsel for her testimony, the Court also rejects any such claim. Mrs. Jackson testified in the first state court trial. She was interviewed by numerous expert witnesses for that trial as well as for the federal trial. There is no allegation that she was unprepared for her testimony in this trial. Instead, the implication is that trial counsel could have uncovered more information. However, the record refutes that implication.

The Court finds that counsel were not ineffective under either standard in connection with their handling of the mitigating testimony of Sally Jackson.

**6.    Ineffective assistance regarding the stun gun expert.**

Next, Belser opines that Lindsay and Foster completely ignored the issue of stun gun evidence. "We were not ready to litigate, *either pretrial or*

*during trial*, a *Daubert*-type challenge to [Dr. Stratbucker's] testimony. . . . We should have moved for and insisted upon a *Daubert* hearing and gotten a qualified scientist to assist." **Belser Affidavit, *supra*, ¶ 10 (emphasis added).** Yet again, the record in the proceedings shows Belser's averments to be distorted and incorrect.

As previously noted, in November 2002, defense counsel moved for the appointment of Dr. Page Hudson as an expert in forensic pathology, in part to "provide opinion testimony relating to certain markings on the body of the victim which the government's expert has opined indicate are stun gun marks[.]"[33] ***Ex Parte* Motion for Expert Witness Fees, filed under seal November 29, 2000, ¶ 3.** Dr. Hudson's appointment as an expert was granted. ***Ex Parte* Order, filed under seal December 4, 2000.** Counsel also requested the appointment of Dr. Reid Davis, a mathematician, to refute the Government's position concerning stun gun marks. ***Ex Parte* Motion, *supra*, ¶ 6.** That request was granted as well. ***Ex Parte* Order, *supra*.** In addition, the defense moved for the appointment of Dr. Murray Marks as an expert in the field of forensic anthropology to testify, in part, that the marks on the victim's body were the result of insect infestations, not

---

[33] Stun gun evidence was presented at the state court trial.

stun gun wounds.  *Ex Parte* **Motion,** *supra,* **¶ 4.**  This request was denied.

*Ex Parte* **Order,** *supra*.  The contemporaneous record, therefore, shows

that trial counsel did not ignore the stun gun issue, made pretrial motions

for experts in order to mount a *Daubert* challenge to Dr. Stratbucker, and

received experts on this issue.

Shortly after the Court denied the request to appoint Dr. Marks as an

expert, Lindsay again raised the subject of an expert regarding stun gun

evidence.  **Transcript of Proceedings held December 14, 2000,** *supra,* **at**

**62-65.**  Lindsay reported he had located an expert who had "agreed to

review the photos and render an opinion about whether he believes that

these were caused by a stun gun."  *Id.* **at 63.**  Although his identity was not

revealed during the hearing, Lindsay has averred that the expert was

Robert Siciliano and that the undersigned was displeased with his request.

**Lindsay Affidavit,** *supra,* **¶ 19.**  In fact, when Lindsay mentioned this

expert, the Court commented, "Is there any field out there that we don't

have experts in[?]  These guys [are] preying on the system[.]"  **Transcript**

**of Proceedings,** *supra,* **at 63.**  Lindsay advisesd that Siciliano described

himself as a "key note inspirational speaker."  **Lindsay Affidavit,** *supra.*

Habeas counsel now state that Siciliano characterized himself as an

inspirational speaker with "18 years of security training in everything from white collar crimes to martial arts, personal body-guarding, bar-room bouncing and observing the human condition." **Petitioner's Motion, *supra*, at 16-17**. Habeas counsel also note that Siciliano sent his "press kit" to Lindsay whom they claim "reviewed the materials from Mr. Siciliano for less than one hour and had no further contact with him." ***Id***. In fact, habeas counsel admit that Siciliano was not an expert.

> Siciliano was primarily a motivational speaker with a background in security issues. He had no experience with stun guns. He was not a biomedical engineer or even a medical doctor. His materials are included in the appendix to this motion. A cursory review of these materials shows Mr. Siciliano would not have come close to qualifying as an expert on stun guns.

**Petitioner's Supplemental Memorandum, *supra*, at 35 (citation omitted).** In what manner Lindsay was ineffective for refusing to seek the appointment of an unqualified expert is not disclosed.

On April 13, 2001, trial counsel attempted yet again to obtain a stun gun expert. ***Ex Parte* Application for Issuance of Subpoenas, filed April 13, 2001, ¶ 7.** Counsel moved to subpoena Dr. Joe Hurt, a forensic pathologist who testified during the state trial, and who was expected to testify that the marks on the victim's body were not caused by a stun gun.

*Id.* The subpoena request for Dr. Hurt was denied. **See Sealed Order, filed April 17, 2001, at 6.**

Contrary to the distorted view of the events now presented, the contemporaneous record shows that trial counsel made multiple pretrial motions related to the appointment of expert witnesses on the issue of stun gun wounds. As for Siciliano, the failure to request appointment of an unqualified expert is not ineffective assistance of counsel. ***United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument thus cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue.").** And, the fact that the undersigned denied counsel's request for Dr. Marks and subsequently Dr. Hurt is not ineffective assistance of counsel. ***See*, *e.g.*, *Moore v. Reynolds*, 153 F.3d 1086, 1099 (10th Cir. 1998) ("Whittaker filed a motion for funds to hire a mental health expert, but the trial court denied that request. Moore offers no explanation in his habeas petition concerning how Whittaker could have discovered and presented this information without receiving the requested funds.") ; *Barnes v. Johnson*, 184 F.3d 816 (table), 1999 WL**

**499655 (5th Cir. 1999).**  Thus, Lindsay's statement that "the issue of stun guns simply fell through the cracks," is incorrect.[34]  **Lindsay Affidavit, *supra*, ¶ 20.**

Next, habeas counsel claim that trial counsel were ineffective because Dr. Reid Davis was not called as a witness.[35]  In support of this position, habeas counsel have attached as an exhibit the report prepared by Dr. Davis for use in the state court prosecution.  ***See* Exhibit 81, Report of Reid M. Davis, Ph.D., *attached to*, Petitioner's Supplemental Memorandum.**  Dr. Davis examined the photographs of the victim's body and made measurements of the wounds alleged to be stun gun marks by Dr. Stratbucker.  In his report, Dr. Davis opined,

---

[34] The Petitioner makes a half-hearted argument that trial counsel should have offered Dr. Hurt's prior state court testimony pursuant to Federal Rule of Evidence 804.  That Rule provides that such testimony is not hearsay if given at another hearing during which the party against whom the testimony is now offered "had an opportunity and similar motive to develop the testimony by" cross-examination.  **Fed. R. Evid. 804(b)(1).** Obviously, the United States was not a party to the state court trial which involved different charges, and it had neither opportunity nor motive to develop the testimony.  ***New Jersey Turnpike Auth. v. PPG Indus., Inc.*, 197 F.3d 96, 110 (3d Cir. 1999).**

[35] At the same time, habeas counsel admit that the Government notified trial counsel in this case that it would not call an expert witness in mathematics.  Dr. Davis was appointed as an expert in mathematics.

"If I were confident that I had accounted for all sources of error, these calculations would flatly prove that the wounds are *not* [emphasis in original] 50 mm apart. As it is, however, the sources of potential error are too large for me to make such a definitive statement. My measurements do not in any way support the claim that the wounds are 50 mm apart, *but they are also not sufficient to disprove this claim*.

*Id*. at 2 (emphasis added). Thus, Dr. Davis could not provide an expert opinion that the wounds on the victim's body were <u>not</u> made by a stun gun. It is, therefore, not surprising that trial counsel chose not to call him.[36] However, Dr. Davis did provide suggestions for use on cross-examination of the state's expert although Dr. Davis himself made no definitive findings.[37]

Moreover, trial counsel made a motion in *limine* based on *Daubert* in February 2001, but, as is the custom in this Court, the hearing on the motion was deferred to the time of trial. **Motion in Limine, filed February 15, 2001;** *see also***, Order Re: Admissibility of the Testimony of Robert Stratbucker, M.D., filed May 11, 2001 (noting that the motion in** *limine*

_____

[36] Even if Dr. Davis' report in the federal prosecution, which has not been provided, were more favorable to the defense, it was an appropriate strategical decision not to call him as a witness in view of this prior report which would have been conflicting and which would have called into question his credibility and credentials.

[37] A review of Belser's cross-examination of Dr. Stratbucker reveals that he used Dr. Davis' suggestions.

**based on *Daubert* was heard outside the presence of the jury during the guilt phase of the trial).** As early as February 2001, trial counsel attacked the qualifications of two other witnesses whom they anticipated might be called as stun gun experts based on the state court trial. **Motion in Limine, *supra*.** Trial counsel attacked the opinions of each expert as unsubstantiated by facts in evidence, reliable principles, and methods and/or application, pursuant to the *Daubert* standard. The hearing regarding the exclusion of the testimony of the stun gun experts, including that of Dr. Stratbucker, was deferred to the time of trial. The Court, therefore, rejects the conclusory statement that "defense counsel did not seek a hearing." **Petitioner's Supplemental Memorandum, *supra*, at 31.**

In view of the record, the Court finds it most disturbing that habeas counsel allege Lindsay, Foster and Belser "formulated no strategy for securing a pretrial hearing on the reliability of the scientific methods and theories Dr. Stratbucker would advance." **Petitioner's Motion, *supra*, at 19.** "Defense counsel had no strategic reason or justification for not requesting and aggressively pursuing Mr. Jackson's right to a pretrial hearing on the *Daubert* motion." ***Id*. at 30.** As the contemporaneous record shows, trial counsel moved for a *Daubert* hearing on two different

occasions.  However, the undersigned deferred the hearing to the time of

trial.  This is a custom with which trial counsel and the prosecutor were

familiar.  Moreover, the Court in fact conducted the hearing outside the

presence of the jury immediately prior to the Government's introduction of

Dr. Stratbucker as a witness.  And, the Fourth Circuit found the Court's

procedural handling of this issue was appropriate and met *Daubert*

standards.  ***Jackson*, 327 F.3d at 298; *Kumho Tire Co., Ltd. v.

Carmichael*, 526 U.S. 137, 142 (1999) ("[T]he law grants a district court

the same broad latitude when it decides *how* to determine [the]

reliability [of expert testimony] as it enjoys in respect to its ultimate

reliability determination.").**  Therefore, trial counsel were not ineffective.

It is also obvious from the contemporaneous record that trial counsel

developed a strategy to deal with Dr. Stratbucker's testimony.  During

argument of the motion in *limine* to exclude his testimony, Belser made the

following statements to the Court:

> [T]he next witness is Dr. Robert Stratbucker.  We have been
> provided a report that he provided the U.S. Attorney's Office. . . .
> He's going to testify apparently that wounds on the victim were
> in fact inflicted by a stun gun.
> . . .
> There's no testimony before the court at all from anybody who
> examined the body or examined the photographs that these
> were in fact stun gun marks.  From this witness' report, it's clear

that he is going to rely on the testimony of other people at a state trial.  And our objection is if you read his report and what he . . . is expected to testify to, it's not sufficiently reliable under [*Daubert*] or under *Kumho Tire* for the Court to allow it in without strict scrutiny of it.

. . .

[In] death penalty cases [there is] the heightened need for reliability under the Eighth Amendment in capital cases, and this is going to be crucial evidence that the government will use to put in the foundation for the aggravating factor of heinous, atrocious and depraved.  And it is absolutely crucial that it be sufficiently reliable to pass your Honor's test under the gatekeeping test under *Kumho Tire.*

. . .

[T]hey haven't put up . . . Dr. Butts who's been here under subpoena who did the autopsy.  They haven't put up the people who examined – took the measurements from the photograph. They haven't put up the people who did tests based on the measurements to conclude in their expert opinion that it was a stun gun mark.  They're skipping all those steps and they're trying to get to the ultimate conclusion with a witness based on hearsay what other people have said.

. ..

The documents he reviewed, according to his report, including the testimony of Dr. Butts, testimony of Dr. Peterson, who is a plastic surgeon.[38]  Dr. Butts was the pathologist who examined the body.  The testimony of Dr. Dohse who was a mathematician who rendered an opinion about the mathematically unlikelihood of similarly placed marks,[39] and the testimony of Michael Wright, the crime scene technician, who did the initial evaluation of the photographs and took the initial

---

[38] The February 15, 2001, motion in *limine* attacked Dr. Peterson as an expert.

[39] Likewise, the February 15, 2001, motion in *limine* attacked Dr. Dohse.

measurements, the measurements that were relied upon by Peterson and Dohse who did not do their own independent measurements. His report is based on the testimony of those witnesses.

It's also based on the report, the written report of Dr. Peterson that was used in state court. It's based on the autopsy examination of Dr. Butts and the cover sheet by John Henderson, the pathologist in Hendersonville, and the autopsy transcript by Dr. Butts.

. . .

We have a specific motion in *limine* with respect to portions of the report[.] . . . I would like to call the court's attention . . . in advance . . . that we know in writing that he has an opinion that the stun gun in this case was used as an instrument of torture. Now, that to me seems incredibly prejudicial and unreliable based on the facts in this particular case and also not relevant to any particular issue at this stage.

**Trial Transcript, Vol. V., filed August 6, 2001, at 1066-71 (footnotes added).** Thus, in seeking to exclude Stratbucker's testimony, Belser made the following arguments: (1) the Government had failed to present any evidence from anyone who had examined the victim's body; (2) Stratbucker was relying on testimony from the state court trial; (3) before Stratbucker could form an opinion, the Government should have placed into evidence the testimony of the pathologist, the plastic surgeon who examined the body, the mathematician who rendered an opinion, and the crime scene technician who took the measurements being relied on; and (4) during the

guilt phase, Stratbucker could not testify that the stun gun was used as an instrument of torture. *Id*.

Despite Belser's thorough argument quoted above, he avers now that he and Lindsay failed to determine which one of them would handle this issue. The record clearly shows that Belser was prepared for and argued the motion. Likewise, his allegation that "[w]e did not take any steps to challenge [Stratbucker's] techniques or opinions" is refuted by the above cited portion of the trial transcript. *See* **Belser Affidavit,** *supra*, **¶ 10.** Moreover, during cross-examination of Dr. Stratbucker, Belser made the following points: (1) the pathologist who did the autopsy did not testify; (2) the autopsy report makes no references to regularly spaced lesions or stun gun wounds; (3) no physician who examined the victim's body made references to any such wounds; (4) Stratbucker had never seen the body; (5) Stratbucker was not present at the autopsy; (6) no forensic pathologist in the country was able to recognize stun gun wounds; and (7) Stratbucker alone claimed to be able to do so. **Trial Transcript,** *supra*, **at 1095-1110;** *see also Miller v. Mullin*, **354 F.3d 1288, 1298 (10th Cir. 2004) (petitioner could not establish deficient performance because "[c]ounsel's cross-examination . . . sufficiently challenged [the expert's] credibility[.]").**

In essence, the Petitioner's argument is that trial counsel were ineffective in failing to adequately prepare for Stratbucker's testimony. It is argued that had they presented competent argument to prevent his qualification as an expert, Stratbucker would not have been so qualified and stun gun evidence would not have been presented to the jury.[40] Trial counsel objected to the evidence both by written motion and oral argument; counsel were overruled by this Court;[41] and the Fourth Circuit found the admission of the evidence proper.

> The district court required the government to lay a foundation for Dr. Stratbucker's testimony by eliciting his qualifications and previous research on the effects of stun guns on the human body. In a written order explaining the reasons for admitting Dr. Stratbucker's testimony, the district court applied Federal Rule of Evidence 702 and the applicable Supreme Court decisions, appropriately describing the requirements of that rule. We are satisfied that the district court did not abuse its discretion in admitting Dr. Stratbucker's testimony.

---

[40] As previously noted, in February 2001, trial counsel attacked the qualifications of two other experts identified by the Government as providing opinions that wounds on the victim's body had been caused by stun guns. **Motion in Limine, *supra***

[41] The Court thus rejects, with disapproval, the comment by habeas counsel in Petitioner's initial motion that Stratbucker testified without objection. **Petitioner's Motion, *supra*, at 19-20.** Counsel objected and were resoundingly reminded that their objections had been overruled. **Trial Transcript, *supra*, at 1069-71.**

*Jackson*, 327 F.3d at 298.

The argument that defense counsel were ineffective in the handling of Dr. Stratbucker and his testimony is rejected whether raised as a *per se* ineffective assistance claim or pursuant to the *Strickland* standard. **See, e.g., United States v. Allen, 516 F.3d 364, 375-76 (6th Cir.) (accepting expert testimony regarding stun gun weapon), cert. denied, 128 S. Ct. 2919 (2008); accord, George v. Angelone, 100 F.3d 353 (4th Cir. 1996); Victory v. Lewis, 2008 WL 3926406, at \*26 (N.D. Cal. 2008) (attorney who presented Dr. Stratbucker as expert on stun guns provided effective assistance of counsel to defendant); Lyon v. Cockrell, 2003 WL 21077419 (W.D. Tex. 2003); Borst v. O'Brien, 1990 WL 129662, at \*2 (N.D. Ill. 1990) (recognizing that Dr. Stratbucker would testify to the biological evidence of whether stun guns had been used and the biophysical analysis of a stun gun's impact on the human body).**

Finally, habeas counsel fault trial counsel for failing to attack Dr. Stratbucker's credibility, claiming they should have impeached him in numerous ways and on multiple issues. In so doing, habeas counsel are engaging in nothing more than "Monday morning quarterbacking." The contemporaneous record shows that trial counsel mounted a valiant fight

against the admission of stun gun evidence in any form and from any expert

witness, including Dr. Stratbucker.  They lost the battle due to rulings of the

undersigned, rulings which have been affirmed on appeal.  Not every lost

litigation battle rises to the level of ineffective assistance.


**7.     Ineffective assistance of counsel by conceding guilt.**

In the next assignment of error to trial counsel, habeas counsel claim

that Petitioner's trial counsel improperly conceded his guilt during opening

and closing arguments and improperly admitted evidence of his confession

without his knowledge or consent.[42]  In his affidavit, Belser states:

> During the government's case, I brought out Mr. Jackson's
> confession in my cross-examination of Detective Randy
> Bradford.  I knew Mr. Lindsay and Mr. Foster had filed a motion
> to suppress this statement, the North Carolina Supreme Court
> had reversed Mr. Jackson's original conviction because this

---

[42] In other portions of the petition, habeas counsel have argued that "the focus of the defense team before [Belser] joined the case [was] unreasonably directed to the guilt-phase proceedings, despite Mr. Jackson having previously pleaded guilty in state court, having confessed to law enforcement, having made an inculpatory statement to a family friend, and having previously been convicted in state court."  **Petitioner's Motion, *supra*, at 37.**  In other words, trial counsel were ineffective for failing to concede guilt under the circumstances.  Such is the pattern of habeas counsel, to castigate trial counsel in one section of the motion for failing to take certain action while later claiming that trial counsel were ineffective for doing so.

statement was unconstitutionally obtained and erroneously admitted, and the government had indicated it did not intend to offer this confession during their case-in-chief. However, I felt the confession was an important aspect of the mitigation case for Mr. Jackson. I recall discussing this issue with Mr. Lindsay before I did it and do not know if Mr. Lindsay realized I was going to do so. . . . I am very sure I did not discuss this matter with my client before I did it and did not obtain his consent to do so.

. . .

Based on my review of the government's evidence, I felt it would be prudent to concede Mr. Jackson's involvement in the victim's death. *I do not recall* discussing this approach with Mr. Jackson. *I am fairly certain* I did not obtain his consent to admit his involvement.

**Belser Affidavit,** ***supra*****, ¶¶ 9, 13 (emphasis added).**

Lindsay has averred:

Mr. Belser and I decided to acknowledge Mr. Jackson's responsibility for this killing in an effort to save his life. Mr. Belser was working closely with Mr. Jackson during this period of time. I assumed that he and Mr. Jackson had discussed this tactic and assumed that he had obtained Mr. Jackson's consent to essentially concede his guilt to the jury. I did not have any such discussion and did not personally obtain consent from Mr. Jackson. Rather, I understood from Mr. Belser that we were authorized to proceed in this manner.

I recall when Mr. Belser was cross-examining one of the government witnesses he elicited our client's confession. I assumed he had Mr. Jackson's authorization to bring in the confession.

**Lindsay Affidavit,** ***supra*****, ¶¶ 15, 16.**

The Petitioner has averred that Belser discussed with him before trial "that he wanted to use my confession in my federal trial."[43] **Exhibit 22, Supplemental Affidavit of Richard Allen Jackson, *attached to*, Petitioner's Supplemental Memorandum, ¶ 2.** Despite this admission, Jackson then avers that although Belser discussed with him the fact that Belser intended to introduce his confession, Belser did not explain that the Petitioner's guilt would be "conceded." *Id.* ¶ 3. In what manner introducing the confession would amount to anything other than a concession of guilt is not explained. At no point does the Petitioner state that he disagreed with this strategy or that he instructed trial counsel to act otherwise. Moreover, as noted below, the Petitioner was present in court and remained silent when this strategy was executed.

> An attorney undoubtedly has a duty to consult with the client regarding important decisions, including questions of overarching defense strategy. That obligation, however, does not require counsel to obtain the defendant's consent to every tactical decision.
> . . .
> [Belser] was obliged to, and in fact . . . did, explain his proposed trial strategy to [the Petitioner]. Given [the Petitioner's silence],

---

[43] Thus, Belser's averment that "I am very sure I did not discuss [the admission of the confession] with my client before I did it and did not obtain his consent to do so," is, according to the Petitioner's own affidavit, incorrect.

> [Belser] was not additionally required to gain express consent before conceding [the Petitioner's] guilt.
>
> . . .
>
> [Belser's] concession of [the Petitioner's] guilt does not rank as a fail[ure] to function in any meaningful sense as the Government's adversary.  Although such a concession in a run-of-the mine trial might present a closer question, the gravity of the potential sentence in a capital trial and the proceeding's two-phase structure vitally affect counsel's strategic calculus.  Attorneys representing capital defendants face daunting challenges in developing trial strategies, not least because the defendant's guilt is often clear. . . .  In such cases, avoiding execution [may be] the best and only realistic result possible.  Counsel therefore may reasonably decide to focus on the trial's penalty phase, at which time counsel's mission is to persuade the trier that his client's life should be spared.  Unable to negotiate a guilty plea in exchange for a life sentence, defense counsel must strive at the guilty phase to avoid a counterproductive course.  In this light, counsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in a useless charade.

*Florida v. Nixon*, **543 U.S. 175, 187, 189-92 (2004) (quotations omitted).**

The conduct of counsel at the time of trial shows that this trial strategy was, in fact, pursued, that is, Belser and Lindsay conceded involvement in an attempt to avoid the death penalty.  In his opening statement, Lindsay argued that the Petitioner did not have the *mens rea* to form the specific intent for first degree murder.  **Trial Transcript, Vol. III, filed August 6, 2001, at 639-42.**  This strategy was executed throughout the trial.  During the cross-examination of Officer Michael W. Wright, Belser placed into

evidence the Petitioner's confession to Officer Bradford in order to place

before the jury the issue of remorse for mitigation purposes.[44] **Trial**

**Transcript, Vol. IV, filed August 6, 2001, at 760-68.** During closing

argument, trial counsel acknowledged that the evidence against the

Petitioner was "strong." **Trial Transcript, Vol. VI, *supra*, at 1230.** Counsel

stated that "there really is no question but that he did these things." *Id*.

Counsel then made an argument designed to avoid the death penalty. *Id*. **at**

**1230-34**. This strategy was devised by defense counsel after the

undersigned ruled against the Petitioner in a pretrial motion concerning the

admissibility of the state court guilty plea. Or, as Belser put it during the

trial:

> [T]he Government put us on notice that they intended to
> introduce evidence of the state court guilty plea because they
> contended in a lengthy pretrial memorandum of law that it was
> relevant to this proceeding. Your Honor found that it was
> relevant to this proceeding. That is the law of the case so far.
> *We have been proceeding on the basis that it was relevant to
> this proceeding and would come in. In fact, evidence of the
> state court prosecution and particularly his guilty plea is relevant
> to his defense. He pled guilty to second degree murder in state
> court. There was a factual basis presented by the state that
> was accepted by the trial court in the second degree murder
> that the defendant lacked the specific intent to kill, he lacked*

---

[44] Obviously, the Petitioner was present during this cross-examination.

*premeditation and deliberation.  <u>That is exactly what his
defense in this case is, that he is guilty not of first degree
murder, but of second degree murder based on the evidence
that is now before the jury through Detective Bradford.  He
indicated to Detective Bradford in his confession that he didn't
mean to kill her.  He didn't mean to kill her.</u>* . . .  That is the gist
of our defense, and the fact of the state court guilty plea and his
admission to that and its acceptance by the Court is part of his
defense.  It corroborates his statement to Randy Bradford that's
now already into evidence and the Government has already
conceded and argued successfully its relevance to this case. . .
.  The point of it is that he is guilty not of first degree murder, but
of second degree murder.  He has admitted that and that's what
we're going to ask the jury to find him guilty of.

. . .

We have a right to present evidence that he's guilty not of the
crime charged but of the lesser included offense.  That's a
defense in most murder cases unless you have an alibi[.]  It's
always I'm guilty of a lesser included offense.

**Trial Transcript, Vol. IV, *supra*, at 834-35, 837-38 (emphasis added).**

On the sixth day of trial, Lindsay advised the Court that "we have

decided . . . that we're not going to be offering any evidence at this point on

his guilt-innocence."  **Trial Transcript, Vol. VI, *supra*, at 1136-37.**

Not only is it clear that counsel devised the strategy of conceding

guilt, it is clear that the Petitioner was aware of that strategy.[45]  The

Petitioner sat in court with counsel and without objection during the opening

---

[45] In fact, as Belser stated, defense attorneys use the same strategy
in every murder case where there is no alibi.  ***Id*. at 838.**

statement, each exchange, and the cross-examination during which his confession was elicited. The contemporaneous record, as well as the affidavits now filed, show that Belser discussed with the Petitioner the introduction of his confession into evidence; the Petitioner knew his confession would be used at trial; the Petitioner listened to his confession being placed before the jury on more than one occasion without any objection; and placing the confession before the jury was a concession of guilt. Moreover, trial counsel's contemporaneous statements to the Court on the record show that placing the confession before the jury had two purposes: to establish that the Petitioner did not have the specific intent to commit first degree murder ("I didn't mean to kill her"), and to establish facts in mitigation, including lack of intent and remorse, in an attempt to avoid a sentence of death.[46] Thus, Belser's claim that he did not discuss the introduction of the confession with the Petitioner is disproved by Belser's contemporaneous statements in court during the trial as well as the Petitioner's own affidavit and his behavior in court during the trial. And,

_____

[46] Detective Bradford testified that the Petitioner was extremely upset during the confession, crying so hard at times that the interview had to halt until he could regain composure. **Trial Transcript, Vol. IV,** *supra***, at 827-830.**

Lindsay's statement that counsel decided to admit involvement in order to

save the Petitioner's life is bourne out by the contemporaneous statements

made on the record.  The undersigned finds it oxymoronic to acknowledge

that the Petitioner and Belser discussed introducing his confession while at

the same time claiming that the Petitioner did not consent to a "concession"

of guilt.

> It is not good to put on a "he didn't do it" defense and a "he is
> sorry he did it" mitigation.  This just does not work.  The jury will
> give the death penalty to the client and, in essence, the
> attorney.". . .  To summarize, in a capital case, counsel must
> consider in conjunction both the guilt and penalty phases in
> determining how best to proceed.  When counsel informs the
> defendant of the strategy counsel believes to be in the
> defendant's best interest and the defendant is unresponsive,
> counsel's strategic choice is not impeded by any blanket rule
> demanding the defendant's explicit consent.  Instead, if
> counsel's strategy, given the evidence bearing on the
> defendant's guilt, satisfies the *Strickland* standard, that is the
> end of the matter; no tenable claim of ineffective assistance
> would remain.

*Nixon*, **543 U.S. at 191-92.**  The Fourth Circuit has recently reiterated this

holding.

> We next consider McNeill's argument that counsel was
> ineffective by admitting, without McNeill's consent, that he was
> guilty of second-degree murder and non-felonious breaking and
> entering.  Under [*Nixon*], trial counsel's performance cannot be
> constitutionally deficient based solely on his failure to seek
> McNeill's consent before admitting guilt to the jury.  Instead,
> McNeill must show that counsel's decision to admit guilt was

objectively unreasonable under the *Strickland* standard. . . . McNeill's contention that counsel was deficient in admitting that he committed second-degree murder is meritless. The record indicates that McNeill, after a hearing, stipulated to the commission of second-degree murder. At this hearing, McNeill indicated that he understood that the stipulation gave trial counsel the right to argue to the jury that he was guilty of second-degree murder. This argument was consistent with counsel's strategy of contending that McNeill lacked the *mens rea* to commit premeditated murder. Further, McNeill's testimony during trial that he "did not intend to hurt" Lipscomb cannot stand for the proposition that he did not intend to admit he committed second-degree murder, as he now maintains. . . . [This] supports trial counsel's guilt phase strategy of arguing that McNeill had a diminished mental capacity due to his emotional state and, therefore, was incapable of committing premeditated murder. It was in this context that McNeill's statement was offered, and in this context McNeill's statement was not contrary to counsel's defense strategy of showing diminished capacity and lack of intent. Given the factual evidence presented . . ., counsel's strategic choice to admit guilt to second-degree murder while arguing that pre-meditation was lacking was not objectively unreasonable.

**McNeill v. Polk**, 476 F.3d 206, 217-18 (4th Cir.), *cert. denied*, 128 S. Ct. 647 (2007).

Likewise, in the case at hand, the Petitioner has acknowledged that Belser discussed the strategy of admitting his confession; and the Petitioner was present during the cross-examination of witnesses during which this confession was elicited. Moreover, the Petitioner had been convicted in state court of first degree murder and, when that conviction was overturned,

he pled guilty to second degree murder, a plea which the undersigned had already ruled would be admissible during trial. ***Gamble v. Sec'y, Florida Dep't of Corr.*, 450 F.3d 1245, 1251 (11th Cir. 2006) (Where jury found beyond a reasonable doubt in guilt phase that defendant had a pecuniary gain motive in committing murder, such a concession during the penalty phase was not ineffective assistance.).** In addition to the confession made to the investigating officers, the Petitioner also confessed to a family friend, a confession which was also admissible. Defense counsel had a case with horrible facts and looming procedural hurtles. ***Strickland*, 466 U.S. at 681 ("Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment."); *United States v. Gomes*, 177 F.3d 76, 83 (1st Cir. 1999) (Counsel conceded guilt as to one charge. "This was patently a reasonable strategy. The government's case . . . was overwhelming . . . . [B]y avoiding a hopeless claim of innocence on one count, counsel preserved some credibility with the jury for use where it might help.").**

Thus, the Court's holding is two-fold.  The Petitioner's affidavit and his contemporaneous conduct show that he did consent to the admission of his confession which is tantamount to consenting to a concession of guilt, whether during opening argument, cross-examination or closing argument. However, assuming *arguendo* that he did not explicitly so consent, his conduct during the trial was sufficiently unresponsive that counsel were not ineffective in pursuing this strategy.   Thus, counsel's trial strategy was not presumptively ineffective assistance.  Nor can it be held, on this record, to be performance which falls below an objective standard of reasonableness. ***Montgomery v. Uchtman*, 426 F.3d 905, 914 (7th Cir. 2005) ("[Counsel] wanted to make certain that he saved credibility for the mitigation aspect of the case. . . .  Employing that same strategy under these very similar circumstances – particularly in light of the highly incriminating admissions Montgomery made to the police – was also reasonable and did not constitute deficient performance under *Strickland*.").**  A concession to second-degree murder was not a concession of first degree murder and was an objectively reasonable strategy to try to save the Petitioner's life.  ***Poindexter v. Mitchell*, 454 F.3d 564, 582-83 (6th Cir. 2006) ("[C]ounsel in this case argued that the crime charged by the**

**State, aggravated murder, had not been proven beyond a reasonable doubt and that the jury must consider a lesser-included offense.  In any event, assuming counsel conceded guilt, given the overwhelming evidence that Poindexter was guilty of aggravated murder, there is no reasonable probability that the outcome of the trial would have been different absent counsel's statements."); *Hovey v. Ayers*, 458 F.3d 892, 905-06 (9th Cir. 2006) ([C]ounsel explained, 'I knew that if I tried to sell a second degree that I would not sell it and I would lose credibility.' . . . Rather than a concession of guilt, counsel engaged in rhetoric to preserve his credibility in the eyes of the jurors.  Because counsel's statement was driven by strategy, and *Strickland* requires deference to informed strategic choices, we do not find deficient performance[.]") .**

Finally, on the issue of conceding guilt, the Petitioner claims that Lindsay rendered ineffective assistance of counsel during closing argument in the penalty phase of the trial "when his lawyer conceded . . . that 'justice in this case says death.'" *Jackson*, **327 F.3d at 299.**  However, the same argument was made on direct appeal and was soundly rejected.

> Although the record confirms that Jackson's counsel did [state, "justice in this case says death"] . . ., it also shows that he did so in presenting the jury with a choice between harsh justice and

the jury's compassion, particularly for Jackson's mother and children. We find counsel's strategy in the circumstances to be reasonable. Given the overwhelming evidence of Jackson's guilt, counsel made the choice to appeal for mercy rather than argue that Jackson was somehow *deserving* of mercy.

To show that counsel's argument to the jury denied Jackson the effective assistance of counsel, Jackson would have to demonstrate that counsel's performance was deficient – making errors "so serious that counsel was not functioning as the 'counsel'" – and that the deficiency prejudiced his defense. We conclude that focusing on this statement and counsel's strategy only, Jackson meets neither the objectively-unreasonable-performance prong nor the prejudice prong of the *Strickland* test for ineffective assistance of counsel. Jackson was represented by two able lawyers throughout his trial, who fought vigorously on behalf of their client. A full reading of the closing argument, in which the objected-to statement was made, reveals that Jackson's lawyer pursued a deliberate and entirely reasonable strategy of contrasting the harsh demands of justice with the power of the jury to act mercifully and then to ask the jury to have mercy. We cannot conclude that the performance was either objectively unreasonable or prejudicial.

*Id*. at 299-300 (quoting *Strickland*, 466 U.S. at 687).

"An issue previously decided on direct appeal may not be raised on collateral review." *United States v. Rush*, 99 F. App'x 489, 490 (4th Cir. 2004) (citing *Boecknhaupt v. United States*, 537 F.2d 1182, 1183 (4th Cir. 1976)). "'[O]nce a matter has been decided adversely to a defendant on direct appeal, it cannot be re-litigated in a collateral attack under section 2255.'" *United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir. 2000)

(quoting *United States v. Natelli*, 553 F.2d 5, 7 (2d Cir. 1977)); *United States v. Davis*, 406 F.3d 505, 511 (8th Cir. 2005).** This claim, therefore, falls.

Moreover, assuming *arguendo* that this argument were not precluded, the Petitioner would fare no better.  Where the evidence in the guilt phase is overwhelming, as it was here, and the attorney is attempting to avoid the death penalty, an attorney does not need his client's explicit consent before he concedes guilt during the sentencing phase.  **Stenson v. Lambert**, 504 F.3d 873 (9th Cir. 2007), *cert. denied*, 129 S. Ct. 247 (2008).

> Renowned advocate Clarence Darrow, . . . famously employed a similar strategy as counsel for the youthful, cold-blooded killers Richard Loeb and Nathan Leopold.  Imploring the judge to spare the boys' lives, Darrow declared: "I do not know how much salvage there is in these two boys. . . .  I will be honest with this court as I have tried to be from the beginning.  I know that these boys are not fit to be at large." . . . Darrow's clients "did not expressly consent to what he did.  But he saved their lives."

*Nixon*, 543 U.S. at 192 (citations omitted); *Poindexter*, 454 F.3d at 582 ("In any event, assuming counsel conceded guilt, given the overwhelming evidence that Poindexter was guilty of aggravated murder, there is no reasonable probability that the outcome of the trial would have been different absent counsel's statements."); *accord*,

*Atwater v. Crosby*, 451 F.3d 799 (11th Cir. 2006), *cert. denied*, 549 U.S. 1124 (2007); *Nixon v. Epps*, 405 F.3d 318 (5th Cir. 2005); *Turrentine v. Mullin*, 390 F.3d 1181 (10th Cir. 2004); *Baker v. Corcoran*, 220 F.3d 276 (4th Cir. 2000).

Habeas counsel endeavor to avoid the Fourth Circuit's ruling that the comment was not prejudicial by implying that it was not a deliberate choice. Or, as Lindsay characterized it in an affidavit made in 2003, "[t]his remark was unintentional." **Exhibit 26, Affidavit of Stephen P. Lindsay, dated March 31, 2003,** *attached to* **Petitioner's Supplemental Memorandum.** However, the entire closing argument, including that of Belser, shows that Lindsay's remark merely carried through with the theme of the trial: to avoid the death penalty and obtain life in prison.[47]  During Belser's closing argument, he made the following comments:

> The truth of the matter is that today each one of you holds in your hands the power of life and death. . . .  Each one of you must decide from somewhere in the depths of your own heart and your own conscience what is the right thing to do in this case.
>
> . . .
>
> [T]he government is trying to prove to you that death and nothing less is required.  I mean, is that really the case?  Is death required here?  Is death the only response that any of you

---

[47] Indeed, that same theme is present in this motion.

could make to this situation now that you know everything that
led up to this moment?

. . .

The issue is whether he dies at the hands of the federal
government, whether he'll be executed – and that's what they
ask you to do, each one of you.  Or, whether he'll be allowed to
die when God takes him, in prison serving a sentence of life
without the possibility of release.  Given that alternative, given
that he will spend every waking, breathing day until he dies, in
the prison cell about the size of your bathroom, is death really
required?  Is it necessary? Is it the only response that you can
summon out of your human heart?

. . .

We ask for no excuses.  We provide no excuses.  We ask only
for your compassion and the deepest leanings of your heart and
to understand how this could have occurred.

. . .

Exercise mercy.  Vote out of the depths of your human heart
and give in this instance life; not much of a life, but life, and . . .
reject the government's call that death is the only thing that is
required.

**Trial Transcript, Vol. VIII,** *supra***, at 1465-69.**  Lindsay spoke next and

speaking on the same theme, stated that if justice, as argued for by the

Government, said death, the jury could exercise mercy.  ***Id***. **at 1470-78.**

Closing arguments in summation must be considered in context, as a whole

and with a highly deferential standard of review.  ***Yarborough v. Gentry***,

**540 U.S. 1, 5-8 (2003).**  And when counsel in that summation focuses on a

particular issue, there is a strong presumption that he did so for tactical

reasons rather than sheer neglect.  ***Id***.  The contemporaneous record

shows that Lindsay merely followed through with the defense theme

forecast by the entire trial in an attempt to cull mercy from the jury.  **Cope v.**

**United States, 272 F. App'x 445, 449 (6th Cir. 2008) (a concession that**

**the jury has the power over the defendant's fate is a reasonable**

**strategy), cert. denied, 129 S. Ct. 958 (2009); Hall v. Washington, 106**

**F.3d 742, 750 (7th Cir. 1997) ("As with other strategic decisions,**

**defense attorneys have some latitude in choosing how to approach a**

**closing argument at a capital sentencing hearing.  A simple plea for**

**mercy may be a valid choice[.]");  Eddmonds v. Peters, 93 F.3d 1307**

**(7th Cir. 1996) (plea for mercy in summation not ineffective).[48]**  The

Court does not find that trial counsel rendered ineffective assistance

pursuant to either the *per se* or *Strickland* standard.

---

[48] The Court rejects the Petitioner's citation to *Wade v. Calderon*, 29 F.3d 1312 (9th Cir. 1994).  In that case, defense counsel called to the stand one of the defendant's other multiple personalities who testified that he felt no remorse for the crime and asked the jury to sentence the defendant to death.  In *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991), defense counsel made the comment that he found it virtually impossible to explain to the jury why his client should not die.  And, in *Boyde v. Brown*, 404 F.3d 1159 (9th Cir. 2005), the attorney argued that his client wanted to die. These cases cited by counsel are, therefore, inapposite.

**8.      Ineffective assistance in connection with the videotape.**

Next, trial counsel claim that they were ineffective due to the admission by the undersigned, over "strenuous objection," of the videotape of an interview with the Petitioner by a news reporter during the Government's rebuttal.  **Lindsay Affidavit,** *supra***, ¶ 28.**  According to trial counsel, they "challenged the admissibility of [the videotape] and had succeeded in keeping it out of evidence through the presentation of the defense evidence at the penalty phase."  **Belser Affidavit,** *supra***, ¶ 22.** Despite acknowledging that success, trial counsel now claim they were ineffective when the Court allowed the videotape to be shown in rebuttal. Or, as trial counsel now claim, they should have been better prepared to "rebut the rebuttal."  Belser averred:

> [T]he district court allowed the government to play this videotape in rebuttal at the penalty phase.  Mr. Lindsay and I were "shell shocked" by the ruling.  The only thing we did in response was recall Sally Jackson for brief testimony in sur-rebuttal.  We did not call any of our experts or lay witnesses. We should have done something else.  We were just so stunned by the sudden development that we froze.

*Id.*  Lindsay's affidavit also addressed this issue:

> After we rested our evidence in the penalty phase, the district court allowed the government to play a television interview with our client.  *The district court admitted this evidence over our*

*strenuous objection*.  In my opinion, this evidence was devastating.

. . .

I recall the defense was in virtual shock over the district court's decision to allow the tape to be played.  [The videotape] didn't rebut any evidence or information offered by the defense during sentencing.  I believed then, and believe now, that this evidence resulted in the eventual death sentence.  Mr. Belser did not have enough grasp on the case to offer any meaningful input on what we should do.  Our staff was stunned and they had no meaningful advice.  I made the decision to offer only Sally Jackson in sur-rebuttal.  I do not know why I did not opt to put any additional evidence on at that point but suspect that *we had released our witnesses at that time*.

**Lindsay Affidavit, *supra* (emphasis added).**

On direct appeal, the Petitioner argued that the admission of this videotape was erroneous because it went beyond the scope of Sally Jackson's testimony.  The Fourth Circuit, noting that defense counsel strenuously objected to this evidence, addressed this issue.

To be sure, some portions of the videotape were properly admissible to rebut portions of Mrs. Jackson's testimony.  For example, Mrs. Jackson testified that her son seemed depressed in the month leading up to the murder, and he had to be reminded to bathe and change his clothes.  In the videotaped interview, however, Jackson describes his life as "normal" in the month leading up to the murder.

It is equally certain, however, that broad portions of the videotape cannot properly be characterized as rebuttal evidence.  For example, Jackson lapses during the interview into rants about politicians, prosecutors, and police, describing them as "scum," and "the devil."  In addition, he repeatedly

asserts his innocence and advances theories about a government conspiracy against him. The trial court erred in admitting these portions of the videotape as rebuttal evidence because of a lack of the required "nexus" between Jackson's diatribe about politicians, prosecutors, and police, and his conspiracy theories, on the one hand, and any portion of his mother's testimony on the other.

. . .

In sum, the trial court abused its discretion in permitting the government to show to the jury the entire videotape, the major portion of which goes beyond the scope of proper rebuttal. Nevertheless, . . . "the Government [has] establish[ed] beyond a reasonable doubt that the error was harmless."

. . .

[T]he jury unanimously found that the evidence established, beyond a reasonable doubt, the four aggravating factors advanced by the Government. The videotape could not have influenced the jury on the aggravating factors because none of them was discussed during Jackson's interview. To the extent that inadmissible portions of the videotape might have made it less likely that the jury would have found a particular mitigating factor, we are convinced beyond a reasonable doubt that, in the absence of the videotape, the jury would have found that the aggravating factors sufficiently outweighed the mitigating factors, and that it would have recommended a death sentence.

**Jackson, 327 F.3d at 306-07 (quoting 18 U.S.C. § 3595(c)(2)).**

Thus, to the extent the Petitioner argues that the admission of this videotape entitles him to relief, the issue was raised and decided on direct appeal and may not be re-visited in this proceeding. Moreover, the Fourth Circuit has found, beyond a reasonable doubt, that the jury would have found that the aggravating factors outweighed the mitigating factors and

would have recommended a death sentence even if the inadmissible portions of the videotape had not been shown.  Assuming *arguendo* that trial counsel were in some manner ineffective, this ruling precludes any finding of prejudice stemming from such ineffectiveness.  **Chapman v. California, 386 U.S. 18, 24 (1967); United States v. Higgs, 353 F.3d 281 (4th Cir. 2003); Foster v. Sowders, 946 F.2d 894 (table), 1991 WL 203120 (6th Cir. 1991) (even if ineffective assistance of counsel were assumed, any such error was harmless beyond a reasonable doubt).**

Moreover, the Court rejects trial counsel's characterization of their conduct.  Before the video was shown, counsel vehemently opposed its admission.  **Trial Transcript, Vol. VIII, *supra*, at 1386-89**.  Belser argued that the Government was trying to "rebut their own evidence" of guilt by trying "to rebut evidence that [the Petitioner] confessed and accepted responsibility by putting in a tape that he 6 years later [renounced] that." **Id. at 1388.**  After the tape was played, the following colloquy occurred:

| | |
|---|---|
| Mr. Lindsay: | There may be some sur-rebuttal from the defense.  I would like to be heard when your Honor has a moment though. |
| | . . . |
| The Court: | All right.  You mentioned cross examination of the TV reporter.  Do you want me to call him back? |

Mr. Lindsay:     How long will it take to get him back?  He's 3 or 4
                 hours from here, your Honor.

The Court:       Where is he from?

Mr. Miller:      He works out of Greenville.  We could call down
                 there.  They probably have radio communications
                 with him.

Mr. Belser:      Why isn't he here?

The Court:       I'm asking you if you want him.

Mr. Belser:      Well, we need a moment to speak about that, your
                 Honor.

The Court:       All right.  All right. [Jury excused from the
                 courtroom.].

The Court:       Mr. Lindsay?

Mr. Lindsay:     I would just like to put on the record, your Honor, a
                 couple of things above and beyond the cross
                 examination issue that I raised, and I will speak with
                 Mr. Belser about that during the break and let your
                 Honor know something in just a few minutes about
                 what our position is going to be on that.  I brought to
                 your Honor's attention on the record before this tape
                 was played our feeling and our belief that this tape,
                 given the way it was played and put forth for the jury,
                 went far beyond what would be appropriate to rebut
                 the testimony of Richard Jackson's mother, and I
                 believe that the tape has done that, that it has gone
                 far beyond those things that would be appropriate
                 for rebuttal.  Because of that, I'm asking that your
                 Honor declare a mistrial at this point with regard to
                 this stage, or at a minimum consider striking the
                 tape and instructing the jury.  It just went way

beyond what rebuttal should be, given the testimony that she provided and the things that she said.

The Court: All right. Show the motion denied, exception for the defendant.

Mr. Belser: Your Honor please, we would like an opportunity at some point – not now because we're about to take a recess and we need to discuss our reaction to this tape. But, we'd like to point out, if necessary line-by-line or page-by-page, what we consider to be the most prejudicial statements in the tape, the most irrelevant statements in the tape, those that would most fully – those objectionable portions that would most fully support our motion for a mistrial. And we would call to the Court's attention what was told to us in chambers as the proper reason for the tape was very, very limited. But as Mr. Lindsay has said, the tape is extremely wide ranging. It goes into absolutely inadmissible issues, such as discussions with his attorney, the possibility of parole, a number of other issues, none of which have anything to do with rebuttal; all of which in toto, cumulatively, are extremely prejudicial. We would like an opportunity, since it's a 50 page document, at some point to go through it with the court.

. . .

Mr. Lindsay: [T]his is a tape that is made 7 years after these incidents, having been in prison for 7 years at the – in the custody of the State of North Carolina. And what the government has done is it has come in and it has taken out those portions of the tape where he talks about other things as if this is all he has said. On the tape he says that he is not on medication, although he talks about medication. And they make no effort to account for Richard Jackson during that 7 year period of time. They don't point out at all that while in prison, he's never had an infraction, that

he's never assaulted anyone, that he's never been involved in any sort of escape attempt, that he never ever had any of those sorts of incidents where there's been any sexual deviance with other inmates or other guards or anything like that.  And they pluck out this thing at the end of a 7 year prison sentence that he talks about on tape when he says he's not on medication and puts it in front of the jury, and on things that we contend are not appropriate at this point for rebuttal.

*Id.* at 1433-39.

Having lost their motion to exclude the tape before its admission, counsel renewed their arguments after the tape was shown, going so far as to move for a mistrial.  Such conduct does not disclose an inability to function at the time and the contemporaneous argument of counsel and their motion for a mistrial belie counsel's averments that they were "shell shocked," in "virtual shock" or otherwise unable to respond to this development.  *See* **Belser and Lindsay Affidavits,** *supra.*

Moreover, counsel cannot be blamed for the fact that the undersigned granted only a short recess within which to devise a response to this tape.  At the end of that recess, Lindsay advised that counsel had discussed the issue and found no reason to cross-examine the reporter who made the

tape.[49]  **Trial Transcript, Vol. VIII,** *supra***, at 1440.**  Lindsay then preserved

his objection to the admission of the evidence. *Id*.  And, in sur-rebuttal,

counsel offered the Petitioner's mother again as a witness.  Sally Jackson

testified as to the following points: (1) she advised her son not to give the

interview; (2) she was present when he pled guilty to the second-degree

murder of Karen Styles; (3) for the past six years, he had been housed at a

high level security state prison at the other end of the state; (4) her son's

affect on the tape was inappropriate in that he was loud, had unusual hand

gestures, and inappropriate laughter; (5) she had seen this type of behavior

in her son since he was a child; (6) on the tape, as was normal, he would

ramble in his thoughts; (7) he had always been highly opinionated, with loud

speech and a high-pitched, shrill laugh; (8) despite his flaws, she continued

to love him; (9) although on the tape, Jackson said he was not on

medication, during times in his life when he took medication for depression,

---

[49] Nor has the Petitioner shown in what manner such a cross-examination would have been of benefit to him.  ***Potts v. Hinkle*, 2007 WL 1577337, at *4 (W.D. Va. 2007) ("Courts cannot find an attorney ineffective for failing to call a witness when the only evidence of that potential witness's testimony is the Petitioner's conclusory statements."); *Haskett v. Ray*, 241 F. Supp. 2d 582 (E.D. Va.) (petitioner failed to provide an outline of purported witness's testimony, thus, no ineffective assistance),** *appeal dismissed***, 46 F. App'x 169 (4th Cir. 2002).**

he was a different person; and (10) he was a kind and loving father to his

two children.[50]  *Id*. **at 1440-46**.  Contrary to the arguments now made, Mrs.

Jackson's sur-rebuttal testimony expounded on the Petitioner's troubled

childhood while also mentioning positive aspects of his personality, such as

his love for his children and his parenting ability.  *Id*.  Mrs. Jackson's sur-

rebuttal clearly showed the jury that her son had positive attributes which

were not "evil."  *Id*.  She testified that when her son took anti-depressants,

he was a different person.  *Id*.  She further explained the Petitioner's

inappropriate affect, his rambling and grandiose style, and showed that his

claims of innocence in the tape were related to those character traits.[51]  *Id*.

---

[50] Habeas counsel also claim that trial counsel should have called the Petitioner's ex-wife, Donna Jackson Hewitt, to testify that he was a good father.  Contained within the open file provided to trial counsel as well as the report of Dr. Claudia Coleman are statements by Ms. Hewitt concerning her sexual relationship with the Petitioner. **Exhibit 79, Jackson Psychological Examination,** *supra.*  In a statement to the Federal Bureau of Investigation, Ms. Hewitt accused the Petitioner of using a stun gun on her during violent sex.  It is not surprising that trial counsel did not call her as a witness.

[51] Habeas counsel claim something should have been done to explain the Petitioner's rambling accusations of governmental conspiracy on the videotape.  Apparently, this refers to the testimony of Robert Sartori. They note that "both Robert Sartori and Eugene Keiber perjured themselves when they testified against Mr. Jackson." **Petitioner's Motion,** *supra***, at 106.**  Keiber did not testify at the trial and Sartori's testimony was stricken from the record and the jury was instructed that it was to be

Not only did Mrs. Jackson testify that she had encouraged her son to plead guilty in state court, but after her sur-rebuttal, Lindsay read into evidence the transcript of that plea. *Id.* **at 1446-47.**

In addition, during closing argument, Lindsay made the following points to the jury in connection with videotape: (1) the Petitioner had been housed in a prison so far from home that his mother and children had been unable to visit him; (2) the adult Jackson suffered from the same problems which his mother described him as having during his childhood; (3) when Jackson took medication for his depression, he was a different person; and (4) during the six year period of imprisonment, he had no infractions, no assaults, and no escape attempts. *Id.* **at 1470-74.**

Habeas counsel now argue that trial counsel should have also introduced other witnesses who would have supported the Petitioner's claims of innocence on the videotape. They refer to DNA evidence, police investigators, ballistics evidence, a cigarette package found at the scene of the crime, and expert witnesses appointed by the Court who could have

---

disregarded by them in their deliberations. *Jackson***, 327 F.3d at 296-97.** It would be ludicrous for habeas counsel to allege that trial counsel should have called these individuals as witnesses after having successfully excluded their testimony.

testified about evidence which would have supported claims of innocence.[52]
However, the same jury sitting in judgment during the penalty phase had
just found the Petitioner was *not* innocent of the crime charged.  The
introduction of evidence disputing the Petitioner's guilt during the penalty
phase would not have been allowed.  Moreover, such evidence would have
been more likely to anger the jury than to explain to them the reasons for
Petitioner's claims of innocence on the videotape.  Trial counsel made an
informed, *albeit* difficult, strategical decision to rely on the mother's sur-
rebuttal alone.  That decision was not ineffective assistance of counsel.
***Cagle v. Branker*, 520 F.3d at 328.**

The same reasoning applies to the claims that a host of mental health
experts should have been called to testify about the Petitioner's mental
condition.  As previously discussed at length, trial counsel had determined
not to introduce evidence of the Petitioner's mental condition during the
sentencing phase of the trial in order to avoid the damaging testimony of
the Government's psychiatric expert, Dr. Dietz.  That testimony would have

---

[52] For example, they claim that Dr. Marks should have been called to
testify that the marks on the victim's body were caused by insect
infestation, not a stun gun.  They also argue that Dr. Davis, a
mathematician, should have been called to refute the stun gun evidence.

been accompanied by another videotape of Dr. Dietz' evaluation of the Petitioner, a videotape which trial counsel had reviewed. Trial counsel's decision not to place the Petitioner's mental condition into evidence was the result of their review of Dr. Dietz' report and the videotaped evaluation, an evaluation which may have presented the Petitioner in a light similar to that seen on the videotape presented in rebuttal. The decision not to allow the jury to hear Dr. Dietz' testimony or to see that videotape was a strategical one. Had trial counsel sought to introduce mental health evidence in sur-rebuttal, the Government would have been allowed to present Dr. Dietz' testimony and the videotape of his evaluation of the Petitioner. The failure of trial counsel to call mental health witnesses at this stage was a strategical, tactical decision made after consideration of the consequences. It was not ineffective assistance. ***Id.* (strategic decision not to open the door to damaging evidence not ineffective assistance); *Meyer v. Branker*, 506 F.3d at 371 ("It is a cardinal tenet of the Supreme Court's ineffective assistance jurisprudence that 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" (quoting *Strickland*, 466 U.S. at 690)).**

Although presented in the guise of "ineffective assistance," the Petitioner's real argument is that the admission of the videotape was so prejudicial as to be erroneous. The Fourth Circuit has held otherwise and the Petitioner may not now "merely re-characterize his prior . . . claim as" one for ineffective assistance of counsel. **Nyhuis, 211 F.3d at 1343.** "A rejected claim does not merit rehearing on a different, but previously available, legal theory." **Id.** However, considering counsel's handling of this issue under the *Strickland* standard does not produce a different result. In order to show that trial counsel's conduct was unreasonable, the Petitioner would have to show that no competent counsel would have taken the action that his attorneys choose. **Chandler, 218 F.3d at 1315.** As previously discussed, in view of the damaging evidence concerning Dr. Dietz' evaluation, trial counsel's decision not to introduce mental health expert evidence was not ineffective assistance of counsel.[53]

---

[53] The Petitioner also claims that trial counsel should have subpoenaed and called as a witness a DSS employee in sur-rebuttal of the videotape. As discussed, trial counsel had successfully prevented the introduction of the videotape and its introduction in rebuttal was unexpected. Thus, it is not surprising that a DSS employee had not been subpoenaed. Moreover, the undersigned had previously denied trial counsel's request for a subpoena to DSS on many of the issues counsel now claim should have been explored. **Sealed Order, filed January 25, 2001.** Lindsay has averred that counsel's efforts to obtain background

### 9.  Ineffective assistance by failing to persuade the Petitioner to accept a guilty plea.

Next, the Petitioner claims that defense counsel were ineffective by not sufficiently encouraging him to accept a plea agreement with the Government which would have called for a sentence of life imprisonment.  It is first noted that there is nothing in the record that reveals the Government at any point actually offered such a plea agreement to the Petitioner.  The affidavits of trial counsel do not affirmatively so state and the Government has not provided any evidence from the prosecutor that such an offer was ever considered.

For example, Belser has averred:

One of the aspects of the case that had received no attention was the possibility of resolving the case through a plea bargain. *It was my understanding* that the government had been willing to accept a guilty plea with a sentence of life imprisonment without parole.  To my surprise, the deadline for pursuing this option had passed.  I am not sure the lawyers had made any effort in this area.  I began talking to Mr. Jackson about it.  It did not take too much effort on my part to get him to agree to this plea.  I spoke to Sally Jackson, . . . and got her assistance in

---

information on the Petitioner were frustrated by the fact that the "agencies involved withheld records prior to Richard's adoption [by the Jackson's] because North Carolina is a 'closed records' state in adoption matters." **Exhibit 1, Affidavit of Stephen P. Lindsay, *attached to* Government's Response in Opposition to Petitioner's Motion to Vacate, filed November 15, 2006, ¶ 3.**

this effort.  Both she and Mr. Jackson's brother were anxious for Mr. Jackson to accept this plea.  After some discussions with him, Mr. Jackson was willing to take the plea, but the government said it was too late.

**Belser Affidavit, *supra*, ¶ 6 (emphasis added).**

Lindsay has averred that "[i]n the early stages of my representation of Mr. Jackson, Assistant United States Attorney Jerry Miller *indicated* to me that *if we were interested in resolving this case for a possible life sentence we would have to accomplish same prior to a certain date*."  **Exhibit 27, Lindsay Affidavit, *supra*, ¶ 6 (emphasis added).**  The language used is hardly an affirmative statement that an offer was made and no date is provided.  Nor has anything from Mr. Miller been placed in the record.  Moreover, Lindsay averred that Foster had most of the communication with the Petitioner, including communication "about a possible plea." *Id*.

Contrary to the ambiguous averments of Belser and Lindsay, Foster has affirmatively stated:

> There was *not* initially an offer from the government to resolve the case by a plea of guilty.  However, after one of the hearings on pretrial motions, the government *mentioned* a plea with a resulting sentence of life without parole because the case was moving so quickly.[54]  *That option would only be available for a*

---

[54] The fact that the Government purportedly made this offer in response to pretrial motions shows that Foster did, in fact, render effective

*short time.* I believe the deadline for pursuing this option was late December 2000 or early January 2001. *I immediately mentioned the possibility of a plea to Mr. Jackson during a visit at the jail. Mr. Jackson was not receptive to the idea of admitting guilt and taking a plea*, so I did not press him. I did not make a "hard sale" about it.

. . .

Mr. Jackson had pled guilty in state court to second-degree murder prior to his federal trial. *I knew it had been difficult for his attorneys in state court to convince Mr. Jackson to take the plea.*

**Foster Affidavit,** *supra***, ¶¶ 5-6 (emphasis and footnote added).**

The Petitioner has averred that he was "worried about pleading guilty because I had pled guilty in state court and then the federal government had charged me." **Exhibit 21, Affidavit of Richard Allen Jackson, dated November 5, 2004,** *attached to* **Petitioner's Supplemental Memorandum, ¶ 4.** He stated that "in the end" he agreed to plead guilty and that before his conversations with Belser, he did "not recall" either Foster or Lindsay speaking with him about a guilty plea. *Id.* **¶¶ 5-6.**

A review of the record shows that the federal indictment was filed on October 2, 2000, and a superseding indictment was filed on November 6, 2000. The notice of intent to seek the death penalty was not filed until

assistance of counsel. However, "mentioning" the possibility of a plea is not a firm offer. Again, nothing has been placed in the record proving an offer was made. As is discussed *infra*, it would have been of no moment.

December 4, 2000. Counsel can hardly be criticized for any conduct prior to the filing of a death penalty notice. Indeed, during an *ex parte* hearing on December 14, 2000, Lindsay advised the Court that the Petitioner had been reluctant in the state court action to accept the plea bargain offered. Lindsay stated that the Petitioner "has never admitted to any of the attorneys who were representing him [in the state court matter] that he did these things." **Transcript of December 14, 2000, Proceedings, *supra*, at 55.** A defendant's continued assertion of innocence supports the conclusion that he would not have entered into a plea agreement. ***United States v. Humphress*, 398 F.3d 855, 859 (6ᵗʰ Cir. 2005).** And, the Petitioner himself has averred that he was not inclined to plead guilty in the federal case until some unspecified time close to trial. **Jackson Affidavit, *supra*.**

The Petitioner's argument is that counsel should have "persuaded" him to take a plea bargain. However, assuming there was such an offer, Foster communicated the offer to Jackson; Jackson knew he faced the death penalty; Jackson was not inclined to take a plea; and Foster did not take extraordinary steps to convince him. ***United States v. Rivera-Sanchez*, 222 F.3d 1057, 1060-61 (9ᵗʰ Cir. 2000) (The record showed**

**that the attorney advised the defendant of the plea offer and the defendant had full knowledge of the ramifications of his decision; therefore, his decision to reject the offer cannot be called ineffective assistance.); *Jones v. Murray*, 947 F.2d 1106, 1110 (4th Cir. 1991).** In fact, counsel had an "affirmative duty to avoid exerting 'undue influence on the accused's decision' and to 'ensure that the decision ... is ultimately made by the defendant.'" ***Id*. at 1111 (quoting ABA Standards 4-5.1(b) & 14-3.2(b)).** Counsel's decision "to refrain from a vigorous attempt to change his client's mind" was not ineffective assistance. ***Id.*** "[T]he ultimate decision whether to plead guilty must be made by the defendant. And a lawyer must take care not to coerce a client into either accepting or rejecting a plea offer." ***Purdy v. United States*, 208 F.3d 41, 45 (2d Cir. 2000) (internal citations omitted).**

In fact, the Petitioner's affidavits show that Foster's conduct was entirely appropriate. In one affidavit, the Petitioner claims that he did not want to plead guilty and that ultimately, his mother pressed him to do so. **Exhibit 21, Jackson Affidavit, *supra* ¶¶ 4-5.** But, in his supplemental affidavit made in March 2005, Jackson avers that "I had pled not guilty and I thought [Belser] was going to fight for me during the guilt-innocence phase

of my trial." **Exhibit 22, Jackson Affidavit made March 14, 2005,** *supra* ¶

**3.** "Although [the courts] have acknowledged . . . that a defense attorney

must advise a client who is facing a plea decision, . . . counsel's choice of

how to do so will be guided by many factors, including the duty to avoid

coercing a plea from an unwilling client." *Purdy*, **208 F.3d at 47.** The

Petitioner was fully aware that he faced the death penalty, in fact, he had

been sentenced to death once before. *United States v. Carter*, **130 F.3d**

**1432, 1441-42 (10th Cir. 1997) (The defendant had full knowledge of the**

**ramifications of rejecting the offer; therefore, he did not show**

**ineffective assistance.);** *Turner v. Calderon*, **281 F.3d 851, 881 (9th Cir.**

**2002) ("Turner was adequately informed that his case could result in a**

**death sentence given that he sat through the reading of his criminal**

**information and the death-qualifying jury voir dire, and that he was**

**informed of the terms of the plea offer, thought about it overnight, and**

**decided to turn it down.").** "Furthermore, [the Petitioner] provides no

legal basis for his claim[] . . . that counsel has an obligation to 'strongly

recommend' the acceptance or rejection of a plea offer." *Id.*; *Jones*, **947**

**F.2d at 1110 ("Jones contends that his counsel acted in what he calls**

**a 'professionally unreasonable' manner by neither recommending that**

**he accept the plea bargain nor attempting to persuade him to do so. . .**

**. We cannot agree. Our review of relevant authorities does not**

**support the contention that Jones' counsel violated prevailing**

**professional norms.").** "[C]ounsel's decision, at this point and in the

context of his client's rejection of the plea offer[,] . . . to refrain from a

vigorous attempt to change his client's mind was [not] 'outside the wide

range of professionally competent assistance.'" ***Id.* at 1111 (quoting**

***Strickland*, 466 U.S. at 690).** "Counsel's conclusion as to how best to

advise a client in order to avoid, on the one hand, failing to give advice and,

on the other, coercing a plea[,] enjoys a wide range of reasonableness

because '[r]epresentation is an art,' and ' [t]here are countless ways to

provide effective assistance in any case.'" ***Purdy*, 208 F.3d at 45 (quoting**

***Strickland*, 466 U.S. at 693).**

     In the motion, habeas counsel argue at length that the effort taken by

the state court attorneys to persuade the Petitioner to plead guilty is

indicative of the effort which should have been exerted here. To the

contrary, that evidence, assuming it would be admissible, shows only how

very reluctant the Petitioner was to enter a guilty plea.[55]  There was

purportedly a small window of opportunity in the federal prosecution for a

plea; Foster immediately approached the Petitioner with that opportunity,

and the Petitioner turned it down.  The fact that later, after the opportunity

had passed and with the trial looming, Belser was able to obtain a

concession that the Petitioner would plead guilty is of no moment.  There is

no evidence, other than sheer speculation and conclusory allegations, that

while the alleged offer was open, Belser, Lindsay or Foster could have

persuaded the Petitioner to accept the plea.  ***Call v. Polk*, 454 F. Supp. 2d**

**475, 499 (W.D.N.C. 2006), *aff'd,* 254 F. App'x 257 (4th Cir. 2007), *cert.***

***denied*, 129 S. Ct. 82 (2008) ("Even in a death penalty case, bald**

**assertions and conclusory allegations" are insufficient to show**

**ineffective assistance.  (quotation omitted)).**  Claims of ineffective

assistance of counsel are not shown by conclusory, speculative allegations.

***Walton v. Johnson*, 440 F.3d 160, 178 (4th Cir. 2006); *Washington v.***

***Renico*, 455 F.3d 722, 733 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 1877**

**(2007); *Rolan v. Vaughn*, 445 F.3d 671, 682 (3d Cir. 2006); *Yaitsky v.***

_____

[55] Indeed, the Petitioner attacks his state counsel for urging him to plead guilty while leaving open the possibility of a federal prosecution.

***United States*, 2008 WL 3845446, at \*8 n.1 (D.S.C. 2008); *McLamb v.***

***United States*, 2007 WL 160933 (E.D.N.C. 2007).**

Moreover, assuming *arguendo* that Foster somehow failed the objective standard of reasonableness, the Petitioner's own affidavits fail to show a "reasonable probability that, but for counsel's unprofessional error[], the result of the proceeding would have been different." **Strickland, 466 U.S. at 694.** "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." **Id. at 697**. The Petitioner averred that he did not want to enter into a guilty plea; he averred that he thought Belser was going to "fight for him" in the guilt phase of the trial; he averred that ultimately, he agreed to plead guilty. However, by that time, the Government had withdrawn the offer.[56]  **Shaw v. United States, 2006 WL 1041790, at \*7 (W.D.N.C. 2006) ("Nor would it be unusual for the Government to take the offer 'off the table' a few days prior to a trial for which it had already prepared.").**  The fact that

---

[56] That the offer was withdrawn is not surprising in view of the ballistics evidence produced by the Government in March 2001. That evidence, along with rulings by the Court on pretrial motions, most likely impacted the Petitioner to allegedly change his mind about the plea offer. However, the record does not show that the Petitioner was willing to accept a plea before the Government withdrew its offer. In fact, as previously noted, the record does not disclose the actual existence of such an offer.

the Government withdrew its offer, if such an offer existed, is not the result

of a lack of assistance by trial counsel, but is solely the result of the

Petitioner's own conduct. **Purdy, 208 F.3d at 48-49.** At the time the plea

offer was purportedly "on the table," Jackson chose not to give it

consideration. **Fields v. Attorney Gen. of State of Md., 956 F.2d 1290,**

**1298 n.19 ("A defendant has no constitutional right to a plea bargain. .**

**. . The [prosecution] may withdraw a plea offer at any time before it is**

**accepted[.]" (citing Weatherford v. Bursey, 429 U.S. 545, 561 (1977)**

**(other citations omitted)).** The Petitioner has not established "through

objective evidence that . . . there is a reasonable probability that he would

have accepted the alleged proposed plea agreement absent defense

counsel's advice."[57] **Paters v. United States, 159 F.3d 1043, 1046 (7th Cir.**

---

[57] In fact, the Petitioner's brief concedes the fact that he would not accept a guilty plea until it was too late. "Both Mr. Foster and Mr. Lindsay were acutely aware of their client's reticence toward admitting involvement in these serious crimes and pleading guilty to them." **Petitioner's Motion, supra, at 11.** Habeas counsel describe the extreme difficulties encountered by state court counsel as well as the fact that it was only after the state death penalty sentence was vacated that the Petitioner would even consider a plea. **Id. at 11-12.** "Both Mr. Foster and Mr. Lindsay were aware of how difficult it had been for the lawyers representing Mr. Jackson in state court to convince him to accept the plea of guilty." **Id. at 12.** The argument is not that the Petitioner would have pled guilty but for counsel's conduct; the argument is that counsel should have "brow beat" the Petitioner into taking a guilty plea. While that conduct would have been

**1998); *Goudie v. United States*, 323 F. Supp. 2d 1320, 1335 (S.D. Fla.**

**2004) ("Petitioner cannot show prejudice simply by asserting in**

**hindsight that he would have accepted a plea agreement had it been**

**properly presented to him." (citing *Johnson v. Duckworth*, 793 F.2d**

**898, 902 n.3 (7th Cir. 1986)), *aff'd*, 147 F. App'x 966 (11th Cir. 2005).**  "If

the rule were otherwise, every rejection of a plea offer, viewed perhaps with

more clarity in the light of an unfavorable verdict, could be relitigated upon

the defendant's later claim that had his counsel better advised him, he

would have accepted the plea offer."  ***Turner*, 281 F.3d at 881.**


**10.  Ineffective assistance by failing to attack the state court guilty plea.**

As previously noted, when the North Carolina Supreme Court

reversed the Petitioner's conviction and ordered a new trial, he and the

State entered into a plea agreement pursuant to which he pled guilty on

March 3, 2000, to second-degree murder, first-degree rape, and second-

degree kidnaping.  ***Jackson*, 327 F.3d at 281.**  On October 2, 2000, the

United States indicted the Petitioner in this Court.  Trial counsel were

unprofessional in and of itself, as noted *infra*, there is no doubt that it would
have also resulted in a motion based on ineffective assistance.

appointed in this Court in connection with this prosecution. They were not appointed for the purpose of providing any representation in connection with the state court matter to which the Petitioner had pled guilty and been sentenced at a time when he was represented by counsel appointed by the State of North Carolina.

Despite the fact that the attorneys in this action were not appointed to represent the Petitioner in connection with his state court action, habeas counsel now claim that the federally appointed attorneys were ineffective because they did not attempt to set aside, in state court, his guilty plea on the ground that it could not have been knowingly and voluntarily entered. The claim is that his state appointed attorneys never advised the Petitioner that he could be prosecuted in federal court despite his guilty plea in state court. Thus, the Petitioner's guilty plea in state court was not knowing and voluntary.

In this regard, Lindsay has averred:

I knew that Mr. Jackson had pleaded guilty to this crime in state court. He had plead (sic) guilty to second degree murder, kidnapping, and rape. I believed that this guilty plea would be admissible in the federal trial as an admission of Mr. Jackson. However, I did not challenge this guilty plea in state court even though I knew such a challenge needed to be made there and not in the federal case. I don't know why I failed to take this action on his behalf.

I recall consulting with Mr. Jackson's state lawyers when they were attempting to negotiate his plea. At that time, I knew the federal government could later proceed against him. Once I was appointed to represent Mr. Jackson on the federal charges, I learned that the lawyers that represented Mr. Jackson in state court had not included as part of the plea agreement that there would be a bar to a subsequent federal prosecution.[58] In my opinion, this failure constituted ineffective assistance of counsel. Nevertheless, *I did not file a motion for appropriate relief in state court* on this basis seeking to set aside Mr. Jackson's state plea.

**Exhibit 27, Lindsay Affidavit, *supra*, ¶¶ 10, 11 (emphasis and footnote added).** Lindsay has not opined in what manner he would have been authorized to file such a motion in state court when his representation was limited to this federal prosecution. Habeas counsel have not provided any authority pursuant to which the undersigned could have made such an appointment. In any event, the undersigned clearly would not have made such an appointment. Assuming *arguendo* that these attorneys could have obtained such an appointment from state authorities, the undersigned would not have delayed the federal prosecution while proceedings in state court went forward. And, Lindsay and Belser have both averred they knew the undersigned would not further continue the case.

---

[58] This is not surprising since state prosecutors had no authority to invoke a bar to federal court proceedings. Only the United States Attorney had such authority.

Moreover, despite the above averment by Lindsay, he describes in this same affidavit the trial strategy he and Belser had devised: "Mr. Belser and I decided to acknowledge Mr. Jackson's responsibility for this killing in an effort to save his life." *Id*. ¶ **15.** And, during the trial, Belser made a contemporaneous statement to the Court in which he clearly outlined trial counsel's strategy with respect to the state court guilty plea.

> [T]he Government put us on notice that [they] intended to introduce evidence of the state court guilty plea because they contended in a lengthy pretrial memorandum of law that it was relevant to this proceeding. Your Honor found that it was relevant to this proceeding. That is the law of the case so far. We have been proceeding on the basis that it was relevant to this proceeding and would come in. *In fact, evidence of the state court prosecution and particularly his guilty plea is relevant to his defense. He pled guilty to second degree murder in state court. There was a factual basis presented by the state that was accepted by the trial court in the second degree murder that the defendant lacked the specific intent to kill, he lacked premeditation and deliberation.* <u>*That is exactly what his defense in this case is, that he is guilty not of first degree murder, but of second degree murder based on the evidence that is now before the jury through Detective Bradford. He indicated to Detective Bradford in his confession that he didn't mean to kill her. He didn't mean to kill her.*</u> . . . That is the gist of our defense, and *the fact of the state court guilty plea and his admission to that and its acceptance by the Court is part of his defense.* It corroborates his statement to Randy Bradford that's now already into evidence and the Government has already conceded and argued successfully its relevance to this case. . . . *The point of it is that he is guilty not of first degree murder, but of second degree murder. He has admitted that and that's what we're going to ask the jury to find him guilty of.*

. . .

> We have a right to present evidence that he's guilty not of the crime charged but of the lesser included offense.  That's a defense in most murder cases unless you have an alibi[.] It's always I'm guilty of a lesser included offense.

**Trial Transcript, Vol. IV,** *supra***, at 834-35, 837-38 (emphasis added).**

Thus, contrary to the lengthy remonstrations and the self-sacrificing affidavits of the attorneys appointed to represent the Petitioner in state court, it is of no moment that the state court guilty plea was never challenged.  ***See* Belser Affidavit,** *supra***; Lindsay Affidavit,** *supra***.**  As both Belser and Lindsay acknowledge, after the undersigned denied their motion to exclude the state court plea, it was part of their trial strategy to acknowledge the Petitioner's admission to second-degree murder, an offense without the specific intent required in the federal prosecution.  It was also part of their strategy to advise the federal jury that the state court had embraced the plea to the charge requiring a lesser intent.  All of this was done in an effort to spare the death penalty.  ***Strickland*, 466 U.S. at 690 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable");** *McNeill***, 476 F.3d at 217-18 (noting trial counsel's conduct was consistent with the strategy of showing the defendant lacked the**

*mens rea* **to commit premeditated murder and not ineffective).** Having

failed in their attempt to exclude the evidence of this guilty plea, it was

entirely reasonable for counsel to adopt this strategy in an effort to convince

the jury that the Petitioner did not have the *mens rea* to commit first degree

murder.[59] ***Blankenship v. Hall*, 542 F.3d 1253 (11th Cir. 2008).** The Court,

therefore, finds that counsel did not render ineffective assistance under

either a *per se* or *Strickland* standard.


**11. Ineffective assistance by failing to offer evidence of positive adjustment to incarceration.**

The jurors unanimously found the following mitigating factor: "Richard

Jackson has been in prison for 7 years for the murder, kidnaping and

sexual assault of Karen Styles. During that time there is no evidence that

he has ever broken any prison rule, misbehaved in any way, or attempted to

escape." **Special Verdict Form Regarding the Punishment to be**

**Imposed,** *supra***, at 8.** Despite this unanimous finding, habeas counsel

_____

[59] Indeed, this is yet another example of trial counsel's effective performance. They could not introduce mental health evidence. However, they still managed to show that the state court had accepted the fact the Petitioner did not have the requisite mental intent to commit first degree murder.

claim that trial counsel were ineffective for failing to present evidence of his positive adjustment to incarceration, as opposed to future dangerousness. The short answer is that the jury's unanimous finding in this regard shows that such evidence was presented; in fact, it was presented through the testimony of Sally Jackson.

As previously discussed, when the penalty phase of the trial began, the Government announced that it would not rely on future dangerousness as an aggravating factor and would not present the damning testimony of inmate Pruette and Captain Daniels. Those witnesses would have testified to Petitioner continuing to read pornography in his cell. However, in the event that the Petitioner presented any allegation or evidence of his remorse for the crime or that he posed no future danger to the community or that this crime was in any related to his exposure to pornographic materials, both witnesses would testify. And as previously noted, Belser referred to that testimony as "overwhelmingly prejudicial."

Although habeas counsel claim that evidence of a positive adjustment is distinct from that of lack of future dangerousness, the evidence they claim trial counsel should have presented relates to the latter. In fact, they claim that trial counsel should have called James Aiken who would have

"opine[d] that the defendant does not pose a danger within the confines of a federal maximum security prison." **Petitioner's Motion, *supra*, at 127.** Aiken "considered Richard Jackson to be a low-risk inmate for violence to other inmates and to correctional officers." *Id*. Aiken "had become aware of Mr. Jackson's interest in pornography. However, Mr. Aiken considered the important issue regarding Mr. Jackson's adaptability to prison environment to be whether his prior prison behavior indicated any risk of potential violence." *Id*. **at 128.** It was Aiken's opinion that Jackson "was controlling his sexuality appropriately" and, as a result, Aiken thought Jackson "had a low risk for violence." *Id*. Or, as habeas counsel put it, "defense counsel had critical, compelling evidence regarding Mr. Jackson's lack of future danger in a prison setting from a highly qualified, expert witness." **Petitioner's Supplemental Memorandum, *supra*, at 60.** Habeas counsel do not address the fact that testimony from Aiken would have resulted in rebuttal evidence from the Government in the form of Pruette and Daniels, who would have testified to the Petitioner's continued use of pornographic materials. It also would have resulted in the reinstatement of the aggravating factor of future dangerousness. As

previously discussed, the strategic decision of trial counsel to avoid those consequences was not ineffective assistance of counsel.

Nor have habeas counsel advised in what manner Aiken could have testified to Petitioner's positive adjustment to prison without also mentioning his opinions concerning future dangerousness.  Indeed, Aiken's affidavit discloses that he considered the positive adjustment to prison to be part and parcel of a lack of future dangerousness.  **Exhibit 1, Affidavit of James E. Aiken,** *attached to* **Petitioner's Supplemental Memorandum.** Trial counsel wisely chose to avoid the possibility that the Government would argue Aiken's testimony had injected the issues of pornography and future dangerousness into the trial, resulting in the testimony of Pruette and Daniels.[60]

The cases cited by habeas counsel[61] are inapposite as none of them involve the factual scenario presented here: trial counsel were faced with

---

[60] To the extent that the Petitioner claims William Stafford should have been called, the same rationale applies.  Moreover, Stafford testified during the state court trial, a trial at which the jury imposed the death penalty.

[61] ***Williams v. Taylor*, 529 U.S. 362 (2000);** *Moore v. Johnson*, **194 F.3d 586 (5ᵗʰ Cir. 1999);** *Valdez v. Johnson*, **93 F. Supp. 2d 769 (S.D. Tex. 1999),** *aff'd in part and vacated in part*, **274 F.3d 941 (5ᵗʰ Cir. 2001);** *Horton v. Zant*, **941 F.2d 1449 (11ᵗʰ Cir. 1991).**

the strategic choice of intentionally failing to put on evidence in order to

avoid damaging evidence. The Court finds that the testimony of Sally

Jackson placed evidence of the Petitioner's positive adjustment to prison

before the jury which unanimously found that mitigating factor. Despite that

unanimous finding, the jury unanimously found that the sentence of death

should be imposed. The Court further finds that trial counsel were not

ineffective by making the strategic decision not to produce Aiken or Stafford

as witnesses. *Lovitt*, **403 F.3d at 180-81;** *Horton*, **370 F.3d at 87.**


**12.    Ineffective assistance by failing to move *in limine* to
exclude Robert Sartori as a witness and by failing to move
for a mistrial in a timely fashion.**

The issue of the testimony of Robert Sartori was raised on direct

appeal. The Fourth Circuit found that the Court did not err in denying a

motion for a mistrial after striking his testimony and further that the

Petitioner was not prejudiced by that testimony. *Jackson*, **327 F.3d at 296-**

**98.** As noted by the Fourth Circuit:

> Jackson next contends that the district court erred in denying
> his motion for a mistrial based on the prosecutor's misconduct
> in calling Robert Sartori as a witness, because the government
> knew or should have known that Sartori's testimony was
> perjured.

Sartori, who was an inmate with Jackson at Pasquatank Correctional Facility, testified that Jackson told him that he was obsessed with Styles and that he laid in wait for her prior to the kidnapping, rape, and murder.  Counsel for Jackson later discovered letters involving other inmates suggesting that Sartori had fabricated or tailored certain parts of his testimony.  Indeed, Jackson's counsel had learned that two of six inmates identified as potential witnesses by the government, Howell and Keiber, may have been fabricating information in their interviews with the prosecuting attorneys, and consequently they issued subpoenas to obtain all correspondence from these persons.  While the government did not call either Howell or Keiber to testify, it did call Sartori.

Based on what Jackson's counsel found, Jackson filed a sealed motion to strike Sartori's testimony.  After hearing testimony that Sartori was housed in the same cell as Keiber, who the court had already deemed to be untrustworthy, as well as other evidence suggesting that Sartori's testimony was unreliable, the court struck Sartori's testimony without objection from the government.  Jackson then moved for a mistrial, which the court denied, but the court did instruct the jury to disregard Sartori's testimony.

. . .

[The Fourth Circuit] conclude[d] that Sartori's testimony did not prejudicially affect Jackson's substantial rights.  The defense subjected Sartori to vigorous cross-examination, probing the consistency of his testimony with statements to government investigators.  Furthermore, the district court ultimately struck the testimony and provided a limiting instruction.  "We generally follow the presumption that the jury obeyed the limiting instructions of the district court."  And the evidence of Jackson's guilt, including his own confession, was overwhelming.  Moreover, there was other substantial evidence, apart from Sartori's testimony, from which the jury could have inferred that Jackson's crimes involved substantial planning.  Not only were all the materials used by Jackson in the commission of the crime purchased three days before the crime, Jackson's

confession revealed that, after seeing Styles in the woods, he waited until she passed and then armed himself in preparation for the crime.

*Jackson*, 327 F.3d at 296-98 (quoting *United States v. Francisco*, 35 F.3d 116, 119 (4th Cir. 1994)).

Habeas counsel now attack the performance of trial counsel claiming they should have filed a motion *in limine* to prevent Sartori from testifying and should have moved for a mistrial "upon learning of Sartori's conspiracy with Keiber and Howell." **Petitioner's Motion, *supra*, at 142.** Once again, the contemporaneous record of the proceedings which occurred prior to and during the trial show that habeas counsel have distorted the actual events.

On November 14, 2000, a discovery order was entered in the criminal case which provided in pertinent part that:

[n]o later than one week before trial, the government shall make all government witnesses who are in protective custody, or otherwise under government control, available to defense counsel for interview. [D]efense counsel [will be allowed] to hear directly from the witness[es] whether [they are] willing to talk to the defense attorney, either alone or in the presence of his attorney. The government may petition the court for an *ex parte* determination of the applicability of this Order to any particular government witness.

**Standard Criminal Discovery Order, filed November 14, 2000, at 3-4**

**(quotation and citations omitted).** The Order anticipated that such

witnesses might require court-appointed counsel. On April 3, 2001, the

Government moved *ex parte* for the appointment of counsel for six inmate

witnesses because during interviews with the prosecutor, questions had

been posed which were only appropriately answered by counsel for the

witness. *In re: Six Witnesses*, **filed under seal April 3, 2001, Case No.**

**1:01MC10.** On April 5, 2001, that motion was granted. *See,* **Order, filed**

**under seal, April 5, 2001.** The Government disclosed to trial counsel

during pretrial discovery[62] that six inmate witnesses had been interviewed

by the prosecutor as well as Special Agent Mark Aysta of the Federal

Bureau of Investigation (FBI). **Sealed Motion for Production of**

**Exculpatory Evidence, filed April 26, 2001**. Although the Government

had provided to trial counsel copies of the statements made to the FBI,

counsel learned on April 26, 2001, that one of the inmate witnesses,

Anthony Soloman, had changed his statement. *Id*. **at 2.** As a result, on the

same day that trial counsel learned of this, they moved the Court for any

---

[62]The United States Attorney for the Western District of North
Carolina has an open file policy.

exculpatory evidence and/or changed statements involving these witnesses, including Sartori, Keiber and Howell.  *Id*.

In addition, trial counsel attempted to interview the inmate witnesses, including Sartori, but were told by the attorneys representing those witnesses that counsel would not allow the interviews.[63]  **Motion for Inquiry into Appropriateness of Joint Representation of Inmate Witnesses, filed April 23, 2001, at 2.**  In response, trial counsel moved this Court to inquire as to whether there was a conflict of interest in having the same attorney represent more than one inmate witness.[64]  ***Id*. at 4-5.**  Among the concerns raised by trial counsel were the fact that the witnesses were housed in the same location and had been exchanging information with each other.  The undersigned declined to make inquiry because no attorney

---

[63] The sole exception was attorney Kyle King who allowed trial counsel to interview inmate witness Howell.  **Sealed Motion for Relief, filed May 7, 2001, ¶ 8.**

[64] Two attorneys were appointed to represent five of the witnesses. Each of those attorneys, after consultation with their respective clients, opined that no conflict of interest existed.  **Government's Response to Motion for Inquiry as to Joint Representation of Inmate Witnesses, filed April 26, 2001, ¶ 5.**  In addition, an attorney was appointed to represent Farlow and a different attorney was appointed to represent Keiber.  **Motion for Inquiry, *supra*, ¶ 23; Sealed Motion for Relief, *supra*, ¶ 6.**

representing the witnesses had reported or opined as to a conflict of interest.  **Order, filed April 27, 2001, at 1.**  Thus, when told by attorneys for the inmate witnesses that interviews would not be allowed, trial counsel tried a different tactic to obtain interviews, *albeit* unsuccessfully.

Nonetheless, the attorneys representing six of the inmate witnesses, including Sartori, Keiber and Soloman, told trial counsel that their clients would testify in substantial conformity with the statements provided to the FBI and recorded in the FBI 302 reports.  **Sealed Motion for Relief, *supra*, ¶ 7.**  Thus, as to these witnesses, trial counsel had no means by which to test or impeach their testimony through pretrial proceedings.

In the motion, habeas counsel claim that "*[d]uring the trial, defense counsel learned that letters had been written among various inmate witnesses that suggested their testimony was being scripted*."  **Petitioner's Supplemental Memorandum, *supra*, at 69 (emphasis added)**.  "Had defense counsel been sufficiently prepared for trial, [Sartori's] prejudicial testimony could have been prevented and the jury never exposed to it." ***Id***.  As shown above, trial counsel did everything possible in the pretrial setting to find out whether such "scripting" was occurring.  The fact that the

evidence was uncovered *during* the trial as opposed to *prior* to trial is not something which may be blamed on trial counsel.

Moreover, on April 26, 2001, the attorney for inmate witness Howell provided to trial counsel copies of two letters received by Howell's sister from inmate witness Keiber. **Sealed Motion for Relief, *supra*, at 5-6.** As noted above, on that same date, trial counsel moved for any additional exculpatory evidence from the inmate witnesses in the possession of the Government. That motion was denied as duplicative of the discovery order extant in the case. **Order, filed April 27, 2001, *supra*.** When counsel tried to subpoena any such documents directly from Howell, his attorney refused access to the witness. **Trial Transcript, Vol. IV, *supra*, at 721 (Lindsay: "We have not been allowed to get back to see Mr. Howell to serve him with that subpoena.")**. As a result, on May 3, 2001, trial counsel requested the Court to issue a subpoena for those documents to be served by the United States Marshal; the motion was granted in open court. ***Id*. at 721-22**. Having first learned about the letters on April 26, 2001, and having tried both through the court system and with counsel to ascertain if any further such documents existed, trial counsel can hardly be called

ineffective for seeking and obtaining a court subpoena after the witness's attorney denied access.

On the same day the subpoena *duces tecum* was ordered, the United States Marshal served it on Howell and made available the requested materials to trial counsel. ***Id*. at 840.** After their initial review of these documents, trial counsel reported to the Court that there were communications between Howell and Sartori which required further investigation. ***Id*. at 840-41.** Trial counsel described to the Court the exchange of information among the three inmates Keiber, Howell and Sartori, and the fact that the information provided by Keiber to Howell was the same information provided from Howell to Sartori. ***Id*. at 840-44.** The Court ruled that Sartori could not testify until trial counsel had an opportunity to go through all of the materials and also issued a subpoena for documents in the possession of Sartori. ***Id*. at 844-45.** Habeas counsel's claim that the undersigned did not rule on this request is incorrect; trial counsel were allowed to review the materials overnight.

After having reviewed the materials, trial counsel made a motion *in limine* the next day, May 4, 2001.[65] **Trial Transcript, Vol. V, *supra*, at 968–69.** Through that motion, trial counsel were successful in limiting certain areas of testimony. *Id*. Habeas counsel's claim that no objection to Sartori's testimony was made is incorrect. In fact, as soon as the first break after Sartori's testimony, trial counsel argued the matter further. *Id*. **at 1042-44.** Trial counsel were unable to make that motion any sooner because it is the custom in this Court that no such motions may be made until a break in the proceedings; in other words, during regular trial time, this Court does not excuse the jury from the courtroom in order that counsel may make motions.

Sartori testified on Friday, May 4, 2001. On Monday morning, May 7, 2001, before Court resumed, trial counsel filed a motion to strike the testimony of Sartori. **Sealed Motion for Relief, *supra*, at 6-13.** The content of the motion shows that over the weekend, trial counsel

---

[65]It is worth noting that the custom in this Court is to rule on motions *in limine* at the time of trial or within the week prior to trial. As discussed *infra*, trial counsel made a valiant effort to obtain this evidence through pretrial rulings. They cannot be blamed for the fact that the evidence itself literally appeared overnight or for the fact that the first time they had proof of the "scripting" was on April 26, 2001, when Howell's attorney turned over the letters.

researched the issue, wrote a brief, and filed it first thing on Monday morning.  Before the jury was brought into the courtroom, the Court addressed the parties concerning the motion and advised that it would provide the parties an opportunity to be heard "at a later time in chambers." **Trial Transcript, Vol. VI,** *supra***, at 1127.**   At that point, the Government advised the Court that it would consent to striking Sartori's testimony.  *Id.* **at 1127-28.**  Contrary to the claim now made by habeas counsel, trial counsel immediately argued that they needed to assess the situation and discuss whether to seek a mistrial.  *Id.* **at 1128-29 ("That's just so difficult because we've gone so far in this case and we feel like, you know, we have a good jury that's going to be fair ... but at the same time, you become concerned . . . .  We don't want to start this case over, but we are concerned[.]").**  Moreover, counsel honestly admitted that there was nothing showing that the prosecutor had any actual knowledge of the inmate witness's behavior.  *Id.* **at 1129.**

The record also shows that the undersigned was not convinced that Sartori's testimony should be stricken, despite the Government's concession.  *Id.* **at 1138.**  As a result, the jury was excused and the testimony of Keiber was taken.  *Id.* **at 1142, 1157-1207.**  Only at that point,

did the undersigned announce that the testimony of Sartori would be

stricken.  *Id*. at 1209.  Trial counsel moved for a mistrial and explained to

the Court their strategical reason for waiting to do so: trial counsel wanted

to make a record of Keiber's testimony,

> a record of what the evidence would be, how the testimony was
> conformed, how the problem and the prejudice arose.  And now
> that we know that, and now that we know that there were
> repeated interviews by government agents, that they were
> housed in the same cell, that it was clear and should have been
> known to everyone involved that – these problems which we
> pointed out in the previous pretrial motion would occur, an
> artificial and false conformity of statements, now we think that
> the ultimate appropriate remedy would be a motion for a mistrial
> as a result of government action.

*Id*. at 1210-11.

In the face of the contemporaneous record, habeas counsel make the

following aspersions against trial counsel:

> What is clear from this chronology of events is that had defense
> counsel acted diligently when they first obtained the
> Keiber/Howell letters, either by reviewing the letters before
> Sartori testified, or asking the district court for more time to
> review the documents before Sartori testified, the jury would
> never have heard Sartori's testimony.
> . . .
> Reasonably competent counsel would have recognized the
> need to ask for a mistrial upon learning of Sartori's conspiracy
> with Keiber and Howell. . . .  [R]easonably competent counsel
> would have known that striking Sartori's testimony and
> instructing the jury to disregard it was a wholly inadequate
> remedy.

. . .

> When it finally occurred to counsel to seek a mistrial, counsel's
> argument on the harm cause was woefully inadequate. . . .
> What counsel should have explained to the district court is how
> counsel's strategy may have been fundamentally different had
> they known before trial the problems with Sartori's testimony[.]

**Petitioner's Motion,** *supra***, at 141-44.**  As discussed above, the first time

trial counsel became aware of the Keiber/Howell letters was April 26, 2001.

On that same date, they immediately moved the Court for relief.  Not only

did they review these letters, they obtained two subpoenas which resulted

in additional documents.  They asked for and received an opportunity to

review the documents prior to Sartori's testimony.  Trial counsel

conscientiously deliberated over the issue of asking for a mistrial *in addition*

to having the testimony stricken.  And, trial counsel shrewdly and

strategically waited until a full record had been made that included Keiber's

testimony before moving for a mistrial.

The Court finds, in the face of the clear record, that the raising of this

issue by habeas counsel is most questionable.  Moreover, the Fourth

Circuit has found there was no prejudice to the Petitioner from the striking

of the Sartori's testimony.  As a result, there can be no ineffective

assistance of counsel.  Nor were trial counsel ineffective under either the

*per se* or *Strickland* standards of review.

### 13. Ineffective assistance by failing to object to prosecutorial comments during closing argument.

The Court first sets forth the standard of review for prosecutorial misconduct in the context of improper closing argument. Obviously, if the comments were not constitutionally infirm, trial counsel committed no ineffective assistance in failing to object.

The test for prosecutorial misconduct in the context of closing argument is "whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). In the Fourth Circuit, in order to meet that standard, the remarks must have, in fact, been improper and must have prejudicially affected the defendant's substantial rights so as to have deprived him of a fair trial. *United States v. Mitchell*, 1 F.3d 235, 240 (4th Cir. 1993). In order to assess prejudice, the Court should consider

> "(1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters."

***United States v. Smith*, 441 F.3d 254, 264 (4th Cir. 2006) (quoting *Mitchell*, 1 F.3d at 241).** Additional factors for consideration include whether the remarks were invited by conduct of the defendant or his attorney and whether curative instructions were given to the jury. ***United States v. Scheetz*, 293 F.3d 175, 186 (4th Cir. 2002).** At the outset, it is noted that the jury was advised on two occasions that the comments of counsel were not evidence and that they should not be persuaded by "passion, prejudice [or] any arbitrary considerations." **Trial Transcript, Vol. VII, *supra*, at 1286; Trial Transcript, Vol. VIII, *supra*, at 1511.** Courts generally presume that juries follow their instructions. ***Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *United States v. N-Jie*, 276 F. App'x 325, 330-31 (4th Cir. 2008) (citing *United States v. Loayza*, 107 F.3d 257 (4th Cir. 1997)).**

In his closing argument, Lindsay included the following plea to the jury:

> I don't have the grace with words or the power of speech to say things that will linger much when you go back in the jury room, because *you're going to hear, after I sit down, thousands and thousands of other words from Mr. Miller urging you, urging that death, death, death is the response that you should give.* And that's not the only response to this.

**Trial Transcript, Vol. III,** *supra*, **at 1468.**  In response, the prosecutor,

Miller, stated during his summation:

> Mr. Lindsay tells you that I'm going to come before you and
> argue death, death, death.  I've been a prosecutor here in the
> mountains of North Carolina where I grew up, and I love these
> mountains, for 21 years.  It's the first time I have ever stood
> before the jury and looked each and every one of you in the
> eyes and asked a man to die for what he chose to do.

*Id.* **at 1488.**

The Petitioner characterizes Miller's statements as commenting on his

prior experience and decisions in previous capital cases and, thus, was an

improper comment to which trial counsel should have objected.  However,

the comment was in direct response to the statement of defense counsel in

his closing argument and, therefore, falls within the category of "invited

response."  ***United States v. Young***, **470 U.S. 1, 11-12 (1985)**

**(prosecutor's comments must be viewed in context, including whether**

**it was an invited response to the defendant's opening salvo);** *accord*,

***United States v. Barr***, **976 F.2d 727 (table), 1992 WL 225845 (4th Cir.**

**1992).**

> Under the "invited response" rule, a "reviewing court must not
> only weigh the impact of the prosecutor's remarks, but must
> also take into account defense counsel's opening salvo.  [I]f the
> prosecutor's remarks were 'invited,' and did nothing more than

respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction."

***United States v. Henry***, **545 F.3d 367, 381 (6th Cir. 2008) (quoting**

***Young***, **470 U.S. at 11-13).**

Lindsay urged the jury to reject what he anticipated would be Miller's argument for "death, death, death."  As a result, Miller was entitled to let the jury know that he was not in the habit of urging "death, death, death."  ***Fahy***

***v. Horn***, **516 F.3d 169, 201 (3d Cir. 2008) (defense counsel first introduced the notion of Satan's responsibility into the proceedings and the prosecutor merely referred back to that idea).**  "[T]he idea of "invited response" is used not to excuse improper comments, but to determine their effect on the trial as a whole."  ***Id.* (citing *Young***, **470 U.S. at 12); *accord*, *Boyd v. French***, **147 F.3d 319, 329 (4th Cir. 1998) (prosecutor's biblical references were in response to defendant's testimony that the murder had been the result of his beguilement by Satan).**  Lindsay repeatedly beseeched the jury to reject death as the sentence.  In this scenario, it was not inappropriate for Miller to point out he was not in the habit of seeking the death penalty in order to "right the

scale." Since Miller's comment was not inappropriate, there was no reason for counsel to have objected.

The cases cited by habeas counsel are inapposite. In *Tucker v. Kemp*, 762 F.2d 1496, 1505 (11th Cir. 1985), the prosecutor, in his *opening* argument during the sentencing phase of the trial, told the jury that, "There are not many times that I come before a trial jury and make the request" for the death penalty. The court noted that the comment "was not supported by any evidence" and was irrelevant to any issue. *Id.* It was not an invited response to the defense's closing argument.

In *Newton v. Armontrout*, 885 F.2d 1328, 1339 (8th Cir. 1989), the prosecutor stated that he had been a prosecutor for ten years and had never asked for the death penalty before, "but I can tell you in all candor, I've never seen a man who deserved it more than [the defendant]." *Id*. In addition to the obviously prejudicial nature of the remark, the appellate court noted that the entire closing argument was filled with improper comments and none of them had been invited "by statements made by the defense counsel during his own penalty phase argument." *Id.* **at 1337.**

Nor was it ineffective assistance of counsel for trial counsel to fail to object to Miller's comment. The jury was instructed that the arguments of

counsel were not evidence.  ***Ivey v. Catoe***, **36 F. App'x 718, 728-29 (4th**

**Cir. 2002).**  "[T]rial counsel was not constitutionally ineffective in failing to

object to . . . certain remarks made by the prosecutor[] in [his] closing

argument because it would have been futile for counsel to have done so,

given the 'wide latitude' accorded counsel in making closing arguments and

given that the prosecutor['s] remarks, read in context, did not constitute an

improper comment[.]"  ***Oken v. Corcoran***, **220 F.3d 259, 269-70 (4th Cir.**

**2000).**  "Failing to object is often a tactical and wise decision made to avoid

calling special attention to the remarks."  ***Beal v. Setzer***, **865 F.2d 1256**

**(table), 1989 WL 976, at  *2 (4th Cir.1989).**  Such was the case here.

Next, habeas counsel claim trial counsel should have objected to the

following prosecutorial comment, again made in response to the closing

argument of defense counsel:

> One of the things that Mr. Lindsay argued to you is about what
> Karen Styles would do.  Every case cries out for justice. They
> acknowledge what justice is, but they ask you to ignore it.  A
> murder case is unique in that the voice for justice calls out from
> the grave.  And it is almost nauseating for Mr. Lindsay to stand
> before you and to purport to speak for Karen Styles.  What
> would Karen Styles really have you folks say with your verdict?
> What she would have you say is:  get this maniac off of me.
> Send a message that people who kidnap, torture, horrendously
> torture a young woman; not because of any derangement, but
> because that's what they plan to do, send a message that the

law says those people will pay the price. That's what Karen
Styles would say. She'd say send a message that will protect
all the other potential victims out there. Send a message that
the law works, that the law functions, that justice can be done.

**Trial Transcript, Vol. VIII,** *supra*, **at 1480.**

It is first noted that this argument was also an "invited response."

Lindsay implied that Karen Styles would not have wanted the jury to

sentence the Petitioner to death because of the kind of person she was.[66]

The prosecutor refocused the jury's attention in response to that argument.

***Darden*, 477 U.S. at 182.**

Moreover, "'[u]nless calculated to incite the passions and prejudices

of the jurors, appeals to the jury to act as the community conscience are not

*per se* impermissible.'" ***Byrd v. Collins*, 209 F.3d 486, 539 (6th Cir. 2000)**

**(quoting *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991)).**

Miller's remarks were in response to Lindsay's request that the jury

consider what the victim would have wanted them to do. ***Payne v.***

***Tennessee*, 501 U.S. 808, 827 (1991) (victim impact evidence is not**

**inappropriate during argument in sentencing phase of capital case).**

_____

[66] Lindsay stated, "Remember, if the times had been different, this is
a person [referring to the Petitioner] she [referring to Styles] would have
wanted to work with and try to fix." **Trial Transcript, Vol. VIII,** *supra*, **at
1478.**

Read in the context of the entire closing argument, Miller was emphasizing the reasons our society has the death penalty as punishment and why it was appropriate in this particular case. *Solivan*, **937 F.2d at 1151 (prosecutor's comments were to send a message to drug dealers in the community rather than focusing on why the death penalty in a particular case was warranted).** By referencing the purposes of capital punishment, **see *Gregg v. Georgia*, 428 U.S. 153, 183-87 (1976),** the prosecutor here argued "that the jury should find that these purposes would be served by imposing the death penalty on Petitioner." ***Byrd*, 209 F.3d at 539.** "When considered in context, these statements are . . . [not] an impassioned command that the jurors must recommend death based on some amorphous societal obligation." ***Beuke*, 537 F.3d at 647.** A prosecutor may "argue in favor of the purposes of the death penalty, including the objectives of retribution and deterrence." ***Lesko v. Lehman*, 925 F.2d 1527, 1545 (3d Cir. 1991).**

Furthermore, it must be "recognize[d] that the [government] should not be required to present . . . closing arguments that are devoid of all passion." ***Williams v. Chrans*, 945 F.2d 926, 947 (7ᵗʰ Cir. 1991).** And, a "prosecutor is permitted a certain degree of latitude in summation." ***United***

***States v. Barker***, 553 F.2d 1013, 1025 (6th Cir. 1977).  Miller's comments did not exceed constitutional bounds.  ***Lesko***, **925 F.2d at 1545 ("the prosecutor exceeded the bounds of permissible advocacy by imploring the jury to make its death penalty determination in the same cruel and malevolent manner shown by the defendants when they tortured and drowned" their victims).**

Habeas counsel also refer to another comment made by Miller during closing argument.  However, counsel do not properly quote the comment; counsel have deleted the last section of the comment in which Miller most specifically refers to the Petitioner's conduct toward the victim.[67]  The Court finds this omission most troubling.  When considered in the context of the entire comment, there is nothing inappropriate, and thus, nothing to which trial counsel should have objected.

---

[67] In its entirety, the comment reads as follows:
What this case is about is the concept of our system of justice not only sending a message to other people who might be inclined to do so, but sending a message of retribution that this is such a horrible crime, *that because of what Richard Allen Jackson did to Karen Lynn Styles on October the 31st, 1994, that our system of justice says that he pays the appropriate penalty, the most severe penalty recognized by the law.*
**Trial Transcript, Vol. VIII,** ***supra*,** **at 1484.**  The italicized portion of the comment was omitted from habeas counsel's argument.

During Lindsay's closing argument, he compared the life of the victim to that of the Petitioner, describing the Petitioner as a pitiful child warped at an early age and unable to overcome his problems despite the love of his adoptive family.  He concluded by asking the jury to, "Bring an end to this forever now.  Bring some closure.  I'm asking you to let him die in prison when called upon by our God to do so."  **Trial Transcript, Vol. VIII,** *supra*, **at 1478.**  Miller responded as follows:

> You know, [Lindsay] talks about closure.  He talks about closure.  Think about closure, what closure means.  Think about these two good folks [the victim's parents] here.  Think about them.  Think about them every time they see Lake Powhatan.  Think about what happens to them.  Think about it.  Their daughter is up there taped to a tree, having a stun gun driven into her by this man who has embraced evil.
>
> I don't know how many of you grew up on farms, but if you ever grew up around pigs, you know pigs will wallow in filth.  And, then, when they get to the trough, one of them will jump right up on the trough and lay long ways, laying all the filth that's on them on the trough and they'll eat back what's along there, covering up so that the filth that he's got on him keeps the other hogs out.  He has bathed himself in that filth.  He's the one that chose to do that.  They [the parents] have to think about this man doing what he was doing to Karen[.] . . .  They think about their daughter up there with this man who has chosen to embrace evil all over her. . . .  She's taped to the tree up there, standing against that yellow pine tree, every move pressing her bare skin up against that, and he is digging into her with that stun gun.  Digging into her, enjoying what he's doing.
>
> . . .

And you talk about closure, when they think about that, you know, see a sign that says Pisgah National Forest and all of this is brought to life, what do they have to remember?  That she went through that and that the man who did it is sitting down there laughing and smiling in the darkness of his cell, masturbating to . . . his pleasure at her suffering.  Every day. Every day they deal with that time after time.

*Id*. at **1480-82**.

Habeas counsel claim trial counsel should have objected to Miller's references to pigs and evil as well as to masturbation by the Petitioner in his cell.  However, almost no case law or argument is cited in support of their objections.[68]

The prosecutor's comments were again a response to the plea of defense counsel to "bring closure" by sentencing the Petitioner to life instead of death.  His comments were meant to show the jury that for the victim's parents, there would never be closure.  While the reference to a pig laying inside a trough in order to keep all the food for itself may have been unnecessary, the prosecutor meant that by a life sentence, the Petitioner would have successfully committed an "evil" crime and retained life while the victim lost her life.  ***Hall v. Luebbers***, **341 F.3d 706, 716 (8th Cir. 2003)**

---

[68] Indeed, it is telling that appellate counsel did not raise on appeal any issue of prosecutorial misconduct regarding Miller's closing argument.

**(comparing putting a dog to sleep with the jury's decision to impose the death penalty improper and unnecessary but not constitutionally infirm);** *United States v. Allen*, **247 F.3d 741, 776-77 (8th Cir. 2001) (reference to defendant as murderous dog did not deprive defendant of fair sentencing),** *rev'd and vacated on other grounds*, **536 U.S. 953 (2002).** In fact, the Fourth Circuit considered a case in which the prosecutor called the defendant a monster during closing argument and held that

> trial counsel was not constitutionally ineffective in failing to object to, or move for a mistrial based on, certain remarks made by the prosecutors in their closing argument because it would have been futile for counsel to have done so, given the "wide latitude" accorded counsel in making closing arguments, and given that the prosecutors' remarks, read in context, did not . . . otherwise infringe upon [the defendant's] constitutional rights.

*Oken*, **220 F.3d at 269-70 (citations omitted).** Thus, counsel were not ineffective for failing to object to Miller's "pig" and "evil" references. *Fields*, **483 F.3d at 360 ("[t]he use of colorful pejoratives is not improper." (quotation omitted))**.

As for the prosecutor's reference to the Petitioner masturbating in his cell, again the comment was in response to Lindsay's plea for closure. The evidence during the guilt phase was that the Petitioner masturbated while

looking at a pornographic magazine while he had the victim tied to the tree.[69]  He then shot her.  Defense counsel argued that life in prison would create closure.  The prosecutor pointed out that the victim's parents would be forced to remember that the Petitioner masturbated while their daughter was tied up and that he then killed her.  Thus, although she was dead at his hands, he would continue his behavior in prison with a life sentence.  Thus, the evidence adduced during the trial supported this remark.  **Drew v. Collins, 964 F.2d 411, 419 (5th Cir. 1992) (references to the defendant as a "sadistic killer" and referring to defendant's trip from Louisiana to Texas as a "rolling torture chamber" not prejudicial because supported by evidence).**  Moreover, under the *Oken* standard, the prosecutor was given wide latitude and the Petitioner's constitutional rights were not infringed.  Since the comments were not improper, trial counsel were not ineffective in failing to object.

Finally, the Petitioner claims the prosecutor made improper reference to his personal feelings about the crime during closing argument.  Miller

---

[69] Indeed, this detail was included in one of the Petitioner's confessions.

observed that he had memories of taking his own daughters to Lake Powhatan, near where the victim was killed.  He then noted:

> But once this case happened, every time I drive by there and every time each one of you sees Lake Powhatan or Pisgah National Forest, the memories that were there before for you are going to be destroyed by what this man did there, what this man chose to do.

**Trial Transcript, Vol. VIII,** *supra***, at 1482-83.**  Later, Miller reiterated the continuing pain for the victim's family and noted that her parents should have been enjoying their grandchildren instead of being forced to live through the trial.  He noted that he did not show the victim's parents pictures of his own grandchildren "because of the pain that I feel."[70]  *Id.* **at 1487.**

The first reference was actually a statement to the jury that their own memories of the area would be tainted by the crime.  The second reference was to the fact that the victim's parents would never have grandchildren, the victim having been an only child.  While it was unnecessary for the prosecutor to refer to his own grandchildren, in neither instance did he offer his personal opinion that the Petitioner was deserving of the death penalty.

---

[70] The context of the comment indicates the prosecutor may have misspoken and meant to say, "because of the pain that they feel."

As a general premise, a prosecutor's repeated references to his or her personal opinion about a defendant may indeed be found improper. However, a prosecutor's "use [of] the phrase 'I think' in an innocuous, conversational sense" does not violate due process because such use "do[es] not suggest an attempt to replace the evidence with the prosecutor's personal judgments." Prosecutors must remain mindful to avoid the expression of personal opinions. However, in this case, the prosecutor's statements did not "so infect[] the trial with unfairness as to make the resulting [sentence] a denial of due process."

**Higgs, 353 F.3d at 332 (quoting *United States v. Adam*, 70 F.3d 776, 780 (4th Cir. 1995) and *Mitchell*, 1 F.3d at 240).** Indeed, in *Higgs*, the prosecutor referred to the victims and stated, "I look at them and I can't believe" what the defendant did to them. *Id*. She then stated that in her opinion, "it would be a better world in the future without [the defendant]." *Id*. Nonetheless, the Fourth Circuit did not find these comments violated the defendant's constitutional rights. Comparing the prosecutor's comments in *Higgs* with those made here, Miller's remarks were much more conversational and less opinionated. In fact, these comments were a further response to trial counsel's pleas to the jury for closure through a life sentence for the Petitioner.[71] ***See, e.g., Chapman*, 209 F. App'x at 276**

---

[71] The Court is compelled to note that the argument was in direct response to trial counsel's cross-examination of Mrs. Styles during which she was asked if the pain of losing her daughter had been changed in any way by the outpouring of support from the community. **Trial Transcript,**

**("And the government statement that the arguments of Chapman's attorney 'pain me personally' was nothing more than an innocuous response to various statements made in Chapman's closing.").**

Moreover, assuming that the prosecutor's comments were improper, they were only a portion of his lengthy closing and were "at most, just over the edge of propriety." *Id.* It was, therefore, "unlikely that [the argument] had any measurable tendency to mislead the jury, nor does it appear that the prosecutor had any intention to divert the attention of the jury." **Smith, 441 F.3d at 264-65.** "To establish ineffective assistance for failing to object to a prosecutor's closing argument, [the Petitioner] must demonstrate, as in every ineffective assistance claim, not only that counsel's performance was deficient, but also that there is a reasonable probability that, but for counsel's failure to object, the result of the proceeding would have been different." **Bucklew v. Luebbers, 436 F.3d 1010, 1021-22 (8th Cir. 2006) (rejecting constitutional challenge where prosecutor argued the victim's children would demand the death penalty although they did not testify and stating his personal belief that no one deserved the**

---

**Vol. VII,** *supra***, at 1325.** Mrs. Styles' answered, "Nothing will ever take that [pain] away." **Id**.

**death penalty more than the defendant).** Considering "the weight of the evidence and whether the [purportedly] improper argument misstated evidence or implicated other specific rights of the defendant, . . . the comments in this case did not . . . render the result of the proceedings unfair." *Id*. **at 1022-23.** As a result, trial counsel were not ineffective in determining not to object to these comments.[72]


### 14. Ineffective assistance of counsel for failing to move to dismiss the death notice as untimely.

On May 9, 2001, the jury in this case entered its verdict imposing a sentence of death. On August 15, 2001, defense counsel in the case of *United States v. Ferebe*, a criminal action filed in the District of Maryland, moved to strike the notice of intent to seek the death penalty in that case because the notice of intent was not provided to the defendant within a reasonable time prior to trial as required under the Federal Death Penalty Act, 18 U.S.C. § 3593(a). At the time the death sentence was imposed in this case, the motion in *Ferebe* had yet to be filed. Nonetheless, habeas

---

[72] Although habeas counsel make an argument that the cumulative effect of these comments was prejudicial, the finding that none of the comments were, in fact, improper, moots that argument.

counsel argue that trial counsel here were ineffective for failing to anticipate a change in the law and for failing to make a similar such motion here.

On June 18, 2003, the Fourth Circuit issued its decision in *Ferebe*, three months after that court affirmed this Petitioner's conviction and sentence. *See Jackson*, **327 F.3d 273 (decided Mar. 18, 2003);** *United States v. Ferebe*, **332 F.3d 722 (4ᵗʰ Cir. June 18, 2003).** In *Ferebe*, the Circuit held that the death penalty statute "must be interpreted to require an inquiry into the objective reasonableness of the time between issuance of the Death Notice and the trial itself, in light of the particulars of the charged offense and the anticipated nature of the defense."[73] *Ferebe*, **332 F.3d at 727.** Ferebe's notice as to a second count of murder was filed about one month before his trial was scheduled to begin. As a result, Ferebe's counsel moved to strike the death penalty notice as untimely in view of the impending trial. Habeas counsel claim trial counsel in this case should have predicted this decision and made a motion to strike the death penalty notice as untimely filed.

───────────────

[73] It is also interesting that Ferebe's indictment charging him with murder was filed in September 1997, but the Attorney General did not authorize the death penalty until May 1998. The actual notice of intent to seek the death penalty does not appear to have been filed until August 2001. *Ferebe*, **332 F.3d at 725.** No such delays occurred in this case.

It is first noted that from the filing of the indictment in this case, all parties were aware that the Government would seek the death penalty. ***See Transcript of Proceedings held October 17, 2000, filed October 19, 2001, at 2-4 (establishing 6-week deadline for the Attorney General's decision);*** *see also*, **Transcript of Proceedings held October 26, 2000, filed October 19, 2001, at 3-4 (trial counsel requesting extension of deadlines previously imposed).** When the Government filed a superseding indictment in November 2000, the Court advised that if the prosecutor obtained permission to pursue the death penalty, the case would be continued from the January 2001 trial calendar. **Transcript of Proceedings held November 14, 2000, filed October 19, 2001, at 2-12.** The notice of intent to seek the death penalty was filed in December 2000. Thus, this case hardly fits within the category of delay seen in *Ferebe*. Nor was counsel rushed into trial in January 2001, a month after the notice of intent was filed. That was the crux of the issue in *Ferebe*.

Moreover, trial counsel did, in fact, move to dismiss the notice of intent to seek the death penalty, arguing that subjecting him to the death penalty through a federal prosecution in 2000 after he had pled guilty to a state crime five years earlier violated his constitutional rights. **Motion to**

**Dismiss Death Penalty as Possible Punishment, filed February 15, 2001.**  Trial counsel also moved to dismiss the indictment based on a six year pre-indictment delay between the time the crime was committed and the filing of the indictment.  **Motion to Dismiss/Pre-Indictment Delay, filed February 15, 2001.**  On April 24, 2001, trial counsel moved again to strike the notice of intent to seek the death penalty, arguing that the specific intent aggravating factors were required to be found by a grand jury.  **Motion to Dismiss the Indictment, filed April 24, 2001.**

Although the undersigned denied all the defense motions, trial counsel presented novel theories for dismissing both the death notice and the indictment itself.  While counsel did not make the precise argument made in *Ferebe*, it is clear from the record they mounted attacks against the death penalty notice, including attacks on its timeliness.  The undersigned cannot find that counsel were ineffective for failing to anticipate a decision rendered over two years after the jury verdict in this case.  "[T]he case law is clear that an attorney's assistance is not rendered ineffective because he failed to anticipate a new rule of law."  ***Kornahrens v. Evatt*, 66 F.3d 1350, 1360 (4th Cir. 1995).**  Moreover, this rule holds true even when, unlike the case at hand, the rule was under attack at the time of the defendant's trial.

***Id.***; ***accord*, *United States v. McNamara*, 74 F.3d 514, 517 (4ᵗʰ Cir. 1996) (counsel was not ineffective fo failing to discover that Supreme Court had granted *certiorari* on the issue in question).**  At the time of the Petitioner's trial, the attorneys in *Ferebe* had not filed the motion which ultimately led to the Fourth Circuit's decision some two years later.  As a result, trial counsel were not ineffective for failing to anticipate the ruling in *Ferebe*.  **Lenz, 444 F.3d 295, 306 (4ᵗʰ Cir. 2006) (defendant was not deprived of effective assistance because counsel failed to object to verdict form used in sentencing phase of capital case due to counsel's failure to anticipate a new rule of law); *United States v. Brown*, 546 F. Supp. 2d 312 (E.D. Va. 2008), *appeal dismissed*, 2009 WL 196820 (4ᵗʰ Cir. 2009).**

### 15.    Miscellaneous allegations of ineffective assistance.

Habeas counsel literally "throw" into the motion a series of other allegations of ineffective assistance of counsel which are unsupported by anything other than sheer speculation.  For example, they claim trial counsel never conducted an adequate investigation into the guilt phase of the trial and thus, did not consult experts in DNA, ballistics and body

decomposition.  **Petitioner's Motion, *supra*, at 8-9**.  However, as noted *infra*, the Court granted Petitioner's pretrial motions for a ballistics expert and a forensic pathologist.  The request for a DNA expert was rendered moot by the Government's agreement to provide DNA analysis.

Habeas counsel also claim that trial counsel failed to interview eyewitnesses who saw the Petitioner in the area, the K-Mart employees and customers who claim he bought the gun, the hunter who discovered the victim's body, or other witnesses who may have seen the Petitioner on the morning of the crime.  *Id*.  In addition to the fact that no indication is provided as to what these witnesses would have reported, trial counsel sought and received a private investigator.

Habeas counsel claim that trial counsel failed to investigate the police for misconduct, to ascertain if the police "pursued all potential suspects," and to pursue the possibility that "more than one person" committed this crime since a cigarette pack and an unmatched hair were found near the crime scene.[74]  *Id*.  Trial counsel's motion for a crime scene investigator was denied as redundant to the services to be performed by two other

---

[74] The Court is compelled to note that the Petitioner confessed on more than one occasion and never implicated anyone else.

experts which were granted.  Thus, counsel sought and received experts to assist in these investigations and there is nothing in the record, other than mere accusations, that proper pretrial preparation did not occur.  Indeed, the record of the proceedings as recounted in this decision show a stellar performance by all three trial counsel in the preparation and trial of this case.

Throughout Petitioner's motion, habeas counsel claim, on the one hand, there was inadequate pretrial preparation, and on the other hand, claim that trial counsel should not have engaged in such preparation but should have spent more time in the development of mitigation evidence.  At the same time, the Petitioner claims the procedural history of the case was complex and warranted pretrial motions to attack issues such as the legality of the indictment and double jeopardy.[75]  Belser has opined that Lindsay and Foster were unreasonably focused on the issue of the Petitioner's guilt instead of mitigation, claiming that based on the Petitioner's confessions and state court guilty plea, his guilt should have been conceded in an attempt to save him from the death penalty.  By the same token, Belser also claims that the Petitioner's guilt was improperly conceded at trial.  ***United***

_____

[75] Both of these attacks were, in fact, carried out.

*States v. Faubion*, **19 F.3d 226, 232 (5th Cir. 1994) ([T]he acuity of hindsight is not our proper lens.").**  And, habeas counsel now argue that no preparation for the guilt phase of the trial was done, while Belser claims that counsel spent too much time on the guilt phase and not enough time on the mitigation issue.  *Strickland*, **466 U.S. 689-90 (Counsel's competency must be judged based on representation at the time of trial without the distortion of hindsight prompted by testimony or affidavits given years after the event.).**  The Court finds these miscellaneous issues to be  unsupported and rejects them based on the record of the case, as shown in this decision.

### 16.    Conclusion concerning ineffective assistance of counsel.

If the aspersions cast by habeas counsel against trial counsel are to be believed, their entire performance was ineffective.  Moreover, in support of this motion, trial counsel literally fell on their swords, admitting all manner of professional incompetencies in the singular goal of removing the sentence of death from the reality of this case.   Nonetheless, such remonstrations have done nothing to remove the reality of the death penalty, either in this case or in the federal system.  The toll that such

conduct takes on the integrity of the judicial system, not to mention the attorneys themselves, is marked.

> This Court is compelled to note the "Hobson's choice" faced by criminal defense attorneys who take capital cases. During the trial, they are required to make strategic decisions based on the evidence known at the time and consultations with their clients. Subsequently, however, these attorneys are invariably blamed for any number of wrongs, almost all of which are imagined or invented out of whole cloth. It is most unfortunate that . . . attorney[s] of the caliber of Mr. [Lindsay, Belser and Foster] [are] disparaged when [their] performance was not only effective but outstanding.

*Call*, 454 F. Supp. 2d at 498 n.11.

The Court rejects the arguments that trial counsel provided ineffective assistance of counsel under either a *per se* or *Strickland* standard. In fact, as the discussion contained in this decision shows, all three trial counsel performed far in excess of reasonableness or competency. The fact that the attorneys, both trial and habeas, may now exceed the bounds of zealousness in an endeavor to defeat a sentence of death does not mean the Petitioner received, at any level, anything less than excellent, thoroughly competent representation.

**B.     Assignments of error unrelated to the competency of counsel.**

**1.     The prosecutor's comments on the evidence during closing argument violated the Petitioner's rights.**

Habeas counsel claim that during closing arguments, the prosecutor made disparaging remarks implying that certain mitigation evidence did not exist when he had knowledge that such evidence in fact existed.  This issue was not raised on direct appeal.  With the exception of claims based on ineffective assistance of counsel, "the general rule [is] that claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice." ***Massaro*, 538 U.S. at 504.**  Habeas counsel do not claim that trial counsel were ineffective by failing to object to these comments, nor have they alleged cause and prejudice or actual innocence.

> Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either "cause" and actual "prejudice" or that he is "actually innocent."

***Bousley v. United States*, 523 U.S. 614, 622 (1998) (quoting *Murray v. Carrier*, 477 U.S. 478, 485 (1986)) (other citations omitted).**

Habeas counsel do not dispute that this claim is not based on ineffective assistance of counsel or that they have failed to show cause and prejudice or actual innocence.  **Petitioner's Reply to Government's**

**Response, filed January 16, 2007, at 3.** Instead, habeas counsel in their reply requested the Court reserve ruling until the resolution of the case of *Roper v. Weaver*, which counsel identified only as a case from the Eighth Circuit, because the Supreme Court had granted *certiorari* on December 7, 2006. Counsel's reliance on that case is misplaced. In that case, the Eighth Circuit made the following rulings:

> In claims the parties identify as 2B and 2C, Weaver contends the prosecutor made six statements during the guilt-phase closing argument and rebuttal which improperly referred to the prosecutor's personal beliefs or threatened the jury. A discussion of the actual statements is not necessary because the district court determined the claims had been procedurally defaulted. As a consequence, Weaver has to show "cause and prejudice" or a "fundamental miscarriage of justice" to have the claims reviewed.
>
> . . .
>
> Weaver does not address the procedural default issue. He does not argue there was cause and prejudice or that a fundamental miscarriage of justice occurred. By failing to address the procedural default issue, he has abandoned his [claim].

**Weaver v. Bowersox, 438 F.3d 832, 838 (8th Cir.), *cert. granted sub nom., Roper v. Weaver*, 549 U.S. 1092 (2006),[76] *cert. dismissed as improvidently granted*, 550 U.S. 598 (2007).**

---

[76] It is this grant of the petition for *certiorari* to which habeas counsel referred.

The defendant in *Weaver* made additional claims related to the prosecutor's remarks during the penalty phase which had not been procedurally defaulted. As a result, the Eighth Circuit addressed those claims. However, at no point did the Eighth Circuit or the Supreme Court, which ultimately dismissed the writ as having been improvidently granted, modify that portion of the decision dismissing the defaulted claims related to improper prosecutorial remarks during the guilt phase of the trial. The *Weaver* case, therefore, supports the dismissal of the claims in this case as being barred by procedural default.

Habeas counsel do not even discuss the law of procedural default and they do not claim cause and prejudice or actual innocence. The Court, therefore, finds this claim of prosecutorial misconduct procedurally defaulted. **See, *United States v. Gaither*, 2008 WL 4998495, at \*2 (10th Cir. 2008) (claim of prosecutorial misconduct procedurally barred where raised for the first time in § 2255 motion); *DiPietro v. United States*, 251 F. App'x 606 (11th Cir. 2007), *cert. denied*, 128 S. Ct. 2094 (2008); *United States v. Ratigan*, 351 F.3d 957, 965 (9th Cir. 2003) (procedural default cannot be excused unless showing of actual, factual innocence, not just legal insufficiency)**.

As previously noted, the Petitioner has not alleged a substantive claim of ineffective assistance of counsel and he has not alleged that ineffective assistance of counsel constitutes cause for failing to raise the issue on appeal.  Nonetheless, the Court has reviewed the claim and finds no merit to the claims and no prejudice to the Petitioner.[77]

The Petitioner's claim of prosecutorial misconduct relates to comments in regard to two mitigating factors:  that the Petitioner lived in eight different foster homes during the first five years of his life and that as a child, the Petitioner often went into trance-like states.  When reviewed in the context of the entire closing argument, it is obvious that the prosecutor did not argue to the jury that there was no evidence to support the mitigating factors at issue.  Instead, in arguing the weight to be given to

_____

[77] Because there was no objection to the argument at trial, any appellate review, had it occurred, would have been for plain error – that is, that the error was plain, affected the Petitioner's substantial rights and seriously affected the fairness, integrity or public reputation of judicial proceedings.  **United States v. Bolden, 545 F.3d 609, 630 (8th Cir. 2008).** "To show that an error affected his substantial rights, he must 'demonstrate[] a reasonable probability that he would have received a more favorable sentence with the . . . error eliminated.'" **Id. (quoting United States v. Pirani, 406 F.3d 543, 551 (8th Cir. 2005)).**  No such showing has been made.

those mitigating factors and their relevance, the prosecutor made the

following comments:

> There's two steps to your consideration as to these nonstatutory
> [mitigating factors].  First one is to determine whether or not it
> really exists.  The second is if it exists, is it mitigating?  Let me
> give you an example of that.  If they were to allege to you, to tell
> you that Richard Allen Jackson is 10 feet tall, that doesn't even
> exist as a mitigating factor.  And so, . . . doesn't even exist as a
> fact, so it can't be mitigating.  It's automatically out.  The second
> is they allege to you Richard Allen Jackson is wearing a white
> shirt.  That would be the kind of thing that you could find exists,
> but so what?  It's not mitigating.
>
> . . .
>
> For the first 5 and a half years of his life, Richard was in the
> custody of the Department of Social Services[.]  That's a white
> shirt one.  It exists, but so what?  That doesn't mitigate against
> what he did.  That in no way plays into it at all.  The second:
> during his first 5 and a half years of life, Richard was in eight
> different foster care homes.  During that time he was physically
> abused.  Richard never knew the unconditional love of a mother
> and a father until the age of 5 and a half years old when he was
> placed in the home of Sally and J.D. Jackson.
>
> First of all, the only evidence about the number of foster homes
> he's been in comes from the statement that he gave to the
> police.  That's the only evidence of that.  Do you recall . . . that,
> although he admitted to . . . killing Karen, remember, he was
> trying to minimize his involvement as much as possible.
>
> . . .
>
> And as far as never knowing the unconditional love of a mother .
> . . that's a white shirt there.  So what?  I mean, at that point he
> sure had a silver spoon put in his mouth.  He had every
> opportunity.  Every opportunity.
>
> The next, again, is one of those white shirt things.  When
> Richard came to live with Sally and J.D. Jackson at the age of 5

and a half, he would go into strange episodes during which he would be rigid, with his eyes blank and his body shaking. These episodes did not lessen as he grew older. Now, that's somewhere between 10 feet tall and the white shirt. You're going to have to decide which that is because the only evidence on that is from Mrs. Jackson.

**Trial Transcript, Vol. VIII, *supra*, at 1460-62.**

The Petitioner claims that his DSS records prove he was in eight different foster homes, thus, the prosecutor deliberately placed evidence before the jury that he knew was false. The prosecutor's argument, however, was not that the claim was false, but that the Petitioner was using the claim to evoke sympathy and to minimize his responsibility, just as he had done during his confession. **Bland v. Sirmons, 459 F.3d 999, 1026 (10th Cir. 2006) (rejecting claim that prosecutor demeaned mitigating evidence by arguing it was nothing more than excuses for the defendant's conduct), *cert. denied*, 127 S. Ct. 2117 (2007); *Bolden*, 545 F.3d at 630 (a prosecutor may argue that, based on the evidence, mitigating factors are entitled to little or no weight).**

The Petitioner also argues it was inappropriate to demean his trance-like behavior. However, the prosecutor merely pointed out to the jury that even if such conduct occurred, it was not relevant. Moreover, a majority of

the jurors found in favor of this mitigating factor. ***United States v. Fell*, 531 F.3d 197, 224 (2d Cir. 2008) (noting that jurors found mitigating factors on the verdict sheet).**

"[T]he prosecutor's comments ... accurately reflected the law: jurors are obliged to consider relevant mitigating evidence, but are permitted to accord that evidence whatever weight they choose, including no weight at all." ***United States v. Johnson*, 495 F.3d 951, 966 (8th Cir. 2007), *cert. denied*, 129 S. Ct. 32 (2008).** The Court finds the remarks did not have a tendency to mislead the jury but instead were fair comment on the weight the jury should give to the mitigating evidence. "As long as the jury is properly instructed on the use of mitigating evidence, [and there is no argument here that it was not], the prosecution is free to comment on the weight the jury should accord to it." ***Bland*, 459 F.3d at 1026.** Moreover, assuming the remarks were improper, they were not extensive; and viewed in the context of the entire argument, the remarks were not prejudicial. ***Smith*, 441 F.3d at 264-65; *Bolden*, 545 F.3d at 630.** As previously noted, the undersigned provided the jury with clear instructions for use during the penalty phase, including instructions concerning the weighing of mitigating versus aggravating factors and that passion should not dictate the outcome.

***Wilson v. Sirmons*, 536 F.3d at 1120; *Fell*, 531 F.3d 224.**  Those

instructions have not been challenged and the Court rejects this claim.


### 2. The prosecutor knowingly allowed Robert Sartori to present false testimony.[78]

Habeas counsel admit that the Fourth Circuit found the prosecutor did

not act improperly in calling Sartori to testify and that, in any event, Sartori's

testimony did not prejudicially affect the Petitioner's substantial rights.

***Jackson*, 327 F.3d at 297.**  Nonetheless, they claim that "evidence not in

the appellate record supports the claim" that the prosecutor knowingly

allowed Sartori to present testimony which he knew or should have known

was false.  **Petitioner's Motion, *supra*, at 144**.  That evidence, it is argued,

includes: (1) the prosecutor knew before trial that Howell and Keiber were

writing letters which related details of statements allegedly made by the

Petitioner;[79] (2) the prosecutor knew that Keiber and Sartori shared a cell

---

[78] The Petitioner claims that the prosecution also offered the testimony of Eugene Keiber which it knew was false.  The record shows that Keiber did not testify before the jury.  **See Trial Transcript, Vol. VI, *supra*, at 1146, 1209.**

[79] The section of this opinion discussing the allegation that counsel were ineffective for failing to deal properly with these letters shows that the first indication of witness inmate communication occurred on April 26,

and, therefore, there was a "substantial likelihood" that they were sharing

details about the purported statements;[80] (3) Sartori contacted Special

Agent Fernandez of the FBI and, therefore, the Government was put on

notice;[81] (4) the prosecutor ignored the situation;[82] (5) the prosecutor

allowed Sartori to leave the jury with the impression that he expected

nothing for his testimony;[83] and (6) the prosecutor knew, however, that

Sartori wanted him to advise the state district attorney of his cooperation

and hoped to get transferred into a different prison.[84]

---

2001, when the attorney for inmate witness Howell provided to trial counsel copies of letters written from Keiber to Howell, not to Sartori.

[80] The Fourth Circuit specifically rejected this allegation. **Jackson, 327 F.3d at 297.** Likewise, in response to a motion by trial counsel for the Petitioner, the undersigned found nothing inappropriate in the housing arrangements. Thus, the prosecutor may hardly be faulted.

[81] The allegation is that this agent notified his superior of questionable conduct by the *other* inmate witnesses, not that Sartori notified the agent that *he* intended to commit perjury. Thus, there is nothing that shows the prosecutor knew Sartori would do so. And, in fact, the prosecutor declined to use the other inmate witnesses because of the events in question.

[82] The discussion *infra* concerning ineffective assistance of counsel shows that none of the attorneys ignored the situation.

[83] Sartori's testimony was that he had not been promised anything. In any event, his testimony was stricken.

[84] In what manner the Petitioner may divine what the prosecutor "knew" is not explained. Nothing more than a conclusory allegation is

The Fourth Circuit made the following ruling:

> Sartori's testimony did not prejudicially affect Jackson's substantial rights. The defense subjected Sartori to vigorous cross-examination, probing the consistency of his testimony with statements to government investigators. Furthermore, the district court ultimately struck the testimony and provided a limiting instruction. "We generally follow the presumption that the jury obeyed the limiting instructions of the district court." And the evidence of Jackson's guilt, including his own confession, was overwhelming. Moreover, there was other substantial evidence, apart from Sartori's testimony, from which the jury could have inferred that Jackson's crimes involved substantial planning. Not only were all the materials used by Jackson in the commission of the crime purchased three days before the crime, Jackson's confession revealed that, after seeing Styles in the woods, he waited until she passed and then armed himself in preparation for the crime.

**Jackson, 327 F.3d at 297 (quoting Francisco, 35 F.3d at 119).**

Habeas counsel have not shown in what manner their purportedly new evidence changes the Circuit's finding that Sartori's testimony did not prejudicially affect the Petitioner's substantial rights. **Varela v. United States, 481 F.3d 932, 935 (7th Cir. 2007).** "A § 2255 motion is 'neither a recapitulation of nor a substitute for a direct appeal.'" **Id. (quoting McCleese v. United States, 75 F.3d 1174, 1177 (7th Cir. 1996)) (other citations omitted)**. Although the Petitioner claims the additional

---

made in support of this contention with no citation to the record. Nor did Sartori aver in his affidavit that he had any such hopes or expectations.

information adds further credence to a claim that the prosecutor knowingly presented perjured testimony, the Petitioner has not argued, much less shown, how that changes the Circuit's finding that in any event his rights were not impacted. *Id*. Claims that have been raised and disposed of on direct appeal may not be raised in the context of a motion pursuant to § 2255 absent an intervening change in the law of the circuit. *United States v. Tucker*, **2008 WL 4771952, at *3 (10th Cir. 2008) (citing** *United States v. Warner*, **23 F.3d 287, 291 (10th Cir. 1994));** *United States v. Segler*, **37 F.3d 1131 (5th Cir. 1994) (court may not consider an issue in habeas which was found against the petitioner at trial and on direct appeal).** The Court finds that this claim is nothing more than an attempt to "'recast, under the guise of collateral attack, questions fully considered by [the Circuit on direct appeal].'" *United States v. Walker*, **2008 WL 4772192, at *3 (4th Cir. 2008) (quoting** *Boeckenhaupt v. United States*, **537 F.2d 1182, 1183 (4th Cir. 1976)),** *cert. denied*, **129 S. Ct. 1535 (2009).**

Moreover, the claims raised are refuted by the contemporaneous record and/or are based on inadmissible evidence. For example, none of "Keiber's live testimony [outside the presence of the jury] . . . indicated that Keiber provided details to Sartori of the facts of which Sartori was

previously aware and to which he testified." ***Jackson*, 327 F.3d at 297.**

Belser has averred that he received a telephone call from Keiber in March

2004. **Exhibit 5, Supplemental Affidavit of David Belser, *attached to*,**

**Petitioner's Supplemental Memorandum, *supra*.** The statements Belser

claims were provided to him by Keiber are inadmissible hearsay.

Sartori has provided an affidavit in which he claims (1) he was housed

in the same detention facility as Keiber, Soloman and Howell;[85] (2) during

that period, Keiber and Soloman made specific statements to him about

details of the Jackson case, an averment as to which the statements are

inadmissible hearsay; (3) Soloman told him that pictures were in Jackson's

state prison cell which looked like the victim, again inadmissible hearsay;

(4) he saw and read letters from Keiber to Howell containing details of the

Jackson case, another example of inadmissible hearsay; and (5) he

contacted the FBI about the conduct of the other inmate witnesses, but not

_____

[85] As previously noted, prior to the trial, the undersigned ruled against
the Petitioner's trial counsel and allowed the prisoner witnesses to remain
in the same facility. ***Jackson*, 327 F.3d at 297 ("The district court had
ruled previously that there was nothing improper in all potential
inmate witnesses being in the same facility and sharing the same
lawyers.").**

his own conduct.[86]  **Exhibit 39, Affidavit of Robert Sartori, *attached to*, Petitioner's Supplemental Memorandum, *supra.***  In addition to the fact that the affidavit is replete with inadmissible hearsay, the Petitioner has not explained why the undersigned should consider the affidavit of a witness who has previously been found to have testified falsely.

None of the other inmate witnesses testified and Sartori's testimony was stricken.  The Court finds no admissible evidence which would warrant a modification to the Circuit's finding that the Petitioner's substantial rights were not prejudiced by Sartori's testimony.

It is unclear whether habeas counsel assert a separate claim for violation of due process.  Assuming *arguendo* that such a claim is asserted, they have not argued, much less shown, that the striking of Sartori's testimony, to which the prosecutor agreed, and the Court's subsequent instructions to the jury to disregard his testimony violated due process.[87]

---

[86] Since none of those witnesses testified before the jury, it is unclear in what manner their conversations show that the prosecutor placed false evidence before the jury.  Moreover, Sartori did not aver that he used information gleaned from those witnesses or that the prosecution knew he would do so.

[87] Habeas counsel completely ignore the fact that the Court ordered the testimony stricken and provided a curative instruction to the jury.

"To establish a due process violation, [the Petitioner] must show that: (1) [Sartori] committed perjury; (2) the Government knew or should have known of [Sartori's] perjury; (3) [*Sartori's*] *testimony went uncorrected*; and (4) there is a reasonable likelihood that the false testimony could have affected the verdict." ***United States v. Hoffecker*, 530 F.3d 137, 183 (3d Cir.), *cert. denied*, 129 S. Ct. 652 (2008) (emphasis added).** Here, the testimony was stricken with the approval of the prosecutor and a curative instruction was given, both prophylactic measures which were approved by the Fourth Circuit. ***United States v. Benton*, 64 F. App'x 914, 919 (6th Cir. 2003) ("The knowing use of false or perjured testimony constitutes a denial of due process *if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.*") (emphasis added; quotation and citations omitted); *United States v. Edwards*, 159 F.3d 1117, 1130 (8th Cir. 1998) (government did not allow false evidence to go uncorrected, thus no showing of due process violation).** The Court, therefore, rejects this claim.

### 3. The Petitioner was denied his right to confrontation by his exclusion from the jury view.

During the trial, the Government requested that the jury view the crime scene, and after having been given an opportunity to consider the request, trial counsel joined in the request. **Trial Transcripts, Vol. III, *supra*, at 704; Vol. IV, *supra*, at 847**. The undersigned granted the Government's motion for a jury view. The Petitioner did not raise on direct appeal any issue related to this ruling. He now claims he was denied his constitutional right to confrontation by his absence from that view although his trial counsel were present. This claim is procedurally defaulted. ***Bousley*, 523 U.S. at 622; *Crowe v. Hall*, 490 F.3d 840, 846-47 (11th Cir. 2007) (noting procedural default of claim regarding jury view), *cert. denied*, 128 S. Ct. 2053 (2008); *D'Ambrosio v. Bagley*, 2006 WL 1169926 (N.D. Ohio 2006) (procedurally defaulted), *aff'd*, 527 F.3d 489 (6th Cir. 2008); *Wiles v. Bagley*, 2005 WL 1181859 (N.D. Ohio 2005); *Crowe v. Head*, 356 F. Supp. 2d 1339 (N.D. Ga. 2005).**

Nor would consideration entitle the Petitioner to relief.

The Constitution does not guarantee a criminal defendant the absolute right to be present at a jury view. [The] Supreme Court [has] held that the Due Process Clause of the Fourteenth Amendment was not violated by excluding a defendant from an

on-site inspection by a jury where the defendant's attorney was present and participated, along with the prosecutor, in directing the jury's attention to various aspects of the location under inspection by the jury. The Court explained that "the presence of the defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." The Court also emphasized that the defendant's presence at a jury view is not among those constitutional rights "conferred so explicitly as to leave no room for an inquiry whether prejudice to a defendant has been wrought through their denial."

**Rogers v. Howes, 64 F. App'x 450, 453-54 (6th Cir. 2003) (also holding that the right of confrontation was not violated) (quoting Snyder v. Massachusetts, 291 U.S. 97, 107-08, 116 (1934) (overruled in part on other grounds)) (other citations omitted).** Indeed, the Fourth Circuit has held that a supervised jury view in the absence of defense counsel did not violate the defendant's rights. **Arnold v. Evatt, 113 F.3d 1352, 1360-62 (4th Cir. 1997).**

Here, trial counsel made a strategic decision that a jury view would be "helpful to [the jury's] understanding from our perspective [of] the overall mental state of the defendant." **Trial Transcript, Vol. IV, supra, at 847.** Habeas counsel do not attack this strategic decision and do not claim that it was ineffective assistance of counsel. Despite counsel's stipulation to the

view, the Petitioner now argues that his absence denied him the right of confrontation because questions were asked during the view.

The decision to exclude the Petitioner was made by the trial court "primarily for safety reasons." *Id.* **at 857.** Due to the wooded, remote nature of the area which hunters were known to frequent, there was a concern that the Petitioner's life might be in danger or that he would be able to escape with the assistance of an armed companion disguised as a hunter. *Id.*; *accord* **at 861 ("Marshal Howard: Your Honor, may I? We would request the defendant not be allowed to attend for security reasons.").** Nonetheless, trial counsel requested and received the opportunity to discuss his absence with the Petitioner.[88] *Id.* **at 857.** Trial counsel proposed, and the Court accepted, the areas selected for the jury view. **Trial Transcript, Vol. V,** *supra***, at 1111-12.** The attorneys and the Court went through an exhaustive procedure to identify the locations and to specify what would be said to the jury, with clear instructions that no one was to speak except the Court. *Id.* **at 1112-18.** The content of what the Court was to say to the jury was approved in advance. *Id.* Moreover, in the

---

[88] Indeed, it could be argued that the Petitioner's failure to object to his absence waived any claim.

event that a juror asked a question, it was agreed by all that the answer would be given by the Court after conferring with counsel.  *Id*. **at 1115**.

Before the jury was allowed access to the view, the Court advised the attorneys of the language he would use with the jury in describing the surrounding area and obtained their approval.  *Id*. **at 1120-21.**  There were three questions asked by the jurors.  The Court asked a law enforcement agent who had previously testified to answer one question and instructed the jury that his answer would be an approximation.  *Id*. **at 1123.**  As to the second question, the Court conferred with counsel before answering and again asked the law enforcement agent (the former witness) to assist.  *Id*. **at 1124.**  As to the third question, again, the Court instructed the former witness to answer the question.  *Id*.  This witness had testified during the Government's case concerning the crime scene investigation and had been subjected to cross-examination.  During the jury view, everything that was done and said occurred in the presence of trial counsel, was reported by a court reporter, and no objections were raised by trial counsel.  "[T]he presence of defense counsel at the jury view [is] one of the reasons why the exclusion of the defendant did not amount to a constitutional violation."  ***Arnold***, **113 F.3d at 1359-60 (citing *Snyder*, 291 U.S. at 103-04).**

The Petitioner argues that because questions from the jury were answered, his absence violated his confrontation rights, even though his attorneys joined in the request for the view, agreed to his absence, and agreed to the procedure for responding to juror questions.  **Fed. R. Crim. P. 43(c)(1)(A) (a defendant who is initially present at trial waives his right when he is voluntarily absent after the trial has begun);** *United States v. Hollie*, **198 F.3d 248 (table), 1999 WL 1021860 (6**[th] **Cir. 1999).**

> Obviously, the difference between a view at which every one is silent and a view accompanied by a request to note this feature or another is one of degree, and nothing more.  The mere bringing of a jury to a particular place, whether a building or a room or a wall with a bullet hole, is in effect a statement that this is the place which was the scene of the offense, and a request to examine it.  When the tacit directions are made explicit, the defendant is not wronged unless the supplement of words so transforms the quality of the procedure that injustice will be done if the defendant is kept away.  Statements to the jury pointing out the specific objects to be noted have been a traditional accompaniment of a view for about two centuries, if not longer.  The Fourteenth Amendment has not displaced the procedure of the ages.
> . . .
> When the scene is explained by showers who are not the counsel for the parties, a defendant gains nothing by being present at a view any more than he gains where there is only a bare inspection without an explanatory word.  He has no privilege in such circumstances, and certainly no constitutional privilege, to speak to the showers and give suggestions or advice. . . .  If [the shower] fail[s] to point out anything material, he may prove the fact upon the trial and ask for another view. He had the same privilege here, for there was a . . . transcript of

all that was said and done. Never, at any stage of the proceeding, has there been a suggestion by the defendant or his counsel that there was need of something more.

**Snyder, 291 U.S. at 110-13.**

Although the Petitioner makes a blanket allegation that he was prejudiced by his absence, the record shows no prejudice. **Id. (a fair and just trial was not thwarted by his absence); accord, United States v. Banks, 213 F. App'x 155, 158 (4th Cir.) ("To begin with, there is no absolute constitutional right for a criminal defendant to be present during a jury view of a crime scene."), cert. denied, 127 S. Ct. 3073 (2007); Rogers, 64 F. App'x at 453-54; Green v. Johnson, 116 F.3d 1115, 1124 (5th Cir. 1997).** Prior to the jury view, the jurors heard the testimony of the hunter who discovered the victim's body, including his detailed explanations concerning the position of the body. **Trial Transcript, Vol. III, supra, 694-99**. Likewise, the crime scene investigator testified at length concerning the locations of the body and the pornographic magazine. **Trial Transcript, Vol. IV, supra, at 732-47**. And, another investigator during testimony explained the location of the expended shell casing. **Id. at 787-88**. Habeas counsel do not allege that any comments

made during the jury view contradicted the testimony of these witnesses or

confused the jury. *Banks*, 213 F. App'x at 158.

> Finally, any error in the way that a jury view is conducted is
> subject to harmless error review. Here, the trial court mitigated
> any possibility of prejudice to the defendant. To begin with, the
> trial judge himself conducted the view. The view itself was
> nonprejudicial; the judge . . . pointed out . . . [three] previously
> determined sites. Finally, defense counsel was given the
> opportunity to participate in the view, to walk through each
> portion of the view with the jurors, and to point out other sites
> that the defendant wished identified.

*Id*. at 158-59; *United States v. Williams*, 2 F. App'x 321 (4th Cir. 2001).

"The lesson of *Snyder* is that, if in any given case the exclusion of the

defendant from a jury view is found to be a deprivation of due process, it is

not because the Constitution guarantees the defendant an absolute right to

be present; it is only because his absence, under the particular

circumstances of his case, can be said to have denied him a fair

proceeding." *Devin v. DeTella*, 101 F.3d 1206, 1208 (7th Cir. 1996). Such

is not the case here.

**4.      The federal death penalty statute is unconstitutional in light
of *Ring v. Arizona*, 536 U.S. 584 (2002).**

In this claim, habeas counsel argue that the Federal Death Penalty

Act (FDPA), 18 U.S.C. §§ 3591, *et seq.*, is unconstitutional because it does

not require the statutory aggravating factors in support of a death penalty to be alleged in the bill of indictment. Thus, they argue, the statute violates the tenets set forth in the Supreme Court's decision in *Ring*. In addition, habeas counsel claim the statute is unconstitutional because evidence presented during the sentencing hearing need not conform to the Federal Rules of Evidence, that is, hearsay evidence is admissible during a sentencing hearing.

On appeal, the Petitioner argued the indictment was defective pursuant to *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring*, because it did not allege the aggravating factors, which are essential elements, necessary to the imposition of the death penalty. ***Jackson*, 327 F.3d at 281-82.** The Petitioner's argument on appeal was two-fold: 1) the undersigned erred when it found that the indictment did in fact allege two statutory aggravating factors as essential elements; and 2) the indictment was defective because it did not allege all of the statutory aggravating factors as essential elements. In ruling on this issue, the appellate court found:

> [T]o impose the death sentence on Jackson in this case, the indictment must allege all elements of an aggravated offense, and because at least one aggravating factor is necessary to

charge such an offense, the indictment must allege that at least one aggravating factor exists.

. . .

The district court, finding the allegation of at least two statutory aggravating factors [in the indictment], denied Jackson's motion [to dismiss the indictment]. And insofar as Jackson appeals the denial of that motion, affirmance is required.

. . .

On appeal, Jackson also makes a new argument in light of the Supreme Court's decision in *Ring*, contending that "[b]ecause the totality of the aggravating factors increase the authorized punishment for Jackson, *all* of the aggravating factors must be raised in the indictment.

. . .

In this case, because the applicable statute requires that at least one aggravating factor be found to justify imposition of the death penalty, 18 U.S.C. § 3593(d), at least one must be alleged [in the indictment] to charge the aggravated crime for which the death penalty is authorized. . . . And thus, only if the aggravated crime is charged may the jury also consider the sentence of death. In this case, the indictment did allege at least one aggravating factor so that the indictment charged an aggravated crime, and therefore, on conviction, the "heaviest punishment" of death could be, but need not be, imposed. . . . [W]hether to impose the death penalty becomes the product of the sentencing factfinding prescribed by 18 U.S.C. § 3593. . . . Accordingly, this new argument raised for the first time on appeal must be rejected.

*Id.* at 287-89.

While the Petitioner argued on direct appeal that the indictment was

defective, he did not claim that the FDPA itself was unconstitutional

because it does not require that the indictment charge the aggravating

factors.[89]  The Petitioner's second argument concerning a relaxed evidentiary standard was also not raised on direct appeal.  Because the Petitioner did not raise either of these attacks on the constitutionality of the statute on direct appeal, his claims are procedurally defaulted.  ***Massaro***, **538 U.S. at 504;** ***Bousley***, **523 U.S. at 622;** ***Weaver***, **438 F.3d at 838;** ***Scuba v. Brigano***, **527 F.3d 479 (6th Cir. 2007) (constitutional claims procedurally defaulted),** ***cert. denied***, **129 S. Ct. 269 (2008);** ***Carney v. Fabian***, **487 F.3d 1094 (8th Cir.),** ***cert. denied***, **128 S. Ct. 721 (2007).**  And, he makes no argument, much less a  showing, that cause and prejudice for the default exists or that he is actually innocent.  ***Bousley***, **523 U.S. at 622**.  "'Section 2255 motions are not available to test the legality of matters which should have been raised on direct appeal.'"  ***United States v. Moore***, **172 F. App'x 877, 881 (10th Cir. 2006) (quoting** ***United States v. Warner***, **23 F.3d 287, 291 (10th Cir. 1994)).**

---

[89] The caption of the Petitioner's argument concerning the constitutionality of the FDPA states that the statute does not require a finding of mental intent as an element of the offense.  However, Petitioner's briefs do not include argument as to this issue.  The issue is, therefore, abandoned for purposes of review.  ***Spaulding v. Smith***, **996 F.2d 1217 (table), 1993 WL 210699, at *1 (6th Cir. 1993) (citing** ***McMurphy v. City of Flushing***, **80 F.2d 191, 198-99 (6th Cir. 1986)).**  It is noted, however, that the wording of 18 U.S.C. § 3591 explicitly makes intent an element of the aggravated crime.

Moreover, even if the merits of the argument are considered, the Petitioner is entitled to no relief. In the most recent decision found considering these precise issues, the Seventh Circuit has held:

> According to [the Petitioner], the [FDPA], is unconstitutional because it violates the Indictment Clause of the fifth amendment (the Attorney General, not a grand jury, determines whether to seek capital punishment for a qualifying offense, and the statute does not require aggravating factors to be included in an indictment), because failure to apply the Federal Rules of Evidence and use of hearsay in sentencing violate the due process clause, and because the statutory aggravating factors are incomprehensible. These three arguments against the statute have been made in this circuit, and in others, to no avail.
>
> . . .
>
> [Considering first the issue of evidentiary standards during the penalty phase,] [t]he Supreme Court held in *Williams v. New York*, 337 U.S. 241 [ ] (1949), that the Constitution does not require application of the rules of evidence in capital sentencing, and in all the ferment about capital punishment in the years since then the Court has never suggested any inclination to overrule *Williams*. The vagueness argument has been made and rejected in *United States v. Webster*, 162 F.3d 308, 354 (5th Cir. 1998), among others. After *Jones v. United States*, 527 U.S. 373 [ ] (1999), rejected a functionally identical vagueness challenge, there is no room for maneuver.
>
> . . .
>
> *Walton v. Arizona*, 497 U.S. 639 [ ] (1990), held that aggravating factors that make a person eligible for capital punishment are sentencing considerations that need not be alleged in an indictment. The [FDPA], enacted in 1994, assumed that *Walton* [was] correct and does not require aggravating factors to appear in the indictment. But in 2002 the Supreme Court overruled *Walton* and held that aggravating factors that make a crime death-eligible (though not those used in a later balancing procedure) must be charged in the indictment. See, *Ring,* [536

U.S. 584], a decision much influenced by *Apprendi,* [530 U.S. 466]. The indictment of [the Petitioner] contains [at least two] aggravating factors. All requirements of *Ring* and *Apprendi* have been satisfied.

Nonetheless, [the Petitioner] insists that the statute must be declared unconstitutional because *it* does not demand that the grand jury find the aggravating factors. He then contends that the statute is not severable, so that to find one constitutional flaw is to knock out the basis of all capital punishment. The argument goes wrong at the first step (and [the undersigned] need not decide whether the severability step is wrong as well), because *Ring* does not hold or imply that any part of the [FDPA] is unconstitutional.[90]

*Ring* does say that the Constitution demands that certain things be in an indictment if a capital sentence is to be valid, but the federal statute does not *forbid* aggravating factors in an indictment. It is silent on whether they are included. If the indictment complies with *Ring*, no constitutional error occurs. There is nothing to sever. As long as a defendant's rights under *Ring* are honored (as [the Petitioner's] were), it is a matter of indifference whether the rights were honored as a matter of statutory command or prosecutorial precaution. . . . Putting in the indictment more than the statutory floor does not imply that any law is unconstitutional.

Just so with the [FDPA]. Title 18 says *what* must be proved, and sometimes it says how; other sources, including the Constitution, the Federal Rules of Criminal Procedure, and the common law, add details about which tasks fall to prosecutors, judges, grand juries, and petit juries. That one source of law is silent on a procedural issue, such as what an indictment must contain, just leaves it to another source.

---

[90] This holding disposes of the Petitioner's argument concerning constitutional avoidance.

***United States v. Mikos*, 539 F.3d 706, 714-16 (7th Cir. 2008) (footnote added) (other citations omitted).**

Other circuits considering the same or similar "multi-faceted" attacks on the federal statute have reached virtually identical conclusions.  ***See, e.g., Fell*, 531 F.3d at 236-37 (the government must charge statutory aggravating factor in the indictment; non-statutory aggravating factors need not be charged; FDPA constitutional); *United States v. Sampson*, 486 F.3d 13, 21 (1st Cir. 2007) ("Sampson contends both that there is a conflict between the FDPA and *Ring*, and that curing the problem would require the rewriting of the statute, which is a legislative function. . . . The courts that have considered this thesis uniformly have rejected it." (citing *United States v. Barnette*, 390 F.3d 775, 788-90 (4th Cir. 2004), *vacated on other grounds*, 546 U.S. 803 [ ] (2005)), *cert. denied*, 128 S. Ct. 2424 (2008); *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005); *United States v. Robinson*, 367 F.3d 278 (5th Cir. 2004); *Williams*, 337 U.S. at 252 (relaxed evidentiary standard during sentencing phase of capital trial does not violate due process); *United States v. Fulks*, 454 F.3d 410, 437 (4th Cir. 2006) (FDPA is not unconstitutional because it withholds the protections of the federal**

rules of evidence), *cert. denied*, 127 S. Ct. 3002 (2007); *United States v. Lee*, 374 F.3d 637 (8th Cir. 2004) (FDPA is not unconstitutional because it allows for the introduction of evidence during the penalty phase which is less reliable); *accord*, *United States v. Fell*, 360 F.3d 135 (2d Cir. 2004) (FDPA does not violate due process or confrontation clause); *United States v. Jones*, 132 F.3d 232 (5th Cir. 1998) (evidentiary standard does not violate the Eighth Amendment).

The Court does not reach the issue of the retroactive application of *Ring* because the indictment in this case charged at least one statutory aggravating factor. Thus, *Ring* was not abridged. In any event, *Ring*, which announced a procedural rule, would not apply retroactively to a case on collateral review. *Schriro v. Summerlin*, 542 U.S. 348 (2004); *Walker v. True*, 399 F.3d 315, 325 (4th Cir. 2005); *McNeill v. Branker*, 601 F. Supp. 2d. 694, 722 (E.D.N.C. 2009).

**5.    The failure to trifurcate the Petitioner's proceedings under the FDPA violated his constitutional rights.**

Habeas counsel argue that pursuant to *Ring*, trials in capital cases must proceed in the following fashion: (1) the jury must determine whether

the defendant committed the essential elements of the statutory offense which triggers the death penalty; (2) during a second phase, the jury must determine whether the defendant committed the offense with the requisite mental intent and whether the offense involved at least one of the statutory aggravating factors;[91] and (3) during a third phase, the jury must determine whether the aggravating factors are outweighed by the mitigating factors.

The Petitioner did not move for a bifurcated, let alone a trifurcated, trial before the undersigned.  Nor did he raise this claim on direct appeal. Habeas counsel do not argue that the claim is not procedurally defaulted; they do not argue that there is cause and actual prejudice for any such default; and they do not argue actual innocence.  Thus, the Court finds the claim procedurally defaulted.  **Massaro, 538 U.S. at 504**; **Bousley, 523 U.S. at 622; Booth-El v. Nuth, 140 F. Supp. 2d 495, 509 (D. Md. 2001) (noting that petitioner sufficiently raised claim of bifurcation on direct appeal to warrant habeas review), aff'd in part, rev'd in part on other grounds, 288 F.3d 571 (4th Cir. 2002); Spaulding, 1993 WL 210699, at *1 (habeas petitioner procedurally defaulted claim for bifurcated trial).**

---

[91] The Court reads this as a concession that the argument made by habeas counsel that the indictment must charge every statutory aggravating factor is spurious.

> [T]he FDPA contemplates a single penalty phase hearing at which all relevant evidence is admitted and, if the defendant is found eligible for the death penalty, ultimately weighed by the jury. A number of district courts have nonetheless granted pre-hearing motions to bifurcate the penalty phase (or, as some have phrased it, "trifurcate" the entire trial) into an "eligibility phase," limited to evidence relevant to mental state and to the existence of one or more statutory aggravating factors, and, if the defendant is found eligible, a "selection phase," at which evidence relevant to mitigating factors and non-statutory aggravating factors such as victim impact and other crimes is received and weighed by the jury.

**Bolden**, 545 F.3d at 618.

The FDPA requires "a separate sentencing hearing," that is, a separate guilt phase from the sentencing phase. **18 U.S.C. § 3593.** The fact that a court may further separate the sentencing phase in its discretion does not provide a right to any such procedure. The FDPA does not preclude a court from making such a procedural division, but it is not unconstitutional in failing to so require it.

> [I]n the proceedings below, [the Petitioner] did not request trifurcation or any other modification of the penalty procedure. Instead, he now claims that the FDPA [as applied in his case] is unconstitutional because it does not allow for trifurcation. [There is] no support for his novel theory. While the FDPA speaks of "a separate sentencing hearing" after which the jury makes both the eligibility decision and the selection decision, the central point of the phrase is that the sentencing decision should be separated from the guilt phase – not that the sentencing phase must necessarily take place during one uninterrupted hearing.

***Fell***, 531 F.3d at 240 (citing 18 U.S.C. § 3593(b) - (e)).

Thus, the statute itself is not unconstitutional in its failure to require such a proceeding. Nor is the Petitioner able to establish that his constitutional rights were violated by the trial court's failure to modify the structure of the sentencing phase when he made no such request at trial. In any event, there is no constitutional requirement for the trifurcated or bifurcated procedure now urged as opposed to the separate guilt and sentencing phases used. ***See, e.g., Gregg v. Georgia***, **428 U.S. at 191-92; *Booth-El*, 288 F.3d at 582-83 (rejecting state prisoner's claim that his due process rights were violated when the trial judge refused to bifurcate the penalty phase as argued here); *United States v. Fell*, 372 F. Supp. 2d 753 (D. Vt. 2005); *United States v. Johnson*, 362 F. Supp. 2d 1043 (N.D. Iowa 2005), *aff'd*, 495 F.3d 951 (8th Cir. 2007); *cert. denied,* 129 S. Ct. 756 (2008); *Evans v. Smith*, 54 F. Supp. 2d 503, 531 (D. Md. 1999), *aff'd,* 220 F.3d 306 (4th Cir. 2000).**

**6.      The Petitioner's demand for exculpatory evidence.**

Habeas counsel make a blanket demand for exculpatory evidence which "includes, but is not limited to[:]" (1) materials related to the

Government's use of testimony from other inmates; (2) exculpatory ballistics evidence; and (3) the supplemental report and/or findings of Dr. Park Deitz related to the Petitioner's evaluation.

As discussed in earlier portions of this decision, the issue of inmate witnesses was explored at length during the trial. Trial counsel requested and received information from the Government and attorneys appointed to represent those witnesses. In addition, subpoenas were issued at the request of trial counsel. To the extent that the Petitioner's request now speculates that there is exculpatory evidence which the prosecutor or the Government failed to turn over, "he cannot conduct a 'fishing expedition' to find something that may support further relief under 28 U.S.C. § 2255." **United States v. Clark, 283 F. App'x 207, 208 (5th Cir. 2008); United States v. Robinson, 152 F.3d 931 (table), 1998 WL 382829 (9th Cir. 1998) ("prisoners are not allowed to use federal discovery for fishing expeditions" (citing Calderon v. United States Dist. Court for the Northern Dist. of California, 98 F.3d 1101, 1106 (9th Cir. 1996)).**

As for the purported exculpatory ballistics evidence, an extensive quote is contained within this decision showing that in March 2001 trial counsel received ballistics reports and information from the Government.

**See also, Order Re: Admissibility of the Testimony of Steve Casper, filed May 11, 2001.**

Concerning Dr. Dietz, as the record and discussion herein show, the parties agreed to disclose his report to trial counsel; the report was disclosed and trial counsel reviewed the videotapes of the evaluation. **See, e.g., Government's Sealed Notice to Court and Defendant Concerning Mental Health Examination, filed May 3, 2001; Consent Order Concerning Mental Health Experts, filed May 3, 2001.** Habeas counsel now request the "supplemental report and/or findings" of Dr. Dietz without asserting that such documents exist. To vaguely assert that such evidence may exist, presumably in an effort to raise an issue for appeal, is insufficient to state an issue here.

The Government has acknowledged its continuing duty to comply with *Brady v. Maryland*, 373 U.S. 83 (1963), has asserted that it has complied, and has agreed to continue that compliance. In fact, habeas counsel do not allege that the Government has failed in its continuing duty, nor do they set forth specific allegations which would demonstrate entitlement to relief. **United States v. Roane, 378 F.3d 382, 403 (4th Cir. 2004).** To the extent that this "demand" may be characterized as a claim, it is denied.

**7.    The Petitioner's constitutional rights were violated by juror misconduct.**

In support of this request, habeas counsel allege:

[The Petitioner] hereby pleads *any potential* misconduct *by any juror* or any claim related to juror bias and/or unlawful extraneous information that was brought to the jurors' attention. *At this time, [the Petitioner] does not have the factual basis to support those claims*[.]

**Petitioner's Motion, *supra*, at 179 (emphasis added).**  This assertion is another attempt to engage in a "fishing expedition" in the hopes of uncovering some issue.  There is no allegation that any juror was, in fact, involved in misconduct, subject to bias, or exposed to extraneous information.  The claim that there is a *possibility* of some *undefined* problem is "so speculative as to be insufficient to survive summary dismissal."  ***Roane*, 378 F.3d at 404 (quotation omitted).**

In Petitioner's supplement to the motion, habeas counsel claim that information recently disclosed shows that there "were general discussions in the community that another person participated in these crimes."  **Petitioner's Supplemental Memorandum, *supra*, at 79.**  Based on these "general discussions," habeas counsel speculate that the jurors *may have been exposed to those discussions which may have impacted their deliberations*.  ***Id*.**  However, any alleged discussions that tended to show

someone else committed the crime here would have dictated against a guilty verdict.  Moreover, throughout the trial, the undersigned gave cautionary instructions to the jury concerning any outside influences, "repeatedly reminding the jurors to avoid such external sources of information."  ***Roane*, 378 F.3d at 404**.  The Petitioner has provided nothing more than rank speculation that any juror was exposed to such "discussions" or that any juror failed to abide by the instructions of the undersigned.[92]

> "Requests to impeach jury verdicts by post-trial contact with jurors are disfavored."  Before proceeding down the path of impeaching a jury verdict, a § 2255 movant must make a threshold showing of improper outside influence.  In this instance, . . . no such showing has been made.  Put simply, [the Petitioner has] failed to proffer any evidence that the jurors engaged in misconduct or that they were improperly exposed to outside influences.

***Id.* (quoting *United States v. Gravely*, 840 F.2d 1156, 1159 (4th Cir. 1988)).**

Habeas counsel also assert that "statistical information indicates federal jurors tend to discriminate against white males who commit violent

_____

[92] Moreover, for reasons set forth in the sealed decisions of the undersigned, entered June 16, 2006, July 28, 2006, and August 15, 2006, the Court finds this assertion is merely another attempt to obtain futile discovery.

crimes and impose the death penalty disproportionately against them."

**Petitioner's Supplemental Memorandum,** *supra,* **at 79.**  As a result,

habeas counsel claim the entitlement to interview jurors.  This blanket

allegation is insufficient to warrant discovery.  ***Roane,* 378 F.3d at 404.**

Moreover, as discussed later, this so-called "claim" is not actually an issue

properly before the Court on a § 2255 motion.  It is merely an

unsubstantiated and procedurally improper request for discovery.  There is

no evidence of juror misconduct and the Court, therefore, rejects this claim.


### 8.      The conviction and sentence violate double jeopardy.

The Fourth Circuit considered and denied the Petitioner's argument

on direct appeal that his conviction and sentence violated double jeopardy.

***Jackson,* 327 F.3d at 295.**  Claims that have been raised and disposed of

on direct appeal may not be raised in the context of a motion pursuant to §

2255 absent circumstances not alleged or shown here.  ***Davis,* 406 F.3d at**

**511;** ***Boeckenhaupt,* 537 F.2d at 1183.**

**9.    The execution of the Petitioner's sentence will constitute cruel and unusual punishment.**

Section 3596(a) provides in pertinent part:

A person who has been sentenced to death pursuant to this [statute] shall be committed to the custody of the Attorney General until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence.  When the sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed.

**18 U.S.C. § 3596(a).**

The Petitioner states, without citation to any authority, that the State of North Carolina executes death sentences by lethal injection.

**Petitioner's Motion,** *supra***, at 182.**  Habeas counsel argue that death by lethal injection constitutes cruel and unusual punishment.  *Id***. at 183.**

The Government notes that this Court lacks jurisdiction to entertain a challenge to the manner of the execution of the Petitioner's sentence of death, claiming any such attack must occur, when ripe, in the district in which he is confined through a habeas proceeding or a civil action.

**Government's Response,** *supra***, at 167-68.**  Habeas counsel acknowledge that "an action under 42 U.S.C. § 1983 may be the most appropriate vehicle to challenge the method of execution[.]"  **Petitioner's**

**Motion,** *supra.* "Moreover, this claim, like a challenge to a defendant's competency to be executed, may be preserved by raising it [in] an initial post-conviction motion, while deferring resolution to another time." *Id*.

Thus, both sides agree this issue is not properly before the Court. A motion pursuant to § 2255 is not the appropriate procedural mechanism for placing this issue before a court. The appropriate procedural vehicle to attack the medical procedures incident to the execution or implementation of a sentence of death by lethal injection and the chemical formula used therein, the crux of the Petitioner's claim, lies elsewhere than a motion pursuant to § 2255. *See, e.g., Emmett v. Johnson*, **128 S. Ct. 2998 (2008) (42 U.S.C. § 1983);** *Baze v. Rees*, **128 S. Ct. 1520 (2008) (declaratory judgment action);** *Hill v. McDonough*, **547 U.S. 573 (2006) (death row inmate could proceed via § 1983 and was not limited to habeas relief pursuant to § 2254);** *Brown v. Beck*, **445 F.3d 752 (4th Cir. 2006).** A motion made pursuant to § 2255, by its terms, provides a means to challenge the constitutionality of the Petitioner's conviction and sentence of death as opposed to the means of carrying out that sentence. *Emmett v. Johnson*, **532 F.3d 291 (4th Cir. 2008).**

Moreover, the parties agree that this claim is premature; therefore, it will be dismissed as such.

### 10. The death penalty constitutes cruel and unusual punishment due to the Petitioner's mental health.

As discussed at length in this opinion, the Petitioner elected not to place his mental condition before the jury at either the guilt or sentencing phases of the trial. Thus, the issue of his mental health, as opposed to intent, was not presented at trial or on direct appeal. Habeas counsel do not argue that there was any error in his conviction or sentence based on his mental health. They argue instead that he should not be subjected to the death sentence because of a current "serious mental illness which has a heavy biological component." **Petitioner's Motion, *supra*, at 183.** Thus, the execution and implementation of the death sentence would constitute cruel and unusual punishment. Nothing more is alleged.

This claim is not an attack on his conviction or sentence. There is no allegation that his trial and conviction were unconstitutional due to his purported mental illness.[93] The only claim is that the implementation of

---

[93] The Court acknowledges that the Petitioner did raise claims that his counsel were ineffective for failing to place evidence of his mental

lethal injection will be unconstitutional due to his current undisclosed, allegedly serious mental illness. To the extent the Petitioner has attempted to state a claim pursuant to § 2255, he has failed. **Roane, 378 F.3d at 400.**

To the extent that the Petitioner alleges that death by lethal injection would constitute cruel and unusual punishment on the basis of his current mental condition, both parties concede that this issue is not ripe for review. **Petitioner's Motion,** *supra* **("Moreover, this claim, like a challenge to a defendant's competency to be executed, may be preserved by raising it [in] an initial post-conviction motion, while deferring resolution to another time."); Government's Response,** *supra***, at 173 ("A challenge to a condemned inmate's competence for execution remains premature until execution is imminent.").** The Court agrees and this claim will be dismissed as premature as well, without prejudice to the Petitioner's right to seek habeas relief in the appropriate court at the appropriate time. **See, e.g., Stewart v. Martinez-Villareal, 523 U.S. 637 (1998); Swann v. Taylor, 173 F.3d 425 (table), 1999 WL 92435 (4ᵗʰ Cir. 1999).**

---

illness before the jury. That is a separate claim previously addressed.

**11. Imposition of the death sentence violates the Fifth and Eighth Amendments because the Petitioner was unlawfully selected for the death penalty on the basis of race and gender of the victim.**

The Petitioner claims, based on statistical evidence purportedly maintained by the Federal Death Penalty Resource Project Counsel that a defendant who kills a Caucasian female is more likely to face the death penalty.  The Petitioner did not raise any such claim at trial or on direct appeal.  As a result, it is procedurally defaulted.[94]  ***Brown v. United States*, 583 F. Supp. 2d 1330 (S.D. Ga. 2008) (noting petitioner had procedurally defaulted discrimination-based claims against the death penalty and FDPA); *Lenz v. True*, 370 F. Supp. 2d 446 (W.D. Va. 2005) (procedurally defaulting such claims).**

---

[94] Nor would he be entitled to relief in any event.  Statistical information alone is insufficient to prove the types of claims raised. ***McCleskey v. Kemp*, 481 U.S. 279, 309 (1987);  *Sampson*, 486 F.3d at 25-28; *Smith v. Dugger*, 840 F.2d 787 (11th Cir. 1988); *Roach v. Martin*, 757 F.2d 1463, 1481 (4th Cir. 1985); *United States v. Taylor*, 2008 WL 217115, at \*5-6 (E.D. Tenn. 2008); *Yarbrough v. Johnson*, 490 F. Supp. 2d 694 (E.D. Va. 2007), *aff'd*, 520 F.3d 329 (4th Cir.), *cert. denied*, 128 S. Ct. 2993 (2008).**

**12.    The reassertion of claims raised on direct appeal.**

Habeas counsel attempt to reassert claims raised and disposed of on direct appeal.  Those claims are rejected.  *Boeckenhaupt*, **537 F.2d at 1183**.

**13.    The Petitioner's conviction and sentence should be set aside based on newly discovered evidence.**

The Petitioner's amendments to the § 2255 motion seek a new trial on the basis of newly discovered evidence.[95]  The claims made concerning that alleged evidence are the subject of a sealed decision rendered by the undersigned on June 16, 2006.  *See* **Sealed Order, filed June 16, 2006.** It is first noted that habeas counsel argue variously that a new trial is warranted pursuant to Federal Rule of Criminal Procedure 33 and also pursuant to § 2255, although the basis for relief pursuant to § 2255 is not specified.  In order to obtain a new trial pursuant to Rule 33 based on newly discovered evidence, which is the only ground raised by the Petitioner, a defendant must show (1) the evidence is, in fact, newly discovered; (2) the

_____

[95] The Government argues that the second amendment should not relate back to the time of the original filing.  The undersigned declines to reach the issue of relation back.  Instead, even considering the second amendment, the Petitioner is not entitled to any relief.

defendant used due diligence in discovering the evidence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence would result in an acquittal at trial.  **United States v. Lofton, 233 F.3d 313, 318 (4ᵗʰ Cir. 2000).**  Unless a defendant demonstrates all five of these factors, the motion should be denied.  **United States v. Smith, 2008 WL 5071072, at \*3 (4ᵗʰ Cir. 2008) (citing United States v. Chavis, 880 F.2d 788, 793 (4ᵗʰ Cir. 1989)).**

Evidence is not newly discovered if it is known to the defendant. **United States v. Munoz, 957 F.2d 171, 173 (5ᵗʰ Cir. 1992).**  "Indeed, according to [the Petitioner's] version of the events, [Lunsford] was responsible for the criminal activity.  Because [the Petitioner] knew of [Lunsford's] guilt, he cannot pass even the first step of the newly discovered evidence test.  Even if he could clear the first hurdle, his failure to call [Lunsford] at trial establishes a lack of diligence on his part."  **Id.; see also, Sealed Order, filed June 16, 2006, supra.**  The Petitioner, therefore, does not meet the test for a new trial.

Although habeas counsel argue that the evidence was discovered by them only after the Government provided the information from the FBI, they cannot avoid the fact that the Petitioner himself would have known at the

time of trial that he had an accomplice, if such were indeed the case.

***United States v. Theodosopoulos***, **48 F.3d 1438, 1448 (7th Cir. 1995);**

***United States v. Jaramillo***, **42 F.3d 920, 925 (5th Cir. 1995) (evidence is**

**not newly discovered if the defendant was in possession of it but did**

**not realize its importance).**  In fact, after multiple, detailed and specific

confessions, it is beyond contemplation that the Petitioner would diligently

have failed to identify another individual involved in this crime or also to

confess that the crime did not occur within the Pisgah National Forest.  *Id.*

It is only common sense that a defendant would reveal to his attorneys such

evidence and the failure to do so dictates against a finding that it is truly

new.  ***United States v. Castillo***, **171 F.3d 1163 (8th Cir. 1999).**  The

evidence of Lunsford's drunken bravado is like that of a witness's

recantation.  "'[R]ecanting affidavits and witnesses are viewed with extreme

suspicion by the courts.'"  ***United States v. Gresham***, **118 F.3d 258, 267**

**(5th Cir. 1997) (quoting *Spence v. Johnson*, 80 F.3d 989, 1003 (5th Cir.**

**1996)).**

    The same reasoning applies to the so-called "new evidence" that a

ballistics expert now opines that the firearm introduced into evidence was

not the actual murder weapon.  The Petitioner received a court-appointed

ballistics expert at the time of trial who provided expert advice to trial counsel. There is no reason why the so-called "new evidence" could not have been produced with diligence at that time.

The undersigned has previously addressed in its 2006 decision the infirmities of the so-called new evidence, including its lack of admissibility and reliability. ***See* Sealed Order, filed June 16, 2006, *supra*.** Assuming *arguendo* that the memories of the two individuals could in some manner be restored, their reports remain hearsay. Although provided with a private investigator for a period of months, the Petitioner never located Lunsford. But even if the Petitioner were able to surmount all of these infirmities, he cannot show that the evidence is of such a nature that it would most likely produce an acquittal at a new trial. Habeas counsel argue this so-called evidence shows the Petitioner and Lunsford kidnaped the victim from Pisgah National Forest, took her to Asheville, kept her there, killed her there, and then presumably returned her body to the national forest. Assuming *arguendo* that this were true, federal jurisdiction remains. Habeas counsel do not dispute that the kidnaping occurred on federal land. Therefore, it is not a jurisdictional requirement that the murder have occurred on federal land; the federal government had continuing jurisdiction

because the kidnaping occurred on federal land. ***United States v. Young***, **248 F.3d 260, 274-75 (4th Cir. 2001) ("Thus, we reject Young's argument that his conviction under section 924(j) required proof that he murdered Diana 'within the special . . . territorial jurisdiction of the United States' because the jurisdictional element of a section 924(j) violation in this case was already satisfied through the predicate offense[] of . . . kidnapping[.]").**

To the extent that habeas counsel recast their grounds for relief in the guise of § 2255, they fare no better. The Petitioner has never alleged that he is actually innocent of the crime. In fact, despite two affidavits submitted by the Petitioner in support of this motion, he has not made any averment regarding this purported new evidence of where and when the murder occurred. His argument is limited to a claim that his conviction and sentence are constitutionally invalid. The purported new evidence does not support that proposition.

### 14.   Cumulative error.

[The Petitioner's] penultimate claim is that the errors of which he complains, even if not mandating reversal when considered separately, collectively require that his sentence be vacated. . . .

> [T]he legal premise on which this arguments rests [is that] "a column of errors may sometimes have a logarithmic effect, producing a total impact greater than the arithmetic sum of its constituent parts."

*Sampson*, 486 F.3d at 51 (quoting *United States v. Sepulveda*, 15 F.3d 1161, 1196 (1st Cir. 1993)).  The Court has exhaustively reviewed and considered each claim raised herein and has not found a single instance in which the Petitioner's rights have been violated.  "It necessarily follows that the cumulative error doctrine finds no foothold in this [case]."  *Id*.

Moreover, to the extent that a claim has not been specifically discussed, it was nonetheless reviewed, considered and rejected as not warranting relief.

## V.  ORDER

**IT IS, THEREFORE, ORDERED** that the Petitioner's Motion to Vacate pursuant to 28 U.S.C. § 2255, filed November 16, 2004, his Amendment to Motion to Vacate, filed April 28, 2005, and his Second Amendment to Motion to Vacate, filed July 17, 2006, are hereby **DENIED.**

A Judgment is filed contemporaneously herewith.

251

Signed: June 19, 2009

Lacy H. Thornburg
United States District Judge